# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

RICHLAND/WILKIN JOINT POWERS
AUTHORITY, *a Minnesota-North
Dakota Joint Powers Authority*,

Civil No. 13-2262 (JRT/LIB)

Plaintiff,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS, JOHN MCHUGH, JO-
ELLEN DARCY, and COL. DAN
KOPROSWKI,

**MEMORANDUM OPINION AND
ORDER GRANTING DEFENDANTS'
MOTION FOR PRELIMINARY
INJUNCTION**

Defendants,

and

FARGO-MOORHEAD FLOOD
DIVERSION BOARD OF AUTHORITY,

Intervenor Defendant.

---

Gerald W. Von Korff, **RINKE NOONAN**, Post Office Box 1497, St. Cloud, MN 56302, for plaintiff.

Carol Lee Draper, **UNITED STATES DEPARTMENT OF JUSTICE**, 601 D Street N.W., Room 3106, Washington, D.C. 20579, and Friedrich A. P. Siekert, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendants United States Army Corps of Engineers, John McHugh, Jo-Ellen Darcy, and Colonel Dan Koprowski.

Robert E. Cattanach, Michael R. Drysdale, Theresa M. Bevilacqua, and Kurt G. Whitman, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402 for Intervenor Defendant Fargo-Moorhead Flood Diversion Board of Authority.

Nathan J. Hartshorn, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1800,

St. Paul, MN 55101, for proposed amicus curiae Minnesota Department of Natural Resources.

The Joint Powers Authority of Richland County, North Dakota, and Wilkin County, Minnesota ("Joint Powers") brought this action against the United States Army Corps of Engineers ("the Corps") and various individuals, alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. The Joint Powers is an organization that was formed to represent the interests of Richland and Wilkin Counties with regard to flood prevention measures. Defendant the Corps is the federal entity involved in the development of a flood prevention project on the Red River in response to flooding in Fargo, North Dakota, Moorhead, Minnesota, and surrounding areas, most recently in 2009. The Chief of the Corps is responsible for submitting a report with a flood prevention proposal for ultimate approval by Congress. In its complaint, filed in August 2013, the Joint Powers alleges that the Corps' proposed plan, which involves diverting flood waters (the "diversion project"), and the Chief's report are and were flawed and arbitrary and capricious in violation of NEPA and the APA. In November 2013, the Fargo-Moorhead Flood Diversion Board of Authority ("Diversion Authority"), which is the local entity developing and managing the diversion project, was granted leave to intervene.

Part of the diversion project involves ring levees around three communities in Cass County, North Dakota, and construction was scheduled to commence in June 2014 on the Oxbow, Hickson, and Bakke ring levees ("OHB ring levees"). On June 13, 2014,

the Joint Powers filed a proceeding in Wilkin County District Court against the Diversion Authority (but not the Corps) seeking to enjoin the construction of the OHB ring levees on the ground that the diversion project has not yet been approved through the State of Minnesota's environmental review process.  The Diversion Authority now moves for a preliminary injunction order enjoining the Joint Powers from continuing to pursue this separate state court action.  Defendants argue that the state court action seeks the same relief the Joint Powers seeks in this action – putting a stop to the diversion project.

The Court will grant the Diversion Authority's motion for a preliminary injunction, concluding that the Joint Powers seeks essentially the same relief – requiring the same legal determinations – in the Wilkin County action as it seeks here.  The Joint Powers is not foreclosed from seeking the relief or bringing the claims it has in the Wilkin County action, but rather is welcome to seek that relief in this action.

## BACKGROUND

### I.    DIVERSION PROJECT BACKGROUND

Fargo-Moorhead and the Red River Basin have been subject to severe flooding in recent years, particularly 2009.  As a result, several entities came together to consider possible solutions and alternate long-term plans for mitigating the flood risk in Fargo-Moorhead, including no action, non-structural measures, flood barriers (including levees), increased conveyance (including diversion channels), and flood storage.  (Decl. of Gerald Von Korff, Ex. A (Fargo-Moorhead Feasibility Report and Environmental

Impact Statement ("EIS Exec. Summ.")) at 4, July 15, 2014, Docket No. 71.)[1]   After analyzing the alternatives for effectiveness, environmental effects, social effects, implementability, cost, risk, separable mitigation, and cost effectiveness, the alternatives were narrowed down to two possibilities moving forward: a diversion in Minnesota and a diversion in North Dakota.  (EIS Exec. Summ. at 4.)  By May 2010, a draft of the Environmental Impact Statement ("Draft EIS" or "DEIS") had been completed, proposing three possible plans:  a National Economic Development plan ("NED"), which would have the capacity to divert 40,000 cubic feet of water per second on the Minnesota side, the Locally Preferred Plan ("LPP"), which would involve 35,000 on the North Dakota side, and the Federally Comparable Plan ("FCP"), which would involve 35,000 on the Minnesota side.  The cities of Fargo and Moorhead and counties of Clay and Cass jointly requested the LPP plan on March 29, 2010, and that plan's designation as the tentatively selected plan was approved by the Assistant Secretary of the Army for Civil Works on April 28, 2010.  (EIS Exec. Summ. at 4-6.)

The Draft EIS summarizing these plans was released for public review on June 11, 2010, and in September 2010, hydraulic modeling indicated that the LPP would have more extensive downstream impacts than previously anticipated, so additional analysis was undertaken to identify ways to minimize downstream impacts from the LPP.  (EIS Exec. Summ. at 7.)  The additional analysis led to a Supplemental Draft Feasibility Report and Environmental Impact Statement ("SDEIS"), which was released for public comment in April 2011.  (*Id.*)

---

[1] Unless otherwise noted, all page citations refer to CMECF pagination.

In July 2011, the Final Feasibility Report and Environmental Impact Statement ("Final EIS") was released, proposing a modified LPP, with additional features to minimize downstream impacts.  (*Id.*)[2]  Ultimately, the Final EIS stated that the Corps' local head engineer "has determined that the selected plan presented in this report [the LPP] is in the overall public interest and is technically sound, environmentally acceptable, and economically feasible," such that the Corps "recommends that the Locally Preferred Plan . . . be authorized for implementation as a federal project."[3]  (EIS Exec. Summ. at 19.)  At some point in 2013 the plan was amended to include the OHB ring levees in order to protect those communities from the intentional flooding resulting from the dam.  (*See* Mot. for Prelim. Inj., Ex. 1 (Compl. in Wilkin County Action ("Wilkin Cnty. Compl.")) ¶ 25, June 19, 2014, Docket No. 53.)

## II.   MINNESOTA'S CONCERNS WITH THE PROCESS

### A.   Coordination with State Environmental Review and Other Concerns

Part of the background of the instant dispute began with the Minnesota Department of Natural Resources ("MDNR") expressing concerns about the Corps' proposed plans.  MDNR sent a letter to the Corps on June 16, 2011 indicating that it did not believe that its concerns about ecological sustainability, need for a least-impact solution and mitigation of adverse effects, and consistency with regional and local

---

[2] The EIS Executive Summary includes summaries of the three plans, and a more detailed summary of the LPP, which is the plan tentatively selected by the report.  (EIS Exec. Summ. at 8-15.)

[3] The LPP had undergone some revisions in the supplemental drafting process, and now involves a 20,000 cubic feet per second diversion channel, with upstream staging and storage, and other features.  (EIS Exec. Summ. at 19.)

ordinances and standards had been thoroughly addressed, and observing that anticipating

these issues early on would facilitate the state environmental review process, which also

needed to be done in order for the project to proceed.  (Von Korff Decl., Ex. B at 2.)

The letter attached previous comments, including one noting that "[a]ll action

alternatives that are being carried forward in the SDEIS include construction of the high

hazard dam on the Red River that would need a dam safety permit from the MDNR," and

that "Minnesota Statutes related to environmental policy address how alternatives must

be considered for actions significantly affecting the environment," (*id.*, Ex. B at 3-4),

specifically referencing Minnesota Statute § 116D.04, subd. 6, which prohibits state

action "significantly affecting the quality of the environment . . . so long as there is a

feasible and prudent alternative . . . ."  Minn. Stat. § 116D.04, subd. 6.

The comments also included a section dedicated to the "State Environmental

Review and Permitting," which explained that under Minnesota rules, regulations, and a

recent executive order from the governor, "the only way to comply with [MN] law is to

have all permitting questions and issues resolved as part of the EIS process," meaning

that a final design report "must be submitted concurrently with the State environmental

review process."  (Von Korff Decl., Ex. B at 11.)  The commentary's conclusion warned

that "the DNR cannot issue a permit for an on-channel structure if a feasible alternative

with less potential for environmental impact is available that can provide acceptable flood

control benefits" and that "additional efforts are needed to demonstrate that projects are

ecologically sustainable, the least impact solution, adverse effects can and will be

mitigated, and the chosen project is consistent with other standards, ordinances, and resource plans of local and regional governments." (*Id.*, Ex. B. at 12.)

The record also includes August 6, 2010, January 14, 2010, and March 16, 2010 letters from the MDNR to the Corps raising a variety of concerns about the proposals, ranging from wildlife and invasive species issues and concerns about the impact of large diversions, to how the Corps will work with MDNR to coordinate the state environmental review process. (*Id.*, Ex. B at 15-38.) The Joint Powers has submitted portions of the SDEIS which summarize many of the comments it received, including those from the MDNR, and addresses those comments. (*Id.*, Ex. C.) With regard to the comments about the Minnesota State EIS Process, the SDEIS states:

> The Corps recognizes the need for a Minnesota State EIS for this project and has been coordinating with the Minnesota Department of Natural Resources and project sponsors for the development of this EIS. . . . During this coordination, the parties agreed to initiate the state process when the Final EIS was released to the public. The non-federal sponsors will work with the DNR to complete the State EIS and determine an appropriate course of action to address the state's 30-day deadline for issuance of permits following final approval of the environmental impact statement.

(*Id.*, Ex. C at 2 (citing Minn. Stat. § 116D.04, subd. 3a).)

## B.   OHB Ring Levees

MDNR also expressed concerns specifically with regard to the proposed OHB ring levees, which were not included as part of the original plan. In a letter dated January 14, 2014, from the MDNR to the co-chair of the Diversion Authority, the MDNR advised that the MDNR had "commenced the necessary environmental review for the Diversion Project," but that the final EIS would not be complete for another year, such that "it

would be unlawful for any Minnesota governmental unit or organization of which it is a member to commence work on a component of the Diversion Project." (Von Korff Decl., Ex. I at 1.) The letter cited Minnesota Rules § 4410.3100, which states that if an "EIS is required for a governmental action . . . a project may not be started and a final governmental decision may not be made to grant a permit, approve a project, or begin a project, until," among other things, "an EIS is determined adequate." Minn. R. § 4100.3100, subp. 1. It also states:

> If a project subject to review . . . is proposed to be carried out or sponsored by a governmental unit, the governmental unit shall not take any action with respect to the project, including the acquisition of property, **if the action will prejudice the ultimate decision on the project** . . . . An action prejudices the ultimate decision on a project if it tends to determine subsequent development or to limit alternatives or mitigative measures.

*Id.*, subp. 2 (emphasis added). Citing this rule, the MDNR specifically referenced the OHB ring levees, which had recently come to MDNR's attention, noting that "[b]ecause of the complexities of Minnesota law it is imperative that the MDNR fully understand the relationship between the O-H-B Levee and the Diversion Project," as "[i]f the O-H-B Levee is a stand-alone project that would be built even if the full Diversion Project is not built, commencement of construction would not present a problem under MEPA." (Von Korff Decl., Ex. I at 2.) But if, as the documents explaining the OHB ring levee plans suggested, it was part of the bigger project, "commencement of construction prior to completion of the state final EIS and adequacy determination would be violation of Minnesota law." (*Id.*)

MDNR sent a follow-up letter on April 22, 2014, referencing its January 14, 2014 letter and the Diversion Authority's response (which stated that "the OHB levee has

independent utility" but "is being designed to also provide flood protection if the F-M Project is approved and constructed"). (Von Korff Decl., Ex. J at 1.) The MDNR's April letter warns that "it would be unlawful for any Minnesota governmental unit or organization of which it is a member to commence work on a component of the F-M project unless there is an independent basis for that component part separate and apart from the F-M project."[4] (*Id.*) The letter proceeds to explain that MDNR has reviewed all the relevant documents and concluded that the OHB ring levee "is a project component of the F-M Project, without an independent basis for its construction as proposed," and that "MDNR will not be making **any** final governmental approvals on the F-M project or any component thereof until the state's EIS process is complete." (*Id.*, Ex. J at 1-2 (emphasis in original).)

## III. THIS ACTION

The Joint Powers filed this action on August 19, 2013. (Compl., Aug. 19, 2013, Docket No. 1.) Initially, the Joint Powers brought four counts: one for violation of NEPA, one for the "selection of [a] project option that violates Minnesota law" (specifically Minn. Stat. chaps. 103A, 103G, 116B, and 116D), one for violation of Executive Order 11988, and one regarding the proposed Finding of No Significant Impact ("FONSI"). (First Am. Compl., Oct. 22, 2013, Docket No. 14.) Upon the stipulation of the parties, however, the Magistrate Judge granted leave to amend and the Joint Powers filed a second amended complaint including only the NEPA claim and  new

---

[4] The letter then notes that "we also continue to acknowledge that, because the OHB levee is entirely within North Dakota, the MDNR has no jurisdiction over construction of the OHB levee." (Von Korff Decl., Ex. J at 1.)

FONSI claim, but excluding counts for violation of Minnesota law, Executive Order 11988, and the FONSI claim as originally stated. (Order, May 6, 2014, Docket No. 48; *see also* Stipulation, May 2, 2014, Docket No. 46.)

In the Second Amended Complaint ("complaint"), the Joint Powers seek to have the Record of Decision set aside and to compel the Corps to comply with NEPA and to cease efforts to obtain authorization to construct any portion of the project until all environmental and permitting reviews are complete. (Second Am. Compl., May 2, 2014, Docket No. 47.) The complaint alleges several problems with the proposed diversion project and the documents and reports the Corps submitted to Congress in order to garner support for the plan. (*Id.*)

The complaint alleges several shortcomings of the report of the Chief of the Corps and the environmental impact statements: that they fail to disclose that the proposed plan wastes scarce federal water resources, its goals could be accomplished at a vastly reduced coast without flooding upstream and downstream communities, it proposes a level of flood protection that is unnecessary (twice as high as any flood in the last century in Fargo), and that it failed to address Minnesota regulatory requirements and required a lengthy and costly regulatory review process. (*Id.* ¶ 6.) For example, it alleges that the Corps did not adequately advise Congress "in a transparent manner if alternatives to the proposed action can meet state and national objectives for a lesser cost and with lesser negative environmental impacts," and the Chief's Report "poses to Congress a false choice between overbuilding a wasteful and costly project with avoidable consequences, on the one hand, and denying any flood protection at all, on the other." (*Id.* ¶ 14.)

The Joint Powers further alleges that an agreement ("Mediated Agreement") following the 1997 floods adopted a "basin-wide" that seeks, among other things, to avoid adopting flood solutions that focus on one or more locales and risk shifting water problems downstream or upstream.  (*Id.* ¶ 28.)  Plaintiff alleges that, rather than taking such an approach, the Corps, heavily influenced by the City of Fargo, ultimately rejected more moderate alternatives (which would not have resulted in upstream flooding) on the grounds that they did not **eliminate** (as opposed to dramatically reduce) the risk of flooding in Fargo-Moorhead.  (*See e.g. id.* ¶¶ 31-32, 40.)  It also alleges that the final proposed plan provides flood protection for areas of Fargo that are not yet developed (but which Fargo presumably hopes to be able to develop) and are in flood plains.  (*See, e.g.*, *id.* ¶¶ 43, 46.)

The Joint Powers also alleges that the selection of the plan "rested upon a major engineering error in hydrology that was discovered only after the original Environmental Impact Statement was completed."  (*Id.* ¶ 48.)  It alleges that the Corps considered only one option for storage of downstream flooding, referred to as the Richland/Wilkin Flood Storage Proposal, which will flood extensive valuable farmland in both counties.  (*Id.* ¶¶ 50, 52.)  Plaintiff alleges that other options were not considered because of the error – and that when the original EIS was done, the Corps was under the mistaken assumption that there would be no need for downstream flooding, but discovered that the LPP would, in fact, cause damaging downstream flooding.  (*Id.* ¶ 49.)  The Joint Powers further alleges that the Corps then failed to consider a variety of options for flood storage and that the ultimate selection of the Richland/Wilkin Flood Storage Proposal was arbitrary

and capricious.  (*Id.* ¶¶ 50-51.)  Part of the diversion plan's solution for the downstream flooding it would generate involves ring levees around the communities of Oxbow, Bakke, and Hickson, all of which are in Cass County.  (*Id.* ¶ 58.)

Count I for violation of NEPA alleges that the selection of the plan and the OHB ring levees is arbitrary and capricious because (1) it failed to address alternatives, (2) failed to address the possibility that the plan might violate Minnesota law, and (3) failed to address the possibility that the plan violates Executive Order 11988. Count II, regarding the Proposed Finding of No Significant Impact alleges that the proposed finding of no significant impact arbitrarily, unlawfully, and capriciously fails to report to Congress that there exists a viable and fully suitable less costly flood control option that avoids the flooding of Richland and Wilkin Counties and lands downstream of Fargo and Moorhead while providing full protection to Fargo and Moorhead for floods reasonably likely to occur.

## IV.    STATE COURT ACTION ("WILKIN COUNTY ACTION")

### A.    Background

When the Joint Powers first became aware of the plan to build the OHB ring levees, it sent a letter to the Corps as part of a comment procedure during a required permit application process.  The letter, dated April 21, 2014, focused on the OHB ring levees, and observed that the project purpose has changed and the EIS did not focus on the OHB ring levees.  (Von Korff Decl., Ex. G at 1.)  The letter argued that the OHB ring levees should not be permitted because they cannot satisfy the requirements of the relevant permit application because there are practicable alternatives which would have a

less adverse impact on the aquatic ecosystem, including more modest flood mitigation measures. (*Id.*, Ex. G at 2.)  It further pointed out that the OHB ring levees were not submitted to Congress with the Chief's Report, and that the Diversion Authority cannot legally commence a part of a project that has not completed the Minnesota environmental review. (*Id.*, Ex. G at 3.)  The letter proceeded to argue that the OHB ring levees are not a standalone project to protect against natural flood conditions, but rather mitigation for the diversion project (and thus cannot be commenced before the full MDNR environmental review is complete). (*Id.*, Ex. G at 4-7.)

The Joint Powers also submitted to the Corps the affidavit of Charles Anderson as a comment to the same permit application process.  Charles Anderson is an engineer who was asked by the Joint Powers to provide advice on potential alternative approaches to the proposed design. (Von Korff Decl., Ex. H at 1.)  In his affidavit, he highlights the state of Minnesota's Mediated Agreement, and opines that the proposed project "is a seriously flawed plan from a basin wide perspective" because it focuses on Fargo-Moorhead and ignores the rest of the basin. (*Id.* at 3.)  He makes recommendations for an alternate plan that includes a variety of approaches and measures. (*Id.* at 4-10.)

B.      **Complaint**

On June 13, 2014, the Joint Powers filed an action in Wilkin County Court against the Diversion Authority (but not the Corps). (Wilkin Cnty. Compl.)  The complaint generally alleges that the Diversion Project, including the dam, will likely violate Minn. Stat. chapters 116B and  116D, particularly § 116D.04, subd. 6, which requires that

> [n]o state action significantly affecting the quality of the environment shall be allowed, nor shall any permit for natural resources management and development be granted, where such action or permit has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, **so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction**. Economic considerations alone shall not justify such conduct.

Minn. Stat. § 116D.04 (emphasis added). The Joint Powers alleges that the part of the proposal that involves flooding of Wilkin County results from several design features that are not necessary, including providing twice the level of protection necessary for Fargo-Moorhead, seeking to provide protection to undeveloped flood plain so that parts of Fargo will be available for commercial development, failing to use mitigation features, and deciding to put the dam in a location that shifts the damage and flooding to Wilkin and Richland Counties. (Wilkin Cnty. Compl. ¶ 11.)

The complaint also explains that the dam and concomitant downstream flooding and storage require a variety of permits under Minnesota law, which involves conducting an environmental review. (*Id.* ¶ 12.) The Joint Powers alleges that "[c]ommencing the project, or any part of it, before the environmental review is completed and before issuance of permits is unlawful and would inflict irreparable harm on Wilkin County, its residents, and others." (*Id.* ¶ 17.) The Joint Powers alleges that the Diversion Authority conceived of the plan to add the OHB ring levees as a solution to the problem of additional flooding generated from the proposed dam, and that the design of the ring levees "was determined entirely by the flooding contemplated as a part of the Fargo Flood Mitigation Project." (*Id.* ¶ 26.) The complaint then references the January 14,

2010 letter from MDNR to the Diversion Authority, stating that the environmental review must precede any construction, including of the OHB ring levees, citing Minnesota Rules § 4410.3100, and that "the DNR identified construction of the dike as a prejudicial action that may 'limit alternatives or mitigative measures or predetermine subsequent development.'" (*Id.* ¶ 27 (quoting Minn. R. § 4410.3100).) The Joint Powers alleges that the Diversion Authority "changed course" as a result of the letter, and began to claim that the ring levees have independent utility not connected to the overall project, such that construction need not wait until environmental review of the entire project is complete. (*Id.* ¶ 28.)

Based on these and other allegations, the Joint Powers brings three counts: (1) for declaratory judgment stating that the proposed project and the OHB ring levees violate the Minnesota Environmental Rights Act ("MERA") by inflicting unnecessary damage on Minnesota's environmental resources and injunctive relief to prevent commencement of construction activities towards any part of that project; (2) for declaratory judgment that commencement of the any part of the Fargo-Moorhead Flood Control Project (including the OHB ring levees) prior to completion of the Minnesota environmental review and grant of all necessary permits is unlawful and injunctive relief prohibiting the commencement of construction; and (3) declaratory judgment that commencement of any part of project will violate state and local law both because state and local permits have not been issued, and because even if applied for, these permits cannot be lawfully granted. (*Id.* at 15-19.)

The Joint Powers did not immediately serve the Diversion Authority upon filing the complaint with Wilkin County, and service had not been effected when the Diversion Authority made this motion for preliminary injunction on June 19, 2014.  Tthe Diversion Authority has since been served.

## V.    MOTION FOR PRELIMINARY INJUNCTION

On the same day the Wilkin County complaint was filed, June 19, 2014, Defendant-Intervenor Diversion Authority filed a motion for a preliminary injunction in this action seeking an order enjoining the Joint Powers from "serving and initiating" the state court action and enjoining them from initiating "any action in the state courts of the State of Minnesota or State of North Dakota seeking declaratory or injunctive relief to prevent or in any way interfere with the commencement of construction of the Fargo-Moorhead Flood Control Diversion Project, and any non-significant changes thereto, as authorized by the [WRRDA]."  (Mot. for Prelim. Inj. at 2.)

The Diversion Authority urges the Court to enjoin the Wilkin County proceeding, arguing that the Anti-Injunction Act does not bar enjoining the suit and that it has satisfied the traditional equitable test for an injunction.  It argues that it has demonstrated a likelihood of success on the merits because the federal WRRDA preempts state law, because the Joint Powers failed to join an indispensable party in the state court action – the Corps, which would have required removal to federal court, and because the parties stipulated that the Minnesota state law issues are not ripe.  It argues that delaying or stalling construction on the OHB ring levees will cause irreparable harm to Oxbow and the surrounding areas, that the balance of harms favors the Diversion Authority because

the Joint Powers can bring its request seeking to delay the construction in this federal action, and because enjoining the Wilkin County action would be in the public interest.

The Joint Powers counters that the Minnesota Statute issues are not preempted by federal law, observing that the Corps itself (and the Chief's Report) has recognized that state approval is needed, suggesting that the way that the diversion project has proceeded is an example of powerful members of Congress diverting water liabilities or assets, and warning that NEPA reforms were intended to stop this sort of abuse of power. Second, the Joint Powers argues that the Diversion Authority has made no claim that would support an injunction – essentially that there is no claim for which it could be 'likely to succeed on the merits' – and urging that it is not clear that there is any issue over which the Court has jurisdiction here that should preclude the proceedings between the Diversion Authority and Joint Powers in Wilkin County.

The Diversion Authority has attached several documents and declarations to its motion, many of which purport to describe the irreparable harm that will occur if the Court does not enjoin the Wilkin County proceeding. Bruce Spiller is the program manager of an engineering firm which is the program management consultant for the Diversity Authority and is contracted with the Cass County Joint Water Resource District ("CCJWRD") to provide construction management services for the OHB ring levees. (Decl. of Bruce Spiller ¶ 1, June 19, 2014, Docket No. 57.) As project manager on both contracts, he oversees the development of project schedules, cost estimates, and sequencing or coordination of projects. (*Id.* ¶ 3.) He states that "[a] massive project like the Fargo-Moorhead Area Flood Diversion Project requires a highly orchestrated

coordination of several components.  Delay in any one part of the project risks delaying the entire project to at least an equal, if not greater, delay.  The very limited construction season in North Dakota further complicates the timing coordination." (*Id.* ¶ 4.)  He explains in his declaration that any delay beyond June 19, 2014, pushes back the completion target of September 26, 2014, on a "day for day" basis, costing approximately $10,000 to $20,000 per day of delay. (*Id.* ¶ 5.)  He further explains that "[e]ven a modest delay risks postponing the entire 2014 Ring Levee project until next year," and that the ring levees must be complete in September in order for further developments to proceed, such as the construction and paving of a road and construction of replacement homes, before winter and in order to keep the entire project on schedule for a 2017 completion. (*Id.* ¶ 6.)  Any delay with the 2014 ring levees could push back the project's completion until 2018, "creating significant personal safety and financial risks," and exposure to millions of dollars in property damage, lost wages, and harm to infrastructure. (*Id.* ¶ 7.)  He estimates that missing this year's construction season would add between $1.2 million and $2.3 million to the cost of the project. (*Id.* ¶ 8.)  Beyond that, delay would generate additional costs on account of staff and management time, home acquisition and relocation costs, duplicative appraisal costs, lost profits for the contractors who have planned to do this work and turned down other jobs as a result, and the opportunity costs for families of lost jobs. (*Id.* ¶¶ 9-11.)

James Nyhof, the Mayor of the City of Oxbow, North Dakota, which is "squarely in the middle of the planned upstream staging area," explains that because of Oxbow's position in the upstream staging area and uncertainty regarding how it would fare in the

project, city residents have been unable to sell or even get appraisals for their homes. (Decl. of Mayor James E. Nyhof ¶ 1, June 19, 2014, Docket No. 58.)  He states that Oxbow lost eleven homes during the 2009 floods and since then it has been able to build levees, but those levees are inadequate for a variety of reasons (not FEMA-certifiable, gaps between sections, and inability to raise them because of location to river bank).  (*Id.* ¶ 2.)  As a result of some of these problems, FEMA ordered several of the levees removed in 2012, which further exposed Oxbow to flooding risk.  (*Id.* ¶¶ 3-4.)  He further states that the OHB ring levees will be FEMA-certifiable and will provide Oxbow with 100-year flood protection, but in order to do so the ring levees must be farther from the river, which requires removing forty-two homes and will sever the Oxbow Golf & Country Club.  (*Id.* ¶ 5.)  Mayor Nyhof declares that Oxbow itself does not have the tax base to support a project of that size, but that the North Dakota legislature committed cost-sharing funds for the construction, and those appropriations "specif[y] that the Oxbow levee project should proceed even if the larger F-M Diversion Project d[oes] not." (*Id.* ¶ 6.)  The plans in place for the Oxbow levee have stabilized home values, but Mayor Nyhof believes that if the Joint Powers are "successful in stopping the commencement of construction, it would result in immediate, disastrous economic and emotional consequences for our community."  (*Id.* ¶ 7.)  For example, the City would be liable for millions of dollars in damages to contractors, thirty-eight families' relocation process (of which they are in the middle) would be interrupted, and others would need to find additional flood insurance.  (*Id.* ¶¶ 10-12.)

Mark Brodshaug is the chair of the CCJWRD, which "is the legal entity at the helm of construction" of the OHB   ring levee project; it selects and will pay the contractors working on the project.  (Decl. of Mark Brodshaug ¶ 1, June 19, 2014, Docket No. 59.)   He explains that the CCJWRD awarded a contract to Riley Brothers Construction on May 22, 2014 for $2.8 million, and if the project is delayed, suspended, or permanently forestalled, CCJWRD will be "irreparably harmed" and liable to Riley for damages.   (*Id.* ¶¶ 2-3.)   Brodshaug also describes the reputational, emotional, and physical damage to Cass County that will occur if construction is delayed.  (*Id.* ¶¶ 4, 6-7.)

Finally, Darrell Vanyo, a Cass County Commissioner and Co-Chair of the Diversion Authority, explains that the diversion "project is the product of more than four years of study, hearings, and legislative work," and is "eagerly anticipated by the thousands of residents who will no longer live under constant threat of catastrophic flooding." (Decl. of Darrell Vanyo ¶ 1, June 19, 2014, Docket No. 60.)  He estimates that if there is another flood comparable to the 2009 flood that it could cost the area $10 billion in damages.  (*Id.*)  The Diversion Authority accepted the Section 404 permit proffered by the Corps on June 18, 2014, and was informed that the permit will be formally executed on June 20, 2014.  (*Id.* ¶ 3.)  He states that "[v]ast and irreparable harm will occur if the flood control project is not completed in a timely fashion," because the whole construction season will be lost and the long-term plan for the project will be extended for another year, putting homes at risk for longer.  (*Id.* ¶ 4.)

## VI.   MDNR'S MOTION FOR LEAVE TO APPEAR AS AMICUS CURIAE

The afternoon before the Court held oral argument on the motion for preliminary injunction, the MDNR filed a motion for leave to participate as amicus curiae and a memorandum (pending ruling on the motion) regarding the Diversion Authority's motion for preliminary injunction, along with several declarations and exhibits.   MDNR essentially opposes the Diversion Authority's position that the diversion project is not subject to state law, arguing that the Corps' involvement in the project does not immunize the entire project from state regulation, but rather such projects are typically undertaken in partnership with state and local governments, and that federal authorization of the project does not preempt state regulation.   (Amicus Curiae MDNR's Mem. on Mot. for Anti-Suit Inj. at 12-15, July 22, 2014, Docket No. 79.)   The Court has reviewed the parties' submissions on this matter.   It concludes that permitting MDNR to file an amicus brief creates no prejudice for the other parties and that there is potentially some benefit in receiving MDNR's perspective, particularly with regard to the preliminary injunction given that the Joint Powers alleges violations of Minnesota's regulatory scheme.   Thus, the Court will grant MDNR's motion for leave to appear as amicus curiae in this action. *See Mausolf v. Babbitt*, 158 F.R.D. 143, 148 (D. Minn. 1994) *rev'd on other grounds*, 85 F.3d 1295 (8th Cir. 1996) ("The amicus privilege rests in the discretion of the court which may grant or refuse leave according as it deems the proffered information timely, useful, or otherwise." (internal quotations omitted)).

**ANALYSIS**

The Court will first consider whether the injunctive relief the Diversion Authority seeks is barred by the Anti-Injunction Act before proceeding to consider the merits of its request.

## I.    ANTI-INJUNCTION ACT

The Anti-Injunction Act states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  In *Barancik v. Investors Funding Corp. of New York*, 489 F.2d 933 (7th Cir. 1973), then-Circuit Judge Stevens, writing for the panel, held that "the mandatory prohibition in § 2283 against injunctions staying court proceedings does not apply to state actions commenced after a motion for injunctive relief is filed in the federal court."  *Id.* at 938.  Although not all circuits have followed this rule, *see, e.g.*, *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 3 F.3d 877, 885 (5th Cir. 1993) (holding that "the Act applies regardless of when the federal and state suits were filed"); *Standard Microsystems Corp. v. Tex. Instruments*, 916 F.2d 58, 61–62 (2d Cir. 1990); *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 533 (6th Cir. 1978), the Eighth Circuit has squarely adopted it.  In *National City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122 (8th Cir. 1982), the Eighth Circuit held that "the question whether state actions are 'pending' is appropriately answered by reference to the date on which injunctive relief is **sought** in federal court, not the date on which injunctive relief is **granted**."  *Id.* at 1127 (emphasis added) (citing *Barancik*, 489 F.2d at 936-67).

- 22 -

Under this rule, the Court concludes that the Anti-Injunction Act does not bar the relief the Diversion Authority seeks here because the Diversion Authority filed this motion for preliminary injunction before it was served in the Wilkin County action, which is what determines whether a state court action has commenced under the Minnesota Rules of Civil Procedure.  *See* Minn. R. Civ. P. 3.01 ("A civil action is commenced against each defendant . . . when the summons is served upon that defendant . . . ."); *cf. Hruby v. Larsen*, Civ. No. 05-894, 2005 WL 1540130, at *2 (D. Minn. June 30, 2005) (holding Anti-Injunction Act did not bar court from enjoining state eviction action by federal defendants against plaintiffs where it was "undisputed that plaintiffs initiated their federal suit [which included a request for preliminary injunction] before defendants initiated eviction proceedings").

## II.    STANDARD FOR REVIEWING PRELIMINARY INJUNCTION MOTION

Thus, as an initial matter, *National City Lines* establishes that the Anti-Injunction Act does not categorically bar the Court from enjoining the state court action here.  It is less clear, however, how the Court should analyze whether it should enjoin the state court action.  For this analysis, the parties point to the standard four factors for determining whether a preliminary injunction should issue and each argues that those factors favor them.  Those factors are:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The Diversion Authority argues that it is likely to succeed because the project cannot be enjoined by a state court and because the Joint Powers failed to name a necessary party (the Corps), while the Joint Powers argues that under these factors, there is no basis for a preliminary injunction because the Diversion Authority has made no **claim** upon which it could be said that it is likely to succeed.

As the Ninth Circuit and others have pointed out, however, this set of factors is an odd fit for an anti-suit injunction. *See E .& J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006) ("The suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions."). The court in *Gallo Winery* considered the propriety of an injunction sought by the plaintiff Gallo to preclude preexisting, concurrent litigation of the same issues in Ecuadorean courts that was initiated by the opposing party, Andina. The court observed that, with anti-suit injunctions,

> [o]ften, as here, the injunction will be defensive in nature. Gallo has requested the preliminary injunction because of Andina's potentially prejudicial, vexatious and oppressive proceedings in Ecuador. But should Gallo also need to prove a likelihood of success on the merits of the breach of contract claim in order to receive an anti-suit injunction? That is, does our usual test for a preliminary injunction apply, or is a modified analysis required for anti-suit injunctions? While our cases are not clear on this issue, we conclude that the more appropriate approach is that enunciated by the Fifth Circuit: "To the extent the traditional preliminary injunction test is appropriate, . . . we only need address whether [the injunction seeker] showed a significant likelihood of success on the merits. The merits in this case, however, are . . . about . . . whether [the injunction seeker] has demonstrated that the factors specific to an anti-suit injunction weigh in favor of granting that injunction here."

*Id.* at 990-91 (alterations in original) (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) ("Although both the district court and the parties discussed all four prerequisites to the issuance of a traditional preliminary injunction, the suitability of such relief ultimately depends on considerations unique to antisuit injunctions.")); *see also Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1463 (Fed. Cir. 1990) (the standard four-part preliminary injunction inquiry "was developed to test the grant of the requested remedy before the case has been tried on the merits," and "does not apply to the different question of whether to enjoin the prosecution of concurrent litigation.   In the latter case it is not controlling whether the plaintiff is likely to succeed on the merits.   Instead, a primary question is whether the issues and parties are such that the disposition of one case would be dispositive of the other.").[5]

This case is a prime example of this poor fit: the Diversion Authority is not bringing **claims** upon which it could be said that it is likely to succeed – rather, the Joint Powers is bringing all the claims, and has tried to do so both here and in state court. Instead, the Diversion Authority is trying to quash the state court action on the grounds that it is duplicative.   Thus, instead of applying the traditional four *Dataphase* factors, the Court will look to considerations more appropriate to an anti-suit injunction.   In this

---

[5] Although the Eighth Circuit relied on the *Dataphase* factors in affirming the enjoining of a state administrative proceeding in *Entergy, Ark., Inc.. v. Nebraska*, 210 F.3d 887, 898-900 (8th Cir. 2000), the party seeking the injunction there, although initially a defendant, had sought to realign itself as a plaintiff and brought substantive cross-claims, the merits of which the Eighth Circuit analyzed under the traditional *Dataphase* factors.   *See id.* at 898.   Here, the Diversion Authority has no substantive claims against the Joint Powers, besides an argument that a state court cannot interfere with or enjoin a federally authorized project, but that is a defense to the merits of the Joint Powers' Wilkin County action, not a separate claim in this action.

regard, the Court takes significant guidance from the Eighth Circuit's opinion in *National City Lines*.[6]   There, the Eighth Circuit observed that "[t]he Anti-Injunction Act is inapplicable when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit.   Notwithstanding the confines of the Anti-Injunction Act, **the federal court may in these circumstances restrain subsequently filed state court proceedings involving the same subject matter**."   *Nat'l City Lines, Inc.*, 687 F.2d at 1127 (emphasis added).   In a footnote following that text, the court noted that a "federal court should not, of course, ignore the principles of equity, comity and federalism which might preclude an injunction against state proceedings."   *Id.* at 1127 n.8.   In determining

---

[6] In other circuits that have explicitly rejected the four-part test, courts typically proceed to use that circuit's foreign anti-suit injunction analysis. *See, e.g.*, *Gallo Winery*, 446 F.3d at 991 (after concluding that "Gallo need not meet our usual test of a likelihood of success on the merits of the underlying claim to obtain an anti-suit injunction," proceeding instead to consider whether Gallo demonstrated "that the factors specific to an anti-suit injunction weigh in favor of granting the injunction" (referring to the factors specific to a foreign anti-suit injunction)). The Eighth Circuit's foreign anti-suit injunction analysis, however, is uniquely specific to **foreign** suits, not suits in state courts, as it focuses on weighing the United States' interests with "concerns of international comity." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359 (8th Cir. 2007) (adopting, in contrast to the Ninth, Fifth, and other circuits, the "conservative" approach for foreign anti-suit injunctions, "under which a foreign antisuit injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity"). The Eighth Circuit adopted this approach, rather than an approach that also considers whether the action is duplicative, in part because it "(1) recognizes the rebuttable presumption against issuing international antisuit injunctions, (2) is more respectful of principles of international comity, (3) compels an inquiring court to balance competing policy considerations, and (4) acknowledges that issuing an international antisuit injunction is a step that should be taken only with care and great restraint and with the recognition that international comity is a fundamental principle deserving of substantial deference[,]" and also in order to avoid "convey[ing] the message, intended or not, that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility." *Id.* at 360 (internal quotation marks omitted) (citing *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004); *Gau Shan Co., Ltd. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir. 1992)). Because most of these concerns are unique to balance and respect for the interests and agency of foreign courts, this reasoning does not require the application of the "conservative" approach in considering whether to enjoin the state court proceeding here.

whether to enjoin the parties from proceeding in state court here, the Court will therefore consider first the extent to which the state court action seeks to litigate issues whose subject matter is already part of this action, and second, how considerations of comity, federalism, and equitable principles operate in these circumstances.

### A.    Comparing the Subject Matter of the Claims

In light of the guidance from *National City Lines* that a "federal court may in these circumstances restrain subsequently filed state court proceedings involving the same subject matter," 687 F.2d at 1127, the Court will first consider whether the Wilkin County action involves the same subject matter as the issues before the Court in this action.   The Eighth Circuit has not provided extensive guidance as to in what circumstances concurrent cases can be deemed to involve the same subject matter.   In the absence of guidance from the Eighth Circuit or argument from the parties, the Court concludes that, applying that language and principle in a common sense manner guided by judicial experience, the subject matters of the two lawsuits are substantially the same because they both involve whether to proceed with the diversion project.

This action involves whether the Corps acted arbitrarily or capriciously in submitting a Chief's Report to Congress which, according to the Joint Powers, was deficient in many respects.  One of the primary respects in which the Joint Powers alleges that the report was deficient is its failure to inform Congress of the fact that the project had not yet been approved through Minnesota's state environmental review, which needed to be done independent of the federal environmental review because the Corps "refused to honor State of Minnesota objections to the completeness" of the federal

environmental impact statement, (Second Am. Compl. ¶ 77), and in its failure "to address a number of specific Minnesota law constraints" (*id.* ¶ 81). Further, the complaint alleges specifically that the EIS fails to note the Corps' inadequate response to MDNR's comments about the premature construction of the OHB ring levees, alleging:

> Adoption of the Environmental Impact Statement, issuance of the Chief's Report and the later adoption of the FONSI and EA in connection with the Oxbow-Bakke-Hickson ring dike proposal, notwithstanding the State of Minnesota's official comments is arbitrary and capricious and unlawful. Leaving those comments unresolved and deferring them for resolution in the Minnesota environmental process improperly certified to Congress that the project selected is ready for funding, when in fact it is not, is arbitrary, capricious and unlawful.

(*Id.* ¶ 84.)

The Wilkin County action involves three claims: whether the entire project (including the OHB levees) comports with Minn. Stat. § 116D.02, whether the OHB ring levees' construction can commence now even though the Minnesota environmental review is not complete for the full project, and a general claim about violation of Minnesota water law. The second issue, about the OHB levees, hinges on whether the OHB ring levees are part of the larger diversion project or an independent undertaking – if they are part of the larger project, commencement of construction on the ring levees could prejudice the environmental review under Minnesota Rules § 4410.3100. Thus, the central question at issue in the Wilkin County case appears to be whether the OHB ring levees are independent of the larger diversion project or not, for the purposes of Minnesota Rules chapter 4410.

Although not identically postured, the issues in both actions would likely require consideration of the same question: whether the diversion project and the ring levees in

particular violate Minnesota law because they are not the least harmful alternative or because they cannot proceed with construction before the environmental review is complete.   These questions are directly before the Wilkin County court and indirectly before this Court, given that part of the Joint Powers' basis for its claim that the Chief's Report was arbitrary and capricious was that it failed to indicate how the plan was violative of and inadequate with regard to Minnesota law.   Thus, the Court concludes that the two actions involve essentially the same subject matter, counseling in favor of enjoining the Wilkin County action.

One consideration might counsel against deeming the claims substantively similar, but are ultimately not persuasive.   It appears that the federal action was filed before the MDNR or the Joint Powers were aware of the plans to construct the OHB ring levees, suggesting that the levees and whether they are part of the larger project or independent is not part of the issues raised in the federal litigation.   However, the Joint Powers amended its complaint in May 2014 – after the January and April letters from MDNR to the Diversion Authority, and the newly amended complaint now focuses on the OHB ring levees.   The Court therefore concludes that the issues "involv[e] the same subject matter." *Nat'l City Lines*, 687 F.2d at 1127.

### B.   Considerations of Equity, Comity, and Federalism

The Eighth Circuit observed that even when the Anti-Injunction Act does not apply, a "federal court should not, of course, ignore the principles of equity, comity and federalism which might preclude an injunction against state proceedings."   *Nat'l City Lines*, 687 F.2d at 1127 n.8.   Any concerns the Court might have had about comity,

federalism, and respect for the state courts are mitigated by the timing of the two cases here. This federal action was filed almost a year prior to the Wilkin County action. Although it does not follow *Barancik*'s timing rule with regard to the Anti-Injunction Act, the Fifth Circuit has nevertheless found that "[w]here the federal case is filed substantially prior to the state case, and significant proceedings have taken place in the federal case, we perceive little, if any, threat to our traditions of comity and federalism," and that "[i]n fact, by filing a state suit after a federal action has been filed, the state plaintiff can be viewed as attempting to use the state courts to interfere with the jurisdiction of the federal courts." *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 3 F.3d 877, 886 (5th Cir. 1993) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21–22 (1983) (fact that substantial proceedings have occurred is a relevant factor to consider in deciding whether to abstain)); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976) (observing that, although it is rare for a federal court to dismiss an action over which it would otherwise have jurisdiction in favor of concurrent state court litigation, one of the considerations is the timing of the two suits, noting that "[i]t has been held . . . that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts.")[7].

---

[7] The Supreme Court also noted the fact of a pending action in state court "is no bar to proceedings concerning the same matter in the Federal court having jurisdiction," *Colo. River Water Conservation Dist.*, 424 U.S. at 817 (internal quotations omitted), and that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *id.* Certainly, the matters in this action should proceed before this Court, and given the recency of the initiation of the state court action, it is most practicable to utilize this forum for all matters related to this dispute.

Furthermore, the Joint Powers indicated at oral argument that its primary intention is to find a forum in which to seek relief against the commencement of construction on the OHB ring levees, but that need not be in state court.  Thus, the Joint Powers' commencement of a state court action here appears to be more of a search for **a** forum, rather than a **preference** for state court.  Indeed, the Joint Powers filed this initial action in federal court, and the Court would receive timely amendments to the Joint Powers' complaint in this action to accommodate its search for a forum for its most recent issues.

The Court also finds that comity and federalism are best served by keeping all claims related to this action in federal court given the unique interstate nature of the project subject to this dispute.[8]  Because the Court concludes that the principles of equity, comity, and federalism generally support rather than discourage the Court's enjoining of the parties' further proceeding in the Wilkin County action and because that action involves substantially similar issues as the instant action before the Court, the Court will enjoin the parties from proceeding with the state court action.[9]

---

[8] The Court declines to adopt or endorse the Diversion Authority's arguments that the state court action should be enjoined because the federal congressional authorization is supreme over any Minnesota laws that could apply, such that failure to comply with Minnesota law cannot possibly bar the progress of a federally funded initiative.  The Court makes no determination now as to whether and how the diversion project would be subject to Minnesota law.

[9] Although the Court previously concluded that the four traditional factors are not a good fit for determining the propriety of entering a preliminary injunction in this case, the Court nevertheless would, applying those factors, likely reach the same determination that the parties should be enjoined from further proceeding in the Wilkin County action.  Although it is unclear what the "merits" would be in this situation, the Court thinks it sufficient that the Wilkin County action would likely end up being removed to federal court because the Corps is likely a necessary party under Minnesota Rule of Civil Procedure 19.01 given its role in planning, overseeing, and facilitating funding of the diversion project and the ring levees, (*see, e.g.,* Second Am. Compl. ¶¶ 61, 76 ("the Corps [] intends to build the ring dikes before the Red River

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Preliminary Injunction [Docket No. 53] is **GRANTED** as follows:

      a.     The parties in this action and their officers, agents, and employees, and all others acting in concert or participation with them are enjoined from prosecuting and pursuing relief in the lawsuit filed June 13, 2014 by Plaintiff in the State of Minnesota District Court, Eighth Judicial District, County of Wilkin.

      b.     This injunction shall remain in effect until a final judgment is entered in this action and all appellate rights are exhausted or until further order of the Court.

2.     The Clerk of Court shall provide a copy of this Order to the Clerk of Court for the State of Minnesota District Court, Eighth Judicial District, County of Wilkin.

---

dam is permitted and approved" (emphasis omitted)), such that in its "absence complete relief cannot be accorded," Minn. R. Civ. P. 19.01.  If the Corps were joined as a defendant in the Wilkin County action it would likely seek removal to federal court, which it is entitled to because the Corps is a federal agency.  *See* 28 U.S.C. § 1442(a)(1).  Thus, the Diversion Authority is likely to succeed at least with regard to whether the Joint Powers' claims practically can or will proceed in state as opposed to federal court.  The Diversion Authority has also likely demonstrated for the purposes of this stage in the proceedings that any delay in the project will cause irreparable harm because it could set the entire project back a year.  The balance of harms favors the Diversion Authority, as the Joint Powers will suffer no harm because it can seek the same relief in this federal action, and the public interest favors keeping all disputes in federal court given the interstate nature of the project. -

3.    The Motion to Appear as Amicus Curiae by Minnesota Department of

Natural Resources [Docket No. 76] is **GRANTED**.

DATED:  August 14, 2014                              ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                                JOHN R. TUNHEIM
                                                  United States District Judge