# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| RICHLAND/WILKIN JOINT POWERS AUTHORITY, | Civil No.  13-2262 (JRT/LIB) |
| Plaintiff, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, JOHN MCHUGH, JO-ELLEN DARCY, and DAN KOPROWSKI, | **MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants, | |
| v. | |
| FARGO-MOORHEAD FLOOD DIVERSION BOARD OF AUTHORITY, | |
| Intervenor Defendant. | |

Gerald W. Von Korff and Jonathan D. Wolf, **RINKE NOONAN**, P.O. Box 1497, St. Cloud, MN  56302, for plaintiff.

Carol Lee Draper, **UNITED STATES DEPARTMENT OF JUSTICE**, 601 D Street NW, Room 3106, Washington DC  20579; Friedrich A. P. Siekert, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for defendants.

Robert E. Cattanach and Michael R. Drysdale, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402, for intervenor defendant.

Jill S. Nguyen, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1800, St.  Paul, MN 55101, for amicus curiae Minnesota Department of Natural Resources.

Matthew A. Sagsveen, Assistant Attorney General, **NORTH DAKOTA ATTORNEY GENERAL'S OFFICE**, 500 North Ninth Street, Bismarck, ND  58501, for amicus curiae State of North Dakota.

This case involves a large-scale flood diversion project being planned in the Fargo-Moorhead region of Minnesota and North Dakota ("diversion project" or "project"). Plaintiff Joint Powers Authority of Richland County, North Dakota, and Wilkin County, Minnesota ("Joint Powers" or "JPA"), which was formed to represent the interests of political subdivisions and citizens affected by the diversion project,[1] brought this action against the United States Army Corps of Engineers ("the Corps") and various individuals (collectively, "federal defendants" or simply, "the Corps"), alleging violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). The Corps is the federal entity involved in developing the diversion project on the Red River, in response to flooding in Fargo, North Dakota, and Moorhead, Minnesota, and surrounding areas, most recently in 2009.

The JPA initially filed this action on August 19, 2013. The Court later granted a motion to intervene filed by the Corps' local sponsor in developing the project: the Fargo-Moorhead Diversion Board of Authority[2] ("Diversion Authority" or "Authority"). Part of the diversion project involves a ring levee around the three North Dakota communities of Oxbow, Hickson, and Bakke ("OHB ring levee"). Construction on the

---

[1] The former chair and current chair of the JPA state that its members include not just Richland and Wilkin Counties, but also other political subdivisions, including Pleasant Township in Cass County, North Dakota and Comstock in Clay County, Minnesota. (Decl. of Perry Miller, Sid Berg, and Lyle Hovland ("Miller, Berg, Hovland Decl.") ¶ 3, Feb. 13, 2015, Docket No. 169.)

[2] The Diversion Authority consists of the following members: City of Fargo, North Dakota; City of Moorhead, Minnesota; Cass County, North Dakota; Clay County, Minnesota; Cass County Joint Water Resource District; and Buffalo-Red River Watershed District. (Decl. of Gerald W. Von Korff ("First Von Korff Decl."), Ex. A, Nov. 1, 2013, Docket No. 23.)

OHB ring levee began last summer – in June 2014 – and portions of the eastern and southern sides of the ring levee have been built.  On June 13, 2014, the JPA filed an action in Wilkin County District Court against the Diversion Authority, seeking to enjoin the construction of the OHB ring levee because Minnesota's environmental review of the diversion project had not yet been completed.  This Court granted the Authority's motion to enjoin the state court action, but welcomed the JPA to assert its state law claims in this action.  *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Richland/Wilkin*), 38 F. Supp. 3d 1043, 1045 (D. Minn. 2014).

The JPA filed a third amended complaint on November 4, 2014.  In it, the JPA asserts NEPA violations against the Corps in Counts I and II.  In Counts III-V, it also alleges against both defendants violations of the Minnesota Environmental Rights Act ("MERA"), the Minnesota Environmental Policy Act ("MEPA"), and state and local permitting laws.  The JPA has brought a preliminary injunction motion, seeking to enjoin construction of the OHB ring levee.  The Corps and the Diversion Authority have both brought motions to dismiss the state and local law claims found in Counts III-V of the third amended complaint.  The Corps argues that sovereign immunity bars the state and local law claims against the federal government.  The Authority makes several arguments in favor of dismissal, one of which is that any application of Minnesota law to construction in North Dakota violates the United States Constitution's so-called dormant Commerce Clause.

Because state and local environmental law does not bind the federal government, the Court will grant the Corps' motion to dismiss Counts III-V of the third amended

complaint.   Claims III and IV as asserted against the Diversion Authority are not precluded by the dormant Commerce Clause, however, so the Court will deny the Authority's motion to dismiss these counts.   The Court will dismiss Count V against the Authority.   Finally, the Court concludes that the JPA has shown a fair chance of prevailing on the merits of at least some of its state law claims, and has met the other preliminary injunction factors.   Consequently, the Court will grant the JPA's motion for a preliminary injunction.

**BACKGROUND**[3]

## I.   DIVERSION PROJECT BACKGROUND

The adjacent communities of Fargo, North Dakota, and Moorhead, Minnesota, and the Red River Basin more broadly, have routinely experienced significant flooding, particularly in the last 25 years.   (Ex. E ("FEIS Executive Summary") at 14, Feb. 12, 2015, Docket No. 162.)   In particular, the record 2009 spring flood reached a flood stage of 40.8 feet.   (*Id.*)   The Corps characterized that flood as a 2-percent chance (otherwise called a 50-year (i.e., twice in 100 years)) event.   (*Id.*)   The affected cities had largely been responding to flooding with short-term emergency measures.   (*Id.*)

Several entities came together to propose various permanent measures to reduce the flood risk in the Fargo-Moorhead metropolitan area.   These measures included a no-action alternative and the continued use of emergency measures;   non-structural

---

[3] This section will briefly summarize the background facts that are most relevant to this decision.   For a more thorough recitation of the facts in this case, see this Court's prior order. *Richland/Wilkin*, 38 F. Supp. 3d at 1045-55.

mitigation measures; flood barriers, including levees; increased conveyance of flood waters, including through the construction and use of water diversion channels; and flood storage.   (*Id.*)   The various alternatives were analyzed for their effectiveness, environmental effects, social effects, acceptability, implementability, cost, risk, separable mitigation, and cost effectiveness.  (*Id.*)  An initial Alternatives Screening Document was issued in December 2009 that resulted in two diversion concepts being carried forward: one in Minnesota and one in North Dakota.  (*Id.*)  All diversion channel options involve the construction upstream of a "control structure" or, as the Minnesota Department of Natural Resources ("MDNR") characterizes it, a high-hazard dam.  (Ex. B (Decl. of Aaron Snyder ("Snyder Decl.")) ¶ 12, Feb. 12, 2015, Docket No. 162.)

A draft Environmental Impact Statement ("Draft EIS" or "DEIS") was completed in May 2010 and released on June 11, 2012, proposing three possible plans: a National Economic Development plan ("NED"), which would have the capacity to divert 40,000 cubic feet of water per second (cfs) in Minnesota; the Locally Preferred Plan ("LPP"), which would divert 35,000 cubic feet per second on the North Dakota side; and the Federally Comparable Plan ("FCP"), which would involve a diversion rate of 35,000 cfs on the Minnesota side.  (FEIS Executive Summary at 14-17.)  Pursuant to the joint request of the cities of Fargo and Moorhead and counties of Clay and Cass, the Assistant Secretary of the Army for Civil Works approved the designation of the LPP as the tentatively selected plan on April 28, 2010.  (*Id.* at 16.)

In September 2010, hydraulic modeling indicated that the LPP "would have more extensive downstream impacts than previously anticipated."  (*Id.* at 17.)  As a result, a

supplemental DEIS ("SDEIS") was released in April 2011.  (*Id.*)  That SDEIS assessed and tentatively recommended several changes to the LPP, including reducing the capacity of the diversion channel, "raising upstream tie-back levee elevations, adding a 50,000 acre-foot storage area and a 150,000 acre-foot staging area, and compensating most affected landowners within the storage and staging areas." (*Id.*)  These revisions reduced the downstream impacts of the diversion project, but increased the upstream impacts.[4] (*Id.*)  The addition of the staging area decreased the capacity requirements of the diversion channel to 20,000 cfs.  (Snyder Decl. ¶ 20.)  It was initially estimated that the staging area would be utilized once every four years.  (*Id.* ¶ 21.)

In July 2011, the Final Feasibility Report and EIS ("FEIS") was released, which considered comments received on the SDEIS and made several more revisions.  (FEIS Executive Summary at 17.)  In a December 19, 2011 report ("Chief's Report") to the Secretary of the Army, the then-Acting Chief of the Engineers of the Corps, Major General Merdith W. B. Temple, recommended the diversion project for authorization. (Second Decl. of Bruce Spiller ("Second Spiller Decl."), Ex. A ("Chief's Report") at 9, July 8, 2014, Docket No. 69.)  The Office of Management and Budget ("OMB") then determined the project was consistent with Administration policy and the final Record of Decision was signed on April 3, 2012.  (Snyder Decl. ¶ 24; *see also* Ex. D (Record of Decision ("ROD")), Feb. 12, 2015, Docket No. 162.)

---

[4] Because the Red River of the North flows northward, "downstream impacts" refers to impacts that occur further north along the river and "upstream impacts" refers to impacts that occur further south along the river.  (Corps Opp'n to Pl.'s Mot. for Prelim. Inj. ("Corps Prelim. Inj. Opp'n") at 8 n.14, Feb. 12, 2015, Docket No. 161.)

Subsequent design and engineering studies led to additional proposed modifications. (Ex. H ("Supplemental EA") at 7, Feb. 12, 2015, Docket No. 162.)  One of these modifications was the OHB ring levee, which would protect the OHB communities – all of which lie within the SDEIS's new flood-water staging area – from being flooded. (*Id.* at 7, 22-23.)  In September 2013, the Corps released a supplemental environmental assessment ("EA") which evaluated various versions of this modification, along with a no-action alternative, and which ultimately proposed a full levee around the OHB communities. (*Id.* at 22-23, 55.)  The EA also proposed in-town levees for Fargo, which would reduce the usage of the staging area to once every ten years. (*Id.* at 32, 36.)

Last year, Congress enacted the Water Resources Reform and Development Act of 2014 ("WRRDA 2014" or "WRRDA"). Pub. L. No. 113-121, 128 Stat. 1193 (2014). The President signed WRRDA into law on June 10, 2014. *Id.* In response to the Corps' recommendation that the diversion project be approved, WRRDA 2014 specifically authorized the project. Pub. L. No. 113-121, § 7002(2)(4). The law authorizes a total project cost of $1,924,300,000. *Id.* $846,700,000 of the project would be federally funded; $1,077,600,000 would be non-federally funded. *Id.* The law notes that that project should be "carried out by the Secretary substantially in accordance with the plan, and subject to the conditions, described in the respective reports designated in this section." *Id.* § 7002.

Although the project has been authorized, no federal construction funding has been earmarked for it yet, and construction funds were not included in the President's FY 2015 or FY 2016 budgets. (Decl. of Kent Lokkesmoe ¶ 17, July 22, 2014, Docket

No. 80.)   The project has received $40 million total in federal funds to date; it has received portions of that $40 million in each fiscal year since 2008.  (Snyder Decl. ¶ 26.) Those funds have been used for the feasibility study and project design.  (*Id.*)

The Authority began construction on the OHB levee in June 2014 and has completed portions of it along its southern and eastern borders.  (Ex. A (Decl. of Brett R. Coleman ("Coleman Decl.")) at 6-7, Feb. 12, 2015, Docket No. 162.)   The Corps is overseeing this work.  (*Id.*)  The Corps has determined that the OHB ring levee is integral to the diversion project and the Diversion Authority is thus receiving in-kind contribution credit for its work on the levee toward the required non-federal cost of the project pursuant to 42 U.S.C. § 1962d-5b(a)(4).   (Second Spiller Decl., Ex. B ("Integral Determination Report").)

## II.   THE STATE OF MINNESOTA AND THE DIVERSION PROJECT

As the Court discussed in greater detail in its prior order, the State of Minnesota has expressed concerns about the diversion project and the scope of the Corps' environmental review on several occasions.  *See Richland/Wilkin*, 38 F. Supp. 3d at 1046-48.  As to the OHB ring levee in particular, the MDNR expressed the concern that beginning construction on the levee prior to the completion of the state's environmental review would violate Minnesota law, unless the levee was an independent project that would be constructed even if the full diversion project was not.  *Id.* at 1048.

The MDNR determined that, because the project included a Class I high-hazard dam, it would require the MDNR – as the responsible governmental unit ("RGU") – to

complete a full State EIS, in addition to the federal environmental review.  (Decl. of Randall Doneen ("First Doneen Decl.") ¶ 12, July 22, 2014, Docket No. 81.); *see also* Minn. R. 4410.4400, subp. 18.  Although the Corps did not address all of the Diversion Authority's comments on its DEIS and SDEIS, it recognized the state's need to complete its own review and agreed with the MDNR that the state process would begin when the Corps' FEIS was released.  (Decl. of Michael R. Drysdale ("Drysdale Decl."), Ex. E ("FEIS App. U"), Feb. 12, 2015, Docket No. 152.)

Minnesota's environmental review of the entire diversion project is ongoing. (Second Decl. of Randall Doneen ("Second Doneen Decl.") ¶ 2, Mar. 12, 2015, Docket No. 180.)  The MDNR expects to release its own State DEIS in August of 2015.  (*Id.*) After a public comment period, the MDNR will complete a State FEIS and an adequacy determination.  (*Id.*)  It expects to complete this process by late fall of 2015 or early 2016. (*Id.* ¶ 3.)  The state is considering several options, including a no-build alternative; the diversion project as proposed in the Corps' Final EIS; the diversion project as proposed, but moving the high-hazard dam one mile north; and the Distributed Storage Alternative ("DSA") favored by the JPA.  (Decl. of Gerald Von Korff ("Third Von Korff Decl."), Ex. E (MDNR Final Scoping Decision) at 6-10, July 15, 2014, Docket No. 71.)  The MDNR released a Final Scoping Decision Document for its DEIS in 2014.  (First Doneen Decl. ¶ 40; Second Doneen Decl. ¶ 5.)  Also in 2014, the MDNR completed a screening report on the DSA option favored by the JPA, which concluded that the DSA "does not meet the project purpose of flood protection from catastrophic flood events."  (Second Doneen Decl. ¶ 6.)  However, public comments could cause the MDNR to reconsider the

DSA option and thus the MDNR has cautioned that "it is incorrect to say that the DSA has been dropped from consideration in the State environmental review." (*Id.* ¶ 7.)

In August 2014, Governor Dayton wrote the Assistant Secretary of the Army for Civil Works to express strong concern over the diversion project. (Decl. of Gerald Von Korff ("Fifth Von Korff Decl."), Ex. 1, Feb. 11, 2015, Docket No. 125.) The Governor noted that while Minnesota would only accrue some 10% of the benefits of the project, it would nevertheless bear much of the cost because the staging area would result in flooding of Minnesota farmland that generally does not flood. (*Id.* at 2.) Indeed, the Governor specifically stated that "a major feature of the Project's design appears to be the flooding of Minnesota (and North Dakota) farmland in order to assure North Dakota developers that their investments will be safeguarded." (*Id.*) The letter stated that "construction of the [OHB] Ring Levee, prior to completion of Minnesota's EIS, violates our state's law." (*Id.*) The Governor urged a halt to any construction on the project in general, and the OHB ring levee in particular. (*Id.* at 3.) The Governor also met directly with Diversion Authority officials regarding his concerns. (Decl. of Darrell Vanyo ("Third Vanyo Decl.") ¶ 2, Feb. 12, 2015, Docket No. 159.) The Diversion Authority responded in September 2014 with several concessions: (1) the OHB ring levee – which is being constructed entirely in North Dakota – would only be built to 100-year flood protection levels (i.e., a level that would be useful to the OHB cities whether the broader diversion project is completed or not); (2) no other construction on the diversion project's actual diversion channel would take place until the State EIS is complete (although the letter also encouraged the MDNR to complete its DEIS by July 1, 2015); and (3) the

Diversion Authority would add representation from a broader geographic area, including upstream Minnesota interests.  (Third Vanyo Decl., Ex. A.)  More recently, the Governor has called for a complete freeze on all summer 2015 diversion project construction, pending Minnesota's environmental review.[5]

## III.    THIS PROCEEDING

The JPA filed its third amended complaint on November 4, 2014.  (Third. Am. Compl., Nov. 4, 2014, Docket No. 112.)  The JPA lists as defendants the Corps and the individual Corps officials, along with the Diversion Authority as defendant-intervenor. (*Id.*)  The Corps alleges five counts.  Counts I-II, under NEPA, are only against the federal defendants.  (*Id.* at 1, ¶ 123.)  Counts III-V, which assert state and local law claims, are against the federal defendants and the Diversion Authority.  (*Id.* at 1, ¶ 123.)

Count I alleges that the federal defendants violated NEPA in the DEIS and FEIS by (1) failing to address appropriate alternatives to the LPP; (2) failing to address the claim that the LPP may violate Minnesota law; and (3) failing to address the argument that the project violates Executive Order 11988 and state and national flood plain management policy.  (*Id.* ¶¶ 88-117.)  Count II alleges that the federal defendants violated NEPA by filing only an EIS and Finding of No Significant Impact ("FONSI") as to the OHB ring levees.  (*Id.* ¶¶ 118-22.)

---

[5] Patrick Springer, *Dayton calls for freeze on major F-M diversion work this year*, Inforum.com (Mar. 16, 2015), http://www.inforum.com/news/3701227-dayton-calls-freeze-major-f-m-diversion-work-year.

Count III, against both the federal defendants and the Authority, is styled as a MERA claim, but it cites both the definition of pollution in MERA and **MEPA's** ban on state action that significantly impacts the environment when feasible and prudent alternatives are available. (*Id.* ¶¶ 123-30.) Count IV, also against both the federal defendants and the Authority, alleges that ongoing construction – on the OHB ring levee, in particular – violates MEPA; specifically, violates Minnesota Rule 4410.3100's bar on starting a project before an EIS has been completed and determined adequate. (*Id.* ¶¶ 131-33.) Finally, Count V, against all defendants, alleges violations of state and local permitting laws, since construction on the OHB ring levee has begun but the applicable permits on other parts of the project, like the dam, have not been issued. (*Id.* ¶¶ 134-39.)

The JPA filed a motion for a preliminary injunction, seeking a temporary halt to any construction on the OHB ring levee. (Pl.'s Mot. for Prelim. Inj., Feb. 11, 2015, Docket No. 122.) The Corps filed a motion to dismiss the state and local law claims – Counts III-V. (Corps Partial Mot. to Dismiss Third Am. Compl., Feb. 11, 2015, Docket No. 141.) The Diversion Authority also filed a motion to dismiss Counts III-V. (Diversion Authority Mot. to Dismiss/Remit, Feb. 11, 2015, Docket No. 145.)

Finally, the State of Minnesota through the MDNR filed an amicus brief, arguing against dismissal of the state law claims against the Diversion Authority and supporting the injunction motion. (Amicus Br. of MDNR ("MDNR Br."), Mar. 12, 2015, Docket No. 179.) The State of North Dakota filed a motion to appear as amicus curiae and lodged a brief in support of the opposition to the preliminary injunction motion and in support of the Authority's dismissal motion. (State of North Dakota's Unopposed Mot.

for Leave to Participate as Amicus Curiae, Mar. 25, 2015, Docket No. 185; Amicus Br. of State of North Dakota ("North Dakota Br."), Mar. 25, 2015, Docket No. 188.)  The Court will grant North Dakota's unopposed motion to appear as amicus curiae.

## ANALYSIS

### I.     MOTIONS TO DISMISS

#### A.     Standards of Review

##### 1.     Rule 12(b)(1) Dismissal Motion

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims.  *Uland v. City of Winsted*, 570 F. Supp. 2d 1114, 1117 (D. Minn. 2008).   Both the Corps' sovereign immunity argument for dismissal, and the Authority's standing argument, are analyzed under the Rule 12(b)(1) standard.  *See Brown v. Dosal*, No. 10-4315, 2011 WL 1990445, at *2 (D. Minn. May 23, 2011).  It is the plaintiff's burden to establish that jurisdiction exists.  *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.* (quotation marks omitted).  If the Court finds that jurisdiction is not present, it must dismiss the matter.  Fed. R. Civ. P. 12(h)(3); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583-84 (1999).  The Court is generally barred, however, "from dismissing a case **with prejudice** if it concludes subject matter

jurisdiction is absent." *Cnty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) (emphasis added).

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments. *See Osborn*, 918 F.2d at 729 n.6. A facial challenge, such as one based on the defendant's sovereign immunity, "does not call upon the Court to engage in a factual review by inquiring into and resolving factual disputes." *Issaenko v. Univ. of Minn.*, No. 13-3605, 2014 WL 4954646, at *9 (D. Minn. Sept. 30, 2014) (internal quotation marks and alterations omitted). In a facial challenge to jurisdiction, the Court will decide "whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint, and drawing all reasonable inferences in favor of the plaintiff." *Id.* (internal quotation marks omitted). In a factual attack, the Court "considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1063 (D. Minn. 2013) (quoting *Osborn*, 918 F.2d at 734 n.6).

## 2.      Rule 12(b)(6) Dismissal Motion

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states "'a claim to relief that is plausible on its face.'" *See Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Although the Court accepts the complaint's factual allegations as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Therefore, to survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The Authority's dormant Commerce Clause argument is analyzed under the Rule 12(b)(6) standard.  *See Estate of Graham v. Sotheby's Inc.*, 860 F. Supp. 2d 1117, 1119-20 (C.D. Cal. 2012).

### B.    Corps' Motion to Dismiss Claims III, IV, and V

The JPA asserts its state and local law claims – found in Counts III, IV, and V – against both the Authority and the Corps.  (Third Am. Compl. ¶ 123 ("The Federal Defendants are named as Defendants in Counts III-V because they may claim an interest relating to the subject of Counts III-V and may be so situated that disposing of the action in the person's absence may be regarded as impacting agency interests.").)  As for the Corps' motion, it argues that the Court should dismiss Counts III-V against the federal defendants because those three counts assert state and local law claims.  The Corps is a federal government entity and its officials – all sued only in their official capacity – are

federal government officials.   The federal government has not waived sovereign immunity as to Minnesota's environmental planning, protection, and permitting laws. *Charter Int'l Oil Co. v. United States*, 925 F. Supp. 104, 106 (D.R.I. 1996) ("The application of state law to federal government agencies requires an explicit waiver of sovereign immunity."); *see also Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983) ("The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress.").   As a result, the Court lacks jurisdiction to hear state and local law claims against the Corps.

First, the Court notes that none of the jurisdictional statutes cited in the JPA's complaint provide a waiver of the federal government's sovereign immunity.   (Third Am Compl. ¶¶ 29, 30.)   For example, 28 U.S.C. § 1367, which the JPA cites to support this Court's supplemental jurisdiction over its state law claims, includes no waiver of the federal government's sovereign immunity.   *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007) ("[Section] 1367 merely grants federal courts supplemental jurisdiction over state claims related to certain federal claims in any civil action of which the district court has original jurisdiction, 28 U.S.C. § 1367(a), and that section cannot operate as a waiver of the United States sovereign immunity." (internal quotation marks omitted)).   Similarly, 28 U.S.C. § 1331 does not constitute any waiver of sovereign immunity.   *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999).   The same is true of the mandamus statute, 28 U.S.C. § 1361.   *In re Russell*, 155 F.3d 1012, 1012 (8th Cir. 1998) ("It is well settled that the mandamus statute, 28 U.S.C. § 1361, does not

provide a waiver of sovereign immunity.").   No waiver is found in the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, either.   *Smith v. U.S. Dep't of Agric.*, 888 F. Supp. 2d 945, 953 (S.D. Iowa 2012).   Thus, none of the jurisdictional statutes saves the JPA's state and local law claims against the Corps.

The JPA also cites to the APA in its complaint as a basis for jurisdiction and seems to suggest that the APA might provide a waiver of immunity for the state and local law claims.  (*See, e.g.*, Third Am. Compl. ¶ 29.)  The JPA is correct that Section 702 does provide a waiver of the federal government's sovereign immunity for persons who were harmed by a federal agency.   5 U.S.C. § 702.   Moreover, as the JPA points out, that waiver is not strictly tied to the APA's cause of action, either.   *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006) ("In sum, we hold that APA § 702's waiver of sovereign immunity permits not only [the plaintiff's] APA cause of action, but his nonstatutory and First Amendment actions as well.").  But, as *Trudeau* demonstrates, in order to utilize the APA's immunity waiver against a federal agency without asserting an APA cause of action, a plaintiff needs a different, viable cause of action.  *See id.*  And the state environmental and permitting laws under which the JPA is suing in Counts III-V provide no viable cause of action against federal agencies.   *See, e.g.*, Minn. Stat. § 116D.04, subds. 1a, 10 (providing for judicial review under MEPA of action by a state or local governmental unit); NEPA Law & Litig. § 12:1 (2014) ("The state 'little NEPAs'[, such as MEPA,] may apply only to state government agencies or may include local governments as well."); *see also* Minn. Stat. § 116B.03, subd. 1 (creating a civil action under MERA for any person, partnership, or corporation residing (or with

shareholders, members, or partners residing) in Minnesota, the Attorney General of Minnesota, or any political subdivision of the state, against "**any person**, for the protection of the air, water, land, or other natural resources located within the state" (emphasis added)); Minn. Stat. § 116B.02, subd. 2 (defining "person" under MERA as "any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality, any public or private corporation, any partnership, firm, association, or other organization, any receiver, trustee, assignee, agent, or other legal representative of any of the foregoing, and any other entity, except a family farm, a family farm corporation or a bona fide farmer corporation"). Thus, the APA's immunity waiver does not enable the JPA to assert state or local law claims against the Corps, since the state and local laws the JPA would need to rely on for its causes of action cannot reach a federal defendant.

The JPA also responds to the Corps' sovereign immunity argument by contending that it simply made the Corps a party to its state and local law claims because of this Court's prior order in this case and to give the Corps a chance to be heard. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Third Am. Compl. on Immunity and Remittitur Grounds ("Pl.'s Opp'n to Corps Mot. to Dismiss") at 5, Feb. 13, 2015, Docket No. 163 ("The primary reason for naming the United States in the new count was to respond to the suggestion by Diversion Authority that the United States has an interest in the outcome of the claims. The Diversion Authority had stated that if we did not name them they would move to join them. By joining them, the United States is given a right to be heard, to the extent that it wishes.").) But this Court's prior order said nothing

about subjecting the Corps to state or local law claims.  And the JPA's desire to let the Corps be heard in general, does not allow it to attempt to hold the federal government liable under state and local law when the government has not waived its sovereign immunity.  Consequently, the Court will grant the Corps' motion to dismiss Counts III-V against the federal defendants; those counts will be dismissed without prejudice.

### C.       Diversion Authority's Motion for Dismissal or Remittitur

#### 1.       Redressability

The Authority first argues that, because the state and local law claims against the federal government must be dismissed due to the government's sovereign immunity, and because the JPA seeks broad relief under those claims in the hopes of halting construction on the entire diversion project,[6] without the Corps as a defendant the JPA's alleged injuries are not redressable and the JPA lacks standing.  *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801-02 (8th Cir. 2006) (concluding that a plaintiff lacked standing because, in part, it could not show that its injuries were redressable; specifically stating that "a favorable decision for [plaintiff] even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code").

---

[6] (Third Am. Compl. at 47-48 (seeking "declaratory relief that the proposed project and its components, including the [OHB ring levee], violate Minnesota water law and Minnesota environmental law by inflicting unnecessary damage on Minnesota's environmental resources, and injunctive relief to prevent commencement of construction activities towards any part of that project").)

Specifically, the Authority contends that because the Corps must be dismissed due to sovereign immunity, it is merely speculative whether any relief granted against the Authority under the state or local law claims would redress the JPA's alleged harms.  The Corps could simply continue construction on its own, irrespective of an injunction against the Authority.  *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) ("[T]he Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that [court action] will alter the behavior . . . of [] third parties that are the direct cause of the plaintiff's injuries."); *see also Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011) (concluding that an injury was not redressable when the plaintiff sought action from a federal agency against an Indian tribe, but the agency lacked any power to force action because of the tribe's sovereign immunity); *id.* at 1270-71 ("[A] judicial remedy is often unavailable for contractors who have disputes with Indian tribes because of tribal sovereign immunity.").

However, the Authority's arguments ignore the practical realities of the project.  As the MDNR points out, whether or not the Authority sees itself as simply carrying out the ultimate orders of the Corps in initiating action on the OHB ring levee, and attempting to acquire other property, (Diversion Authority Mem. in Supp. of Mot. to Dismiss/Remit Counts III-V ("Authority Mot. to Dismiss Mem.") at 6, Feb. 11, 2015, Docket No. 147 ("The Diversion Authority is doing nothing more than implementing its required portions of the congressionally authorized Diversion Project in order to receive credit for its cost sharing obligations.")), the Authority is still the only entity with funding that is actually taking any action on the project.  It is unclear when Congress will actually

**earmark** federal funds to the Corps for the construction of the project. *See* Nicole T. Carter & Charles V. Stern, Cong. Research Serv., R41961, *Army Corps Fiscal Challenges: Frequently Asked Questions* 12 (2011) (estimating that the Corps' construction backlog was at least $62 billion). Moreover, Congress's authorization of the project does not assume that only the federal government will complete the project; instead, it explicitly explains that state and local funding will cover more than half of the cost of the project. Water Resources Reform & Development Act, Pub. L. No. 113-121, § 7002(2)(4) (stating that non-federal funds will cover $1,077,600,000, or 56%, of the overall project cost of $1,924,300,000). In light of the fact that only the Authority is taking action on the project right now, and that the federal authorization pins more than half the project costs on non-federal sources and no federal money has yet been appropriated, it is more than mere speculation for the Court to conclude that relief granted against the Authority would alter the Corps' behavior. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938.

The cases the Authority cites do not require a contrary conclusion. *Advantage Media*, for example, is inapposite. In that case, the plaintiff was challenging local laws, and was only challenging some of the local laws that restricted its behavior. *Advantage Media*, 456 F.3d at 801-02. Here, the JPA makes broad claims under the relevant statutes, not leaving select statutes out. While it is true that the JPA cannot bring its state law claims against the Corps, that fact does not render its attempt at seeking redress as ineffectual as a case in which the plaintiff challenges only some of the laws that are causing it harm. The Authority and the Corps are intertwined and are both intimately

involved in the planning and construction of the diversion project. Not asserting state law claims against the Corps, but asserting them against its state/local partner, offers a much better chance of gaining redress for injuries than the plaintiff's approach in *Advantage Media*. Similarly, the holding in *National Wrestling Coaches* is only somewhat relevant. That case states that it is difficult to demonstrate redressability when a plaintiff seeks agency action that might possibly impact or apply pressure to third-party behavior. 366 F.3d at 938. The Authority and the Corps – as partners on this project – are much more closely tied together than a regulator is to the third parties it regulates. (*See, e.g.*, Authority Mot. to Dismiss Mem. at 6 ("The Diversion Authority is doing nothing more than implementing its required portions of the congressionally authorized Diversion Project in order to receive credit for its cost sharing obligations.").)

The *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010), case is relevant here. In that case, the plaintiff challenged the State Department's FEIS and issuance of a pipeline permit under NEPA. *Id.* at 1155. The State Department argued the claim was not redressable, because even if the court found that the department had violated NEPA and invalidated the permit, the President could still choose to grant the permit pursuant to his inherent authority. *Id.* The court rejected that argument, noting that the "President's future actions or inactions are too speculative to preclude standing in this case." *Id.* While the Corps' eventual actions vis-à-vis the project are less speculative – given the congressional authorization of the diversion project in WRRDA – the principles of the *Sierra Club* case still apply. The Diversion Authority is the one moving forward on the project and it is responsible, under WRRDA, for more than half the project's funding.

(Chief's Report at 9-13.) The Authority and the Corps seem to argue that the state and local law claims against the Authority are not redressable because the Corps might step in and move forward, irrespective of what the Court decides in this case. (*See, e.g.*, Second Spiller Decl. ¶¶ 6-7) Given that no federal construction money has yet been earmarked, and the significant percentage of the project that is to be funded through non-federal means, such an argument is far too speculative.

Additionally, while the Corps states that it is the only entity that can change the diversion project and that it will not make significant changes from what was authorized in the 2014 WRRDA, (Snyder Decl. ¶ 44), that does not change the fact that successful state or local law claims against the Authority might be able to limit or restrain critical non-federal funding for the project, or show a violation of state or local law that would bar state approval of aspects of the project (including the high-hazard dam). Those possibilities would provide some redress to the JPA on its state and local law claims, if successful on the merits. In sum, the Court concludes that the JPA's alleged state and local law injuries are redressable.

## 2. Dormant Commerce Clause

### a. Governing Law and Scope of MEPA and MERA

The Authority contends that the JPA's MEPA and MERA claims, and state and local law permitting claims, violate the Constitution's so-called dormant Commerce Clause. Specifically, by seeking to enjoin construction on the entire diversion project, the JPA is attempting to stop construction of portions of the project that are being or will be

constructed entirely in North Dakota, like the OHB ring levee. (*See* Third Am. Compl. at 47-48.) By doing so, the Authority argues that the JPA is impermissibly attempting to apply the laws of one state to conduct occurring wholly within another state.

The Constitution's Commerce Clause "grants Congress the authority to regulate interstate commerce." *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) (citing U.S. Const. art. 1, § 8, cl. 3). The Supreme Court has stated that flood control or protection falls under Congress's Commerce Clause power. *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 426 (1940) ("Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control."). The dormant Commerce Clause is the Commerce Clause's negative implication: "states may not enact laws that discriminate against or unduly burden interstate commerce." *Hazeltine*, 340 F.3d at 592.

There are multiple stages to the dormant Commerce Clause analysis. First, a state statute or regulation "is per se invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." *Cotto Waxo Co. v. Williams* (*Cotto Waxo*), 46 F.3d 790, 793 (8th Cir. 1995) (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). "The Commerce Clause precludes application of a state statute to commerce that takes place **wholly** outside of the state's borders." *Id.* (emphasis added).

If a state statute or regulation is not per se invalid, the next question is what level of scrutiny applies. "If the challenged statute discriminates against interstate transactions either on its face or in practical effect, it burdens interstate commerce directly and is

subject to strict scrutiny." *Id.* (internal quotation marks omitted). Similarly, if a state statute was enacted "for a discriminatory purpose," it is also subject to strict scrutiny. *Id.* This strict scrutiny standard invalidates the statute "unless the state can show that the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means." *Id.*

On the other hand, if the statute does not discriminate and was not enacted for a discriminatory purpose, but instead "regulates evenhandedly, then it burdens interstate commerce indirectly and is subject to a balancing test." *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The *Pike* balancing test asks whether a statute's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

Both the Authority and the State of North Dakota in its amicus brief, contend that if Minnesota's environmental laws – namely MEPA and MERA – are used as a basis to obtain the relief sought in the JPA's third amended complaint – a halt on all diversion project construction – or simply to obtain the relief sought in the injunction, it would amount to an extraterritorial application of those statutes to conduct occurring wholly outside the state. They contend that such an application would be per se invalid. *Cotto Waxo*, 46 F.3d at 793. They argue that the first step of the analysis, however, is to assess the scope of the relevant statutes. *North Dakota v. Heydinger*, 15 F. Supp. 3d 891, 908-09 (D. Minn. 2014) (considering a dormant Commerce Clause challenge to a Minnesota statute that regulated the importation of power from facilities outside the state "that would contribute to statewide power sector carbon dioxide emissions," and rejecting the

Minnesota commissioner defendant's attempt to construct the statute narrowly as only applying within the state to Minnesota power producers).  Regardless of the scope of MERA – which they acknowledge is designed to have a broad reach beyond the state itself – they claim that since MEPA is clearly not meant to apply outside of the state, it cannot be used to achieve the relief sought in the complaint and therefore the MEPA claim must be dismissed before even reaching the dormant Commerce Clause analysis.

As to the scope of MEPA and MERA, the Court notes first that this case is distinct from *Heydinger*.  There, the Court interpreted the scope of the statutes because the defendant state argued the statutes only applied narrowly to wholly in-state conduct.  *Id.* at 908.  Here, the MDNR takes the opposite position, contending that MEPA and MERA both apply to out-of-state conduct, at least when that conduct is committed by Minnesota government entities.  (Amicus Br. at 9-14.)  Nevertheless, to the extent the Court still must construe the scope of the statutes, this Court agrees with the MDNR's interpretation.

MEPA has the broad overarching purpose of ensuring that "governmental agencies contemplating taking action . . . on a proposed project must first consider the project's environmental consequences."  *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 823 (Minn. 2006).  The statute and its regulations codify this requirement to conduct environmental analysis before taking action.  Minn. Stat. § 116D.04, subd. 2b(3) (stating that a "project may not be started and a final governmental decision may not be made to grant a permit, approve a project, or begin a project, until . . . the [EIS] has been determined adequate"); Minn. R. 4410.3100, subp. 2

(stating that prior to the completion of environmental review, "the governmental unit shall not take any action with respect to the project").  Indeed, the Authority which is undertaking the project is partially run by a Minnesota city and county (i.e., governmental units under MEPA), Minn. R. 4410.0200, subp. 33-34, and will indisputably be constructed and have effects, in part, in Minnesota.  It is therefore the type of governmental action envisioned by and subject to MEPA.  *Id.*

These mandates on Minnesota governmental units do not evaporate when those units take action on portions of cross-border project built outside of Minnesota.  Holding as much would allow Minnesota cities or counties favoring a cross-border project but apprehensive about Minnesota environmental review to cross the border, start construction, and build momentum that prejudices and eviscerates the power of MEPA.  Moreover, MEPA's requirements are not avoided simply because the actual memorandum of understanding for the construction of the OHB ring levee specifically was signed only by North Dakota political subdivisions.  (North Dakota Br. at 6-7.)  The motion to dismiss is not focused solely on the OHB ring levee's construction, but more broadly on the connection between the JPA's state law claims and the relief it seeks.  More importantly, while Moorhead and Clay County may not have signed the MOU, they are equal members of the Diversion Authority with their counterpart North Dakota political subdivisions and responsible for the JPA's actions.  They cannot evade MEPA's requirements by simply letting North Dakota's Authority members sign off on portions of a cross-border project that may violate MEPA, or eviscerate its review.

MERA even more obviously applies outside the state. The statute allows any person with ties to Minnesota to sue "any person" to protect the state's resources from destruction, pollution, and impairment. Minn. Stat. § 116B.03, subd. 1. A "person" is not just a Minnesota person, but is "any natural person, any state, municipality or other governmental or political subdivision . . . ." Minn. Stat. § 116B.02, subd. 2. Indeed, MERA has a long-arm provision that specifically reaches "any foreign corporation or any nonresident individual." Minn. Stat. § 116B.11, subd. 1. In sum, both MEPA and MERA are sufficiently broad in scope to achieve the relief the JPA seeks.[7]

### b.   Dormant Commerce Clause Analysis

The Authority's dormant Commerce Clause argument centers not on a contention that MEPA or MERA are discriminatory in effect or purpose, or that they impose a "clearly excessive" burden on interstate commerce, but instead that their application here is per se invalid because they have an improper "extraterritorial reach."[8] *Cotto Waxo*,

---

[7] The state and local permitting law claims in Count V are different. The JPA has not shown that they are sufficiently broad in scope to support the relief it seeks. Tellingly, the MDNR did not address their scope, or their viability under the dormant Commerce Clause, in its amicus brief. (MDNR Br. at 14 n.6.) More importantly, unlike the JPA's MEPA and MERA claims, the state and local permitting law claims are more speculative, in that, for example, the MDNR has not yet made a decision about whether or not to grant a permit for the diversion project's high-hazard dam. *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)). Consequently, the Court will grant the Authority's motion to dismiss these claims against it, without prejudice.

[8] One academic piece notes the lack of clarity in court decisions on how to analyze a claim that a statute is barred by the extraterritoriality doctrine, where that statute does not otherwise appear to evince protectionism or fail the *Pike* balancing test. Will Sears, Note, *Full-Impact Regulations & the Dormant Commerce Clause*, 39 Colum. J. Entl. L. 157, 172 (2014)

(Footnote continued on next page.)

46 F.3d at 793.   Like the Minnesota statute invalidated in *Heydinger* because it effectively regulated energy producers in other states in their transactions with non-Minnesota customers or members, the Authority contends that MEPA or MERA as applied here would impermissibly regulate the construction and flood mitigation activities of North Dakota counties and cities.  *Heydinger*, 15 F. Supp. 3d at 910-11.

The Court concludes that the application of MEPA and MERA in this case does not violate the dormant Commerce Clause.   The Authority's arguments overstate the reach of the dormant Commerce Clause, and ignore critical distinctions between this case and *Heydinger*.   First, the dormant Commerce Clause "precludes application of a state statute to commerce that takes place **wholly** outside of the state's borders."   *Cotto Waxo*, 46 F.3d at 793 (emphasis added); *see also Heydinger*, 15 F. Supp. 3d at 916-17 (concluding that the Minnesota statute at issue impermissibly regulated transactions occurring outside of Minnesota between non-Minnesota entities).   While the OHB ring levee is being constructed in North Dakota, and while many other aspects of the diversion project will be built in North Dakota, they are all integral parts of a larger project that indisputably will be constructed, in part, in Minnesota.   (FEIS App. U.)   That fact

_____

(Footnote continued.)

("Regardless of what standard of review courts apply to extraterritorial regulations, such laws face a steep challenge, and the Supreme Court has yet to uphold a state law after finding that it falls within this category.   Because [key Supreme Court cases] all involved regulations that either evinced protectionism or failed *Pike* balancing, the circuits have had little guidance as to what standard of review to apply to regulations that may regulate extraterritorially but do not demonstrate a protectionist purpose or fail *Pike* balancing.").

presents a critical difference between the application of MEPA and MERA to the diversion project and to the statute at issue in *Heydinger*.

The Authority's arguments to the contrary – that the OHB ring levee is of independent value, for example – ignores the project's practical reality. The Fargo-Moorhead metropolitan region is facing significant flood risks. (FEIS Executive Summary at 14.) Mitigating those risks, for the significant numbers of people living in those two communities, is a top priority of the two communities, their states, and the Corps. The OHB communities, on the other hand, have certainly experienced flooding, but do not appear to face the same risk or present the same sense of urgency, unless the diversion project is constructed. (Miller, Berg, Hovland Decl., Ex. A at 1.) In other words, the OHB ring levee is being built now not because its independent value is so great that North Dakota has prioritized the OHB communities over the Fargo-Moorhead region, but because it is an integral part of the overall diversion project. Moreover, it is a part of the diversion project that the Authority – as opposed to the Corps, which lacks earmarked federal construction funding – can easily fund and construct. The Court rejects the Authority's "independent value" argument. Enjoining construction on part of a two-state project – which is conducted by an Authority made up of Minnesota and North Dakota political subdivisions and commenced prior to the completion of Minnesota environmental review (and therefore in violation of Minnesota law) – irrespective of which side of the border that construction is located, does not contravene the bar on the extraterritorial application of state law.

To the extent the Authority contends that such a holding allows Minnesota environmental law to run amok in a different state, it ignores that the holding it seeks would have effectively the same result, just in reverse: in the unique context of a cross-border, two-state project, if political subdivisions seek to evade the environmental review of one state, they can begin construction in the other, generating momentum that neuters the first state's review. *Cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (noting the "difficulty of stopping a bureaucratic steam roller, once started" (internal quotation marks omitted)).  Such a result means that the law of a state with more lenient environmental laws, or that has more political will behind a project, could run amok and wreak havoc on the environmental review regime of a state with more stringent requirements.  *Cf. Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1105 (9th Cir. 2013) ("If we were to invalidate regulation every time another state considered a complementary statute, we would destroy the states' ability to experiment with regulation.").  Ultimately, while the extraterritoriality doctrine is concerned with how a challenged statute might "interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation," *Heydinger*, 15 F. Supp. 3d at 911 (internal quotation marks omitted), this case presents a unique setting: political subdivisions of both states are jointly building a project on the border between the two states.  Therefore, the state environmental regimes of both states are implemented throughout the planning and construction of the overall project.

Indeed, *Heydinger* demonstrates the difficulty of squarely applying the dormant Commerce Clause's extraterritoriality doctrine in this context. *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 547 (4th Cir. 2013) ("Modern dormant Commerce Clause jurisprudence is motivated primarily by a desire to limit economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (internal quotation marks omitted)). Unlike a case involving a Minnesota statute that regulates commercial transactions between out-of-state power producers attempting to transact with out-of-state customers, *Heydinger*, 15 F. Supp. 3d at 916-17, this case involves an attempt to regulate an Authority partially made up of Minnesota political subdivisions, which is beginning construction on a massive environmental project on the border between the two states. The federal environmental review law at issue – NEPA – specifically forecasts the need for projects to comply with state and local law. *See* 40 C.F.R. § 1500.2(c) (directing federal agencies to "[i]ntegrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively"); *id.* § 1506.1(d) ("This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance."). Contrary to the Authority's arguments, the factual setting here is fundamentally and critically distinct from in *Heydinger*.

Moreover, this case is also different than *Heydinger* in part because MEPA and MERA would be regulating Minnesota actors, in part, in this case.[9]  *Cf. Rocky Mountain Farmers Union*, 730 F.3d at 1103 ("When presented with similar rules in the past, we have distinguished statutes that regulate out-of-state parties directly from those that regulate contractual relationships in which at least one party is located in the regulating state." (internal quotation marks and alterations omitted)).  Unlike a state statute that effectively reins in out-of-state energy producers, here, MEPA and MERA would regulate an Authority that is partially led by Minnesota governmental units (the kind expressly regulated by both MEPA and MERA) engaged in a project that will take place, in part, in Minnesota.  *See Heydinger*, 15 F. Supp. 3d at 916 (quoting an attorney's statement at argument that the statute at issue would encompass, regulate, and interfere with "a seller in one non-Minnesota state trying to reach a buyer in another").  As the Supreme Court has said, the dormant Commerce Clause is about protecting interstate commerce from being unduly burdened by states, but it is not a tool to allow citizens to protect themselves from their own responsibilities.  *Goldberg v. Sweet*, 488 U.S. 252, 266 (1989) ("It is not a purpose of the Commerce Clause to protect state residents from their own state taxes.").  In other words, to let the Authority – particularly its Minnesota members – escape Minnesota environmental law via the dormant Commerce Clause,

---

[9] Indeed, because Minnesota actors are involved, the JPA cannot be characterized as impermissibly attempting to subject wholly out-of-state actors to Minnesota's regulatory regime.  *See Energy & Env't Legal Inst. v. Epel*, 43 F. Supp. 3d 1171 (D. Colo. 2014) (noting that the dormant Commerce Clause can preclude a regulatory regime that forces out-of-state actors to gain approval from a state's regulators prior to taking in-state action).

would be to extend that clause's reach beyond its traditional focus on keeping one state from regulating the commerce of another.  It may be that only the Authority's North Dakota members sign construction paperwork as to construction in North Dakota, but, as noted above, that does not change the fact that Minnesota counties and cities are still equal members in the Diversion Authority and that the Authority is ultimately the local sponsor in charge of and responsible for all non-federal funding and construction, including the integral work on portions like the OHB ring levee.  (Integral Determination Report.)

Although no case deals with precisely the issue presented here, several cases do support the Court's conclusion.  The Third Circuit has noted, for example, that "it is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects.  The Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994).  Here, laws governing a project that crosses the border between two states are bound to have some extraterritorial effect.  Both the Third and Seventh Circuits have gone further, as well, acknowledging that states have an interest in these effects when a transaction involves cross-border activity.  *Dean Foods Co. v. Brancel*, 187 F.3d 609, 619-20 (7th Cir. 1999) (quoting and discussing the statement in *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999) ("When an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the

contract."")).  Here again, both states clearly have an interest in regulating the diversion

project and their regulatory regimes will no doubt intersect.  In sum, because of the

unique nature of the cross-border project at issue, because the Authority is partially made

up of Minnesota political subdivisions, and in light of supportive case law and the clear

distinctions between this case and cases like *Heydinger*, the Court concludes that the

dormant Commerce Clause – and especially the extraterritoriality doctrine – do not

preclude the JPA's MEPA and MERA claims.

### 3.    Remittitur

The Authority also argues that, even if the Court allows the JPA's MEPA and

MERA claims to proceed, it must remit them under MERA's remittitur provision.

Minnesota Statute § 116B.08, subd. 1, states:

> If administrative, licensing, or other similar proceedings are required to
> determine the legality of the defendants' conduct, the court shall remit the
> parties to such proceedings.  If administrative, licensing, or other similar
> proceedings are available to determine the legality of the defendants'
> conduct, the court may remit the parties to such proceedings.  In so
> remitting the parties the court may grant temporary equitable relief where
> appropriate to prevent irreparable injury to the air, water, land or other
> natural resources located within the state.  In so remitting the parties the
> court shall retain jurisdiction of the cause pending completion thereof.

The JPA stated at oral argument that it has no objection to its case being remitted.

The remittitur provision, however, falls under MERA.  The statute's language makes

plain that remittitur is appropriate, and required, when administrative proceedings, like

the environmental and permitting review happening now, are required to determine

whether a defendant's actions are legal.  *Id.*  But while the ongoing review may

- 35 -

determine the project's compliance with MERA, the JPA's claims under MEPA do not require an administrative determination first. The Court concludes that the statute does not mandate remittitur where, as here, the ongoing administrative process would not determine the legality of the entirety of the Authority's conduct. *Id.* As a result, the Court declines to remit these proceedings.

## II.     MOTION FOR PRELIMINARY INJUNCTION

In its motion for a preliminary injunction, the JPA asks the Court to enjoin "the defendants and those acting in concert with them [to] cease and desist work on the [OHB] Ring Dike and other work connected that would reconfigure Oxbow to make it ready for the staging and storage component of the diversion project." (Pl.'s Mot. for Prelim. Inj. at 2.) The JPA seeks to enjoin construction both because it contends that the Corps' environmental review has already violated NEPA and, therefore, construction of an illegal project should not be allowed, and, most importantly, because construction of the OHB ring levee would "compromis[e] the State of Minnesota['s] environmental review." (*Id.*)

While the injunction motion is directed at both defendants, it only asks the Court to enjoin the construction of the OHB ring levee, which the Authority alone is carrying out. (*See* Second Spiller Decl., Ex. B at 15, 26-28 (noting that the OHB ring levee work is integral to the overall project, and that the Authority would complete the ring levee and receive in-kind contribution credit for the levee's design and completion costs toward the non-federal portion of the project cost).) Indeed, the Corps conceded at argument that

while the Corps had approved the levee, the authority was constructing it with its own funds.  Although it is true that the Corps could decide to complete the levee in the Authority's absence, (*see id.* ¶ 7 ("[T]he Corps is capable of undertaking design and construction of any Project elements the non-Federal sponsors are unable to perform or prevented from performing.")), that possibility is unlikely to occur, both because no federal dollars have yet been earmarked for the project and because the parties acknowledge that the underlying issues in this case are largely ready for speedy review by the Court, save for the State of Minnesota's environmental review.  As a result, the Court will consider only the JPA's arguments in support of the injunction against the Authority.

## A.  Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Court considers four factors (sometimes referred to as the *Dataphase* factors) in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest.  *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.* (*Dataphase*), 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*,

640 F.2d at 113.  The party requesting injunctive relief bears the complete burden for showing the above factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### B.      Success on the Merits

#### 1.      Standard

While no single *Dataphase* factor is determinative, the likelihood of success on the merits is predominant in the preliminary injunction analysis.  *Janel Russell Designs, Inc. v. Mendelson & Assoc., Inc.*, 114 F. Supp. 2d 856, 863 (D. Minn. 2000).  The general standard is that the movant must show that it has a "fair chance of prevailing" on its claims.  *Planned Parenthood Minn., N.D., S.D. v. Rounds* (*Rounds*), 530 F.3d 724, 732 (8th Cir. 2008) (en banc).  Likelihood of success does not, however, require the moving party to "'prove a greater than fifty percent likelihood that [it] will prevail on the merits.'"  *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase*, 640 F.2d at 113).  In considering whether a movant is likely to prevail on the merits, "a court does not decide whether the movant will ultimately win." *Id.*  Where, as here, a plaintiff alleges several violations of state law and seeks one type of narrow injunctive relief that is tied to all of the alleged statutory violations, it "need only establish a likelihood of succeeding on the merits of any one of those claims in order to satisfy this part of the preliminary injunction standard."  *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003); *see also Occupy Minneapolis v. Cnty. of Hennepin*, 866 F. Supp. 2d 1062, 1068 n.5, 1072 (D. Minn. 2011).

The Corps and the Diversion Authority argue that a more stringent test should apply under this factor.  In *Barrett v. Claycomb*, the Eighth Circuit noted that courts should analyze this first *Dataphase* factor under a stricter "likely to prevail" standard, versus the more lenient "fair chance of prevailing" standard, when seeking to enjoin a statute or regulation.  705 F.3d 315, 321 n.4 (8th Cir. 2013).  That is because statutes or regulations are entitled to more deference because they came about by a "presumptively reasoned democratic process[]."  *Rounds*, 530 F.3d at 732.

The Court will apply the "fair chance of prevailing" standard.  It is true that this project was brought about through a robust environmental planning process that involved significant public input.  But the Eighth Circuit in *Rounds* applied the more stringent "likely to prevail" test more narrowly – not just to governmental decisions that involved public input, but to government statutes and regulations that involved debate and deliberation by an elected legislative body.  *See id.* at 732-33 ("Only in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, must district courts make a threshold finding that a party is likely to prevail on the merits.").[10]

---

[10] *See also id.* n.6 ("Although only a state statute is before us, our reasoning obviously indicates that the 'likely to prevail on the merits' test, rather than the 'fair chance' test, also should apply to the analysis of motions for preliminary injunctions of the enforcement of federal statutes.  Where preliminary injunctions are sought to enjoin city ordinances or administrative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents 'the full play of the democratic process' and, thus, deserves the deference of the traditional test.  *See Able* [*v. United States*, 44 F.3d 128, 131-32 (8th Cir. 1995)]").

At argument, the Authority correctly noted that the project was also authorized in WRRDA, which Congress enacted. Pub. L. No. 113-121, § 7002(2)(4). But that fact highlights another distinction between this case and the Eighth Circuit's "likely to prevail" cases. First, those cases involve a straightforward attempt to enjoin the enforcement of the statute or regulation that was the product of a deliberation by an elected legislative body. *See, e.g.*, *Rounds*, 530 F.3d at 726. Here, the JPA is not trying to enjoin the enforcement of WRRDA – a statute that does not appropriate funds for the diversion project – but is instead simply trying to delay the local partner's construction of part of the project pending Minnesota environmental review. Moreover, even if the JPA were trying to enjoin WRRDA's authorization of the project more broadly, that project was adopted along with other projects pursuant to the Army Corps' Chief's Report. (Chief's Report.) Congress's authorization of a project pursuant to expert agency recommendation is far different than adopting a complex statute through fulsome debate that a plaintiff seeks to permanently bar from being enforced. In sum, the Court concludes that the less stringent "fair chance of prevailing" standard should be applied in this case.

## 2. Fair Chance of Prevailing

### a. MEPA

Counts III and IV of the third amended complaint allege violations of MEPA and MERA, claiming that the project will damage the environment more than necessary since feasible and prudent alternatives exist, (Third Am. Compl. ¶¶ 123-30), and that the OHB

ring levee should not be constructed before the MDNR's environmental review has been completed, (*id.* ¶¶ 131-33).  MEPA "requires that governmental agencies contemplating taking action . . . on a proposed project must first consider the project's environmental consequences."  *Citizens Advocating Responsible Dev.*, 713 N.W.2d at 823.  MEPA requires the preparation of an environmental impact statement for major governmental actions that carry a "potential for significant environmental effects," and a final decision as to the adequacy of that environmental impact statement.  Minn. Stat. § 116D.04, subds. 2a, 3a.  The MDNR is completing an EIS for the diversion project in this case. (Second Doneen Decl. ¶ 2.)

MEPA bars a project from being "started" and a final governmental decision from being rendered until "the environmental impact statement has been determined adequate."  Minn. Stat. § 116D.04, subd. 2b(3); *see also* Minn. R. 4410.3100, subp. 1. MEPA's implementing regulations specify that the governmental unit responsible for carrying out a project "shall not take any action with respect to the project, including the acquisition of property, if the action will prejudice the ultimate decision on the project, . . . until the final EIS has been determined adequate by the [responsible governmental unit] or [Environmental Quality Board]."  Minn. R. 4410.3100, subp. 2.  The regulations define a governmental unit as "any state agency and any general or specific purpose unit of government in the state, including . . . counties, towns, cities, port authorities, housing authorities, and the Metropolitan Council, but not including courts, school districts, the Iron Range Resources and Rehabilitation Board, and regional development commissions."  Minn. R. 4410.0200, subp. 34.  The responsible governmental unit, or

RGU, is "the governmental unit that is responsible for preparation and review of environmental documents." *Id.*, subp. 75. The RGU in this case is the MDNR. (*See* Second Doneen Decl. ¶ 2; First Doneen Decl., Ex. 1 at 2); *see also* Minn. R. 4410.4400, subp. 18.

MEPA explicitly provides a cause of action. Minn. Stat. § 116D.04, subd. 10; *see also Lakes & Parks Alliance of Minneapolis v. Fed. Transit Admin.*, --- F. Supp. 3d ---, No. 14-3391, 2015 WL 999945, at *14 (D. Minn. Mar. 6, 2015) (quoting *Nat'l Audubon Soc'y v. Minn. Pollution Control Agency*, 569 N.W.2d 211, 218 (Minn. Ct. App. 1997)). A MEPA plaintiff "aggrieved by a final decision on . . . the adequacy of an environmental impact statement is entitled to judicial review of the decision" under the standards enunciated in the Minnesota Administrative Procedure Act ("MAPA"). Minn. Stat. § 116D.04, subd. 10; *see also In re Declaring a Negative Need for an Envtl. Impact Statement for the Proposed Living Word Bible Camp Project*, Nos. A13-1153, A13-1157, 2014 WL 3557954, at *5 (Minn. Ct. App. July 21, 2014).[11]

---

[11] MEPA review requires final agency action. *Cnty. of Dakota (C.P. 46-06) v. City of Lakeville*, 559 N.W.2d 716, 721 (Minn. Ct. App. 1997). In addition, MEPA's judicial review provision appears to provide a cause of action primarily against the RGU, or the agency responsible for conducting the environmental review. *See* Minn. Stat. § 116D.04, subd. 10. The parties do not address the issue of final agency action, or whether a MEPA cause of action exists against the Diversion Authority (which consists in part of Minnesota political subdivisions, including the city of Moorhead and Clay County), as opposed to the MDNR, which is preparing the EIS in this case. It is not clear, for example, whether the JPA asserts an implied cause of action under MEPA's implementing regulations against the Authority. *See Lakes & Parks Alliance of Minneapolis*, 2015 WL 999945, at *14 (concluding that no implied cause of action existed under Minnesota Rule 4410.3100 against the RGU in that case, the Metropolitan Council). Given that this case is in an entirely different posture than *Lakes & Parks Alliance* (i.e., a third-party Authority, with Minnesota city and county members, is allegedly violating MEPA; the plaintiff states a MEPA claim and seeks an injunction; and the RGU, the MDNR,

(Footnote continued on next page.)

### b. MERA

MERA "permits any person to maintain a civil action for declaratory or equitable relief against another person 'for the protection of the air, water, land, or other natural resources located within the state, whether publicly or privately owned, from pollution, impairment, or destruction.'"   *White v. Minn. Dep't of Natural Res.*, 567 N.W.2d 724, 737 (Minn. Ct. App. 1997) (quoting Minn. Stat. § 116B.03, subd. 1).  "Person" is defined as "any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality, [or] any public or private corporation. . . ."  Minn. Stat. § 116B.02, subd. 2.  To demonstrate a prima facie case under MERA, "a plaintiff must show (1) the existence of a protectable natural resource; and (2) that defendant's conduct will or is likely to cause pollution, impairment or destruction of that resource."   *White*, 567 N.W.2d at 737.  "Pollution, impairment or destruction" is defined as

> any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency, or political subdivision thereof which was issued prior to the date the alleged violation occurred or is likely to occur or any conduct which materially adversely affects or is likely to materially adversely affect the environment.

Minn. Stat. § 116B.02, subd. 5.

---------------------------------------------

(Footnote continued.)

supports, rather than opposes like the Met Council in *Lakes & Parks Alliance*, the injunction request), the defendants did not raise these issues, and the Court is only considering a preliminary injunction motion at this stage, the Court will assume, without deciding, that the JPA can satisfactorily resolve these issues.

The Minnesota Supreme Court has identified the following factors for determining

whether conduct "materially adversely affects or is likely to materially adversely affect

the environment":

> (1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

> (2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

> (3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable (for example, by replanting trees or restocking fish);

> (4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed);

> (5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action.

*State by Schaller v. Cnty. of Blue Earth*, 563 N.W.2d 260, 267 (Minn. 1997).

### c.     Chance of Prevailing Under MEPA and MERA

The Court concludes that the JPA has a fair chance of prevailing on at least one of

its MEPA and MERA claims.  First, under MEPA, the JPA presents a strong case that

action on the ring levee, which is an integral part of the overall project, (Integral

Determination Report; Supplemental EA at 7), amounts to a violation of MEPA's

prohibition of starting a project prior to an EIS being determined adequate.  Minn. Stat.

§ 116D.04, subd. 2b.  Indeed, since "project" is defined under MEPA as "governmental

action, the results of which would cause physical manipulation of the environment,

directly or indirectly," Minn. R. 4410.0200, subd. 65, and construction is defined as "any

activity that directly alters the environment," Minn. R. 4410.0200, subp. 10, there is little dispute that beginning construction on a project – even if just one portion of it – constitutes the sort of initiation of action that Section 116D.04, subd. 2b proscribes at this point.  Indeed, since the OHB ring levee is intended to mitigate the effects of a specific version of the diversion project, (Coleman Decl. ¶ 6), the JPA also presents a strong case that construction on the OHB ring levee "will prejudice the ultimate decision on the project" by the MDNR.  Minn. R. 4410.3100, subp. 2.

Ultimately, the facts and law are straightforward.  Construction is underway on a project clearly subject to the State of Minnesota's environmental review, (Ex. C, Decl. of Craig O. Evans ("Evans Decl.") ¶ 5, 10, Feb. 12, 2015, Docket No. 162), and Minnesota law bars such action until environmental review is complete, Minn. Stat. § 116D.04, subd. 2b; Minn. R. 4410.3100, subp. 2.  This showing is sufficient to demonstrate a fair chance of prevailing on the merits.  Of course, the JPA's MEPA claims are written more broadly, and target the entirety of the diversion project, (Third Am. Compl. ¶¶ 123-33), but in that broad scope they clearly encompass the argument that action on the OHB ring levee now, prior to the completion of state environmental review, violates MEPA and its regulations, (*see id.* ¶ 132).  Because the Court concludes that the JPA has a fair chance of prevailing on its MEPA claim, the Court need not consider whether the JPA has a fair chance of prevailing on its MERA claim.  *Am. Rivers*, 271 F. Supp. 2d at 250.

The Authority argues that the JPA has no fair chance of prevailing on the merits of its state law claims because the MDNR's review has effectively ejected DSA from consideration and, as a result, "all likely outcomes of MDNR review involve some

variant of the current plan of the F-M Project, including the OHB Ring Levee."
(Authority's Resp. to Pl.'s Mot. for Prelim. Inj. ("Authority's Prelim. Inj. Opp'n") at 27,
Feb. 12, 2015, Docket No. 151 (emphasis omitted).)   While this argument – which
assumes that the state's decision has effectively already been made – might counter a
MEPA claim under Minnesota Rule 4410.3100, subp. 2, which only bars action that
"prejudice[s] the ultimate decision on the project," it ignores the broader requirements of
Minnesota Statute § 116D.04, subd. 2b, which bars a project from being started until the
state EIS has been determined adequate.   Even if the MDNR had effectively ruled out all
alternatives that would not require construction of the OHB ring levee, beginning
construction prior to the completion of the state EIS could still lead to a violation of
MEPA.   Moreover, the MDNR itself, which is conducting the state EIS, disputes the
assertion that it has definitively ruled out DSA as a flood mitigation option.   (Second
Doneen Decl. ¶¶ 5-7 ("Although the DSA is not being fully evaluated as part of the Draft
EIS, it is incorrect to say that the DSA has been dropped from consideration in the State
environmental review process at this time because the process has not been completed").)
As a result, construction on the OHB ring levee, which is tied to the overall project
choice of a diversion channel and high-hazard dam, could plausibly prejudice the
eventual outcome of the environmental review.   Minn. R. 4410.3100, subp. 2.

In addition, the Authority contends that, even if the MDNR changed course and
issued an EIS that disagreed with the current plan for the diversion project, the JPA is
unlikely to succeed against the OHB ring levee specifically, and an injunction is therefore
not justified.   Since the OHB ring levee has independent utility if constructed to levels

that would prevent flooding in the OHB communities if the diversion project was never completed, and since the Authority has voluntarily agreed to limit construction of the OHB levee in 2015 to those levels, the levee is "justified by itself" such that it stands apart from the overall project, irrespective of whether the JPA can successfully assert a MEPA or MERA claim against the rest of the project. *See* 40 C.F.R. 1506.1(c) ("While work on a required program [EIS] is in progress . . . . agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action: (1) is justified independently of the program . . . ."); Minn. R. 4410.0200, subp. 9c ("Two projects are 'connected actions' if a responsible government unit determines they are related in any of the following ways: . . . C. neither project is justified by itself.").

First, the claim that the OHB ring levee is an independent project that would have been constructed in any event is belied by the Corps' supplemental environmental assessment that labels the OHB levee as a component of the overall diversion project that serves the purpose of mitigating the effects of the to-be-constructed high-hazard dam. (Supplemental EA at 7; Coleman Decl. ¶ 6.)  It may be, as several Oxbow residents – including Oxbow's mayor – state, that the ring levee will provide critical flood protection to the OHB communities.  (*See, e.g.*, Decl. of Jim Nyhof ("Nyhof Decl.") ¶¶ 8-9, Feb. 12, 2015, Docket No. 156.)  But the Authority has not shown that the project stands apart, such that the North Dakota legislature would have funded it at this time irrespective of its ties to the overall diversion project.  More importantly, as the MDNR points out, the Authority does not identify any provision under **MEPA** that contains the same caveat as

NEPA under 40 C.F.R. § 1506.1(c).  In other words, the Authority's citation to MEPA's definition of "connected actions" does not appear to weaken or impact the requirements of Minnesota Statute § 116D.04, subd. 2b and Minnesota Rule 4410.3100, subp. 2.  In sum, the Court concludes that the JPA has shown that it has a fair chance of prevailing against the Authority on its MEPA claim.

### C.      Irreparable Harm and Balance of Harms

To succeed in demonstrating a threat of irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Roudachevski v. All–Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks omitted).  The Court must also consider how the threat of irreparable harm to the moving party weighs against "any injury an injunction would inflict on other interested parties."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009).  When asserting a claim under NEPA – or because of their similarities, under MEPA, *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1171 (8th Cir. 1994) ("Procedures under MEPA are in large measure similar to, and coextensive with, those under NEPA.") – a failure to comply with required environmental review procedures is a harm in and of itself.  *Sierra Club*, 645 F.3d at 995 (noting that, in considering whether irreparable harm exists, it is appropriate for a district court to take into account the "difficulty of stopping a bureaucratic steam roller, once started" (internal quotation marks omitted)).  A plaintiff must also show harm to his "specific environmental interests."  *Id.*

Here, the JPA has sufficiently demonstrated a procedural harm under MEPA, by showing that the Authority is moving forward with an integral part of the diversion project prior to the completion of the MDNR's environmental review, in violation of Minnesota Statute § 116D.04, subd. 2b and Minnesota Rule 4410.3100, subp. 2. *Id.* The more important question is whether the JPA has shown sufficient allegations of harm to its "specific environmental interests." *Id.*

The Authority claims the JPA has failed to show irreparable harm, arguing that none of the declarations provided by the JPA are from officials or residents of Richland and Wilkin Counties, and therefore that they do not allege any irreparable harm to the JPA itself. Moreover, the Authority contends that the JPA's declarations allege vague and non-specific harms that are not imminent, *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544-45 (8th Cir. 1982) ("[N]o individual landowner would sustain immediate or irreparable harm by allowing construction because the initial operation of the project will not begin until [five years later]."), and all of the harms alleged could be compensated by money damages, *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 689 (1995) ("Plaintiffs have made no showing that their injuries are not compensable in dollars.").

The Court concludes that the JPA has sufficiently demonstrated irreparable harm. First, although some of the JPA's declarations are somewhat vague and not sufficiently connected to the JPA, the Authority dispenses with all of the declarations too quickly. For example, one declaration is from Pleasant Township. The chair and former chair of the JPA have submitted a declaration that clarifies that Pleasant Township, although not

within Richland or Wilkin Counties, is a member of the JPA.  (Miller, Berg, Hovland Decl. ¶ 3.)  The Authority cites no precedent – including Minnesota's joint powers law, Minnesota Statute § 471.59 – that states that a township from one county cannot be a member of a joint powers authority that is tied to two other counties.[12]  Pleasant Township, which faces significant flooding from the diversion project, asserts specific harms that will result from the project.  (Decl. of MaryJane Nipstad, Pleasant Township Clerk ("Nipstad Decl."), Feb. 11, 2015, Docket No. 129).  It is true that construction of the overall project, and the flooding that will result, is likely years down the road.  But construction here is critically tied to that eventual harm, because the OHB levee is tied to one specific configuration of the diversion project that, if completed, will have a certain and significant impact on citizens in Pleasant Township and elsewhere.  That certain and significant impact will no doubt have immediate consequences in terms of property value, at a minimum.  In any event, the JPA has shown a procedural injury, and sufficient threat of environmental harm, to meet the standard set in *Sierra Club*.

Finally, as to the balance of harms, the Court acknowledges that delay may result in higher construction costs, continued risk of flooding for the OHB communities, and uncertainty for homeowners within the ring levee that are attempting to sell their homes.  (*See, e.g.*, Decl. of John Rustvang ("Rustvang Decl."), Feb. 12, 2015, Docket No. 157.)

---

[12] Indeed, the opposite appears to be true.  *See generally, e.g.*, Beth Walter Honadle, *Choices for Change*, Minnesota Extension Service, No. BU-6541-F at 15 (Jan. 1995) ("Q. Can we include cities from other counties in a joint powers agreement?  A. Yes, joint powers agreements are not limited by geography."), *available at* http://conservancy.umn.edu/bitstream/handle/11299/55918/6541.pdf?sequence=1.

But, as noted above, those arguments are belied by two points. First, Minnesota's environmental review should be completed soon and the injunction need not be a lengthy one. Second, prior to the agreement to build the ring levee, OHB-community residents noted that they themselves had created significant flood protection and that the completed diversion project was what posed the greatest risk to them. (*See, e.g.*, Miller, Berg, Hovland Decl. Ex. A at 1.) While they do face a risk, that risk is less the motivation for the OHB ring levee than the need to pave the way for the diversion project. In sum, the JPA has shown sufficient risk of irreparable harm and the balance of harms weighs in the JPA's favor.

### D.     Public Interest

Finally, before granting a preliminary injunction, the Court must also consider the public interest. *Gen. Motors Corp.*, 563 F.3d at 316. The Court finds that the public interest clearly aligns with the JPA. The costs of delaying construction, with respect to the longer-term public interest in constructing the diversion project and mitigating floods in Fargo-Moorhead, are relatively minor. But the public's interest in enforcing a state's environmental laws, and, in particular, ensuring that every major environmental action is subjected to robust review and compliant with all of the relevant federal, state, and local requirements, is significant. As a result, the Court concludes that the public interest favors granting the JPA's request for a preliminary injunction. And, since the Court finds

in the JPA's favor on all four factors,[13] the Court will grant the JPA's preliminary injunction motion.[14]

## CONCLUSION

The Court emphasizes that the scope of this injunction is narrow – it applies only to construction of the OHB ring levee – and the length of the injunction may be short – it applies only until the State of Minnesota has completed its environmental review of the diversion project and the Court has had the opportunity to review the legal landscape at that time.  The law simply requires that all federal and state environmental review be completed before construction begins.  Construction of the OHB ring levee violates this principle and creates the real risk of a "steam roller" effect.  When considering a project of this size, scope, and potential environmental impact, the review process must be

---

[13] To the extent the Authority contends that the Court should not grant the injunction because the JPA has not challenged other construction on the diversion project in Fargo, the Court will not consider that argument.  The Court will consider only the preliminary injunction motion that is before it.

[14] Federal Rule of Civil Procedure 65(c) requires the party moving for a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Court may also waive the security requirement.  *See, e.g.*, *Fantasysrus 2, L.L.C. v. City of East Grand Forks, Minn.*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012) (noting that the Rule 65(c) requirement may be waived when "no demonstrable harm" would occur to the enjoined party).  Because the parties did not discuss Rule 65(c) in detail in their briefs and because the Authority requested the opportunity to present more evidence on the security requirement, (*see* Authority's Prelim. Inj. Opp'n at 42), the Court will waive the security requirement at this point and order additional briefing on the issue.  *See Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713, 723 (D. Minn. 2006) (waiving the security requirement in a case in which the defendant did not object to waiver and in which the defendant did not attempt "to quantify any dollar amount of harm that it may face from a wrongly issued injunction").

completed first.   When Minnesota has completed a State FEIS and an adequacy determination, the Court will further consider this case.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The State of North Dakota's unopposed motion for leave to participate as amicus curiae [Docket No. 185] is **GRANTED**.

2.      The federal defendants' partial motion to dismiss [Docket No. 141] the third amended complaint, Counts III, IV, and V, is **GRANTED**.   These claims against the federal defendants are **DISMISSED without prejudice**.

3.      The Authority's motion to dismiss [Docket No. 145] the third amended complaint, Counts III, IV, and V, is **GRANTED in part**, and **DENIED in part** as follows:

      a.      The Authority's motion to dismiss Count V is **GRANTED**. Count V against the Authority is **DISMISSED without prejudice**.

      b.      The Authority's motion to dismiss Counts III and IV is **DENIED**.

4.      The JPA's motion for a preliminary injunction [Docket No. 122] is **GRANTED** against the Authority until further order of this Court.   All physical construction activities related to the OHB ring levee, if ongoing, must cease immediately. The Clerk shall enter judgment on this motion.

      a.     Until the Court considers additional briefing on the issue, the security requirement in Federal Rule of Civil Procedure 65(c) is waived.

      b.     No later than 7 days after the filing of this Order, the Authority and the JPA shall submit briefs, no more than 10 pages in length, that discuss whether the security requirement in Federal Rule of Civil Procedure 65(c) should be waived and, if not, what the proper amount should be.

DATED: May 13, 2015
at Minneapolis, Minnesota.

                                     JOHN R. TUNHEIM
                             United States District Judge