# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

RICHLAND/WILKIN JOINT POWERS
AUTHORITY,

Plaintiff,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS, JOHN MCHUGH, JO-ELLEN
DARCY, and COL. DAN KOPROWSKI,

Defendants,

v.

FARGO-MOORHEAD FLOOD DIVERSION
BOARD OF AUTHORITY,

Intervenor Defendant.

Civil No. 13-2262 (JRT/LIB)

**MEMORANDUM OPINION
AND ORDER ON
CROSS MOTIONS FOR
SUMMARY JUDGMENT**

---

Gerald W. Von Korff, **RINKE NOONAN**, P.O. Box 1497, St. Cloud, MN 56302, for plaintiff.

Carol Lee Draper, **UNITED STATES DEPARTMENT OF JUSTICE**, 601 D Street N.W., Room 3106, Washington, D.C.  20579, for defendants.

Michael R. Drysdale and Robert E. Cattanach, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402, for intervenor-defendant.

Plaintiff Richland/Wilkin Joint Powers Authority ("JPA") alleges that Defendants violated state and federal laws in allegedly not devoting sufficient attention to one particular Minnesota alternative to a proposed flood diversion project that the U.S. Army Corps of Engineers ("Corps") decided to place in North Dakota.  The JPA's theory of the case is that the Minnesota alternative route would have been better in terms of floodplain protection, and Defendants ignored that concern in their study of alternatives.     The

Court's order today concerns only the JPA's federal claims brought under the National Environmental Protection Act ("NEPA").   Because NEPA's provisions are largely procedural, and the Corps studied the at-issue Minnesota route at length, the Court will grant Defendants' motions for summary judgment.

The Court notes that it passes no judgment on whether the North Dakota route that the Corps ultimately selected is the best route either generally or for the environment. The Court's task today is not to decide whether the Minnesota alternative is good, or the selected North Dakota route is bad.   The Court's role is only to evaluate whether the government's decision-making process in declining to choose the Minnesota route was "arbitrary and capricious."   It was not.

Even after today, this case will go on.   The JPA's Minnesota law claims have not yet been decided and the Court's previously granted injunction will continue for the time being.

## BACKGROUND

The Court has issued numerous orders in this case and those orders have discussed the facts at length.   *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1043, 1045-55 (D. Minn. 2014).   The Court will revisit these facts only to the extent necessary to provide context for and decide the motions now pending before the Court.

## I.    THE PARTIES

The JPA is a joint authority created by Richland County in North Dakota and Wilkin County in Minnesota pursuant to statutes in each state allowing their respective government units to jointly and cooperatively exercise power with other government units, even those in other states.   *See* Minn. Stat. § 471.59 ("JOINT EXERCISE OF POWERS"); N.D. Cent. Code § 54-40.3 ("JOINT POWERS AGREEMENTS"). Richland and Wilkin Counties formed the JPA to protect their citizens and their citizens' property from flooding.

The Corps is a federal agency involved in the development of the flood prevention project at issue in this case.

Defendant Fargo-Moorhead Flood Diversion Board of Authority ("Diversion Authority") is also a joint authority formed pursuant to Minnesota and North Dakota's joint powers statutes.   The Diversion Authority was formed by the following government units:   the City of Fargo, North Dakota; Cass County, North Dakota; Cass County Joint Water Resources District, North Dakota; the City of Moorhead, Minnesota; Clay County, Minnesota; and the Buffalo-Red River Watershed District, Minnesota.   The Corps designated the Diversion Authority as the local entity that would develop and manage the diversion project at issue in this case.

## II.    FACTUAL BACKGROUND

The Red River of the North originates at the confluence of two tributaries, demarking nearly the entirety of the Minnesota-North Dakota border.   The Red flows northward through the Red River Valley, eventually emptying into Lake Winnipeg in

Canada.  For as long as humans have lived on the Red River, the river has flooded, sometimes to disaster.  In 2008, the Corps, Fargo, and Moorhead together began a feasibility study to examine "alternatives . . . to reduce flood risk in the entire Fargo-Moorhead Metropolitan area."  (A.R. at 49,644.)[1]  After a devastating flood in 2009, the project gained momentum.

In December 2009, the Corps published an "Alternatives Screening Document" indicating that it had identified a "wide array of initial alternatives" for how communities along the Red River should address future flood risks:  continue the status quo and respond to floods with "emergency measures"; take "[n]onstructural measures" to reduce flood risks by, for example, relocating flood-prone structures, elevating at-risk structures, and bolstering the role of wetlands and grasslands; build "[f]lood barriers," such as levees and floodwalls; "[i]ncrease conveyance" of water by building "[d]iversion channels around the study area" either in Minnesota or in North Dakota; or take action to increase "[f]lood storage," by for example building "[d]istributed storage" and "[l]arge dams upstream."  (*Id.* at 990, 998-99.)  That document analyzed the various alternatives and recommended that two options be considered for further evaluation:  taking no action, and building diversion channels.  (*Id.* at 1,033.)   The document reported that the Corps had conducted an initial screening of nine different diversion channels running along four different "alignments":  a 25-mile alignment in Minnesota, a 29-mile alignment in

---

[1] The Corps lodged a CD-ROM copy of the 63,239-page administrative record with the Court.  (Notice by U.S. Army Corps of Eng'rs at 1, Feb. 27, 2015, Docket No. 177.)  The Court will cite to the administrative record as "A.R."  Many of the key documents found in the administrative record, including the FEIS, can be found at http://www.fmdiversion.com.

Minnesota, a 35-mile "west" alignment in North Dakota, and a 36-mile "east" alignment in North Dakota. (*Id.* at 1008-09.) The Corps initially considered varying capacities for each alignment ranging from 25,000 to 45,000 cubic feet of water per second ("cfs"). (*Id.*)

Corps policy required that it designate one of the various alternatives as the "national economic development" ("NED") plan, and that it propose that plan for implementation "unless there are overriding reasons for recommending another plan, based on other Federal, State, local and international concerns." (*Id.* at 6,903, 6,914.) To designate an NED plan, Corps policy required it to analyze the alternatives to determine which option "reasonably maximizes net national economic development . . . benefits consistent with protecting the environment." (*Id.* at 6,903; *see also id.* at 6,955 (citing the "Corps of Engineers Planning Guidance Notebook").) The Corps does not analyze the options according to benefit-cost ratio when determining which alternative receives the NED designation; the Corps only considers the net benefits of each option. (*Id.* at 6,937.) The only example relevant here of when the Corps may propose a plan other than the NED plan is if and when another plan "has positive net economic benefits and is approved by the Assistant Secretary of the Army for Civil Works." (*Id.* at 6,903.) This alternative to the NED plan is referred to as the "locally preferred plan" ("LPP"). (*Id.* at 6,903, 6,914.)

Over months and multiple phases of analyses, the Corps initially concluded that the 25-mile ("short") Minnesota 20,000 cfs diversion was the NED plan (*id.* at 1,135, 1,138), but then later, upon further study, granted the NED plan designation to the short

Minnesota 40,000 cfs diversion, estimating that it would net an average of $105,600,000 in annual benefits (*id.* at 6,937).  The Cities of Fargo and Moorhead and Cass and Clay Counties, however, requested that the Corps consider recommending the North Dakota east 35,000 cfs diversion as the LPP.   (*Id.* at 6,696-6,703 (reprinting resolutions supporting the North Dakota diversion as the LPP).)

On April 19, 2010, in a seven-page single-spaced letter, Theodore A. Brown of the Corps wrote to Assistant Secretary of the Army Jo-Ellen Darcy and requested that she grant an LPP-exception allowing the Corps to recommend the North Dakota plan instead of the Minnesota-alignment NED plan.  (*Id.* at 6,687.)  Brown's letter described both the LPP and the NED plan, compared the two plans, and concluded that although the NED "produces greater net benefits" than the LPP, the LPP was better because it produced "larger overall economic benefits to more people and a greater geographic area." (*Id.* at 6689-91.)  On April 28, 2010, Darcy issued a memorandum "grant[ing] the requested policy exception because the LPP would significantly reduce flood damages, the risk of loss of life, and the need for emergency flood fighting measures." (*Id.* at 6,707.)  Darcy stated the LPP would better reduce average annual damages as compared to the NED plan, benefit "6,625 more people and protect about 3,100 more structures," and hold in place the expected costs for the federal government.  (*Id.*)[2]  Both Brown and Darcy

---

[2] Brown and Darcy based their analyses on the original NED plan with 20,000 cfs, but anticipated that the NED-plan designation might change to apply to a larger capacity project, as it eventually did.  (A.R. at 6,689 (noting "that the NED plan may actually be a larger capacity Minnesota diversion"); *id.* 6,707 (stating the Corps "may change the NED Plan designation to a larger capacity diversion in Minnesota").)  Brown and Darcy acknowledged that an NED plan with a larger capacity would lessen the differences with the LPP, but concluded that the change

(Footnote continued on next page.)

acknowledged that the LPP would remove more land from the floodplain than the NED plan, but that factor did not alter their conclusion.  (*Id.* at 6,691, 6,707.)

In May 2010, the Corps published a Draft Environmental Impact Statement ("Draft EIS").  (*Id.* at 6,848.)  The Draft EIS discussed how the Corps had studied the benefits and costs of taking no action, building six variations of the Minnesota diversion including the version the Corps labeled the NED plan, building two different variations of the North Dakota diversion including the version labeled the LPP, and versions of the diversions with various "non-structural measures."  (*Id.* at 6,862.)  The Draft EIS indicated the Corps next refined its analysis to the NED plan and the LPP.[3]  The Draft described the NED plan, described the LPP, and devoted 27 pages to a comparison between the alternatives.  (*Id.* at 6,938-66.)  For example, the Draft EIS noted that the NED plan would "include[] a large control structure on the Red River which is an operable structure with three tainter gates 40 feet wide and 40 feet high"; the "diversion channel [would have] a maximum excavation depth of 30 feet with a bottom width of 360

_____

(Footnote continued.)

in capacity would not alter the overall analysis, and that the LPP would remain the better plan. (*Id.* at 6,690 (noting that "[a] larger capacity NED Plan would . . . reduce the gap in performance between the NED Plan and the LPP," but continuing to recommend the LPP); *id.* at 6,707 (approving the LPP based on the assumption that the "differences in effects between the NED Plan and the LPP" will remain similar to those for the 20,000 cfs Minnesota diversion).)

[3] The Corps actually compared the LPP to the 35,000 cfs Minnesota plan instead of the 40,000 cfs Minnesota plan which had been designated as the NED plan because the former was better suited to estimating federal cost sharing for each respective plan.  (*Id.* at 6,863, 6,937.) The Corps referred to the 35,000 cfs Minnesota plan as the "Federally Comparable Plan" or "FCP" in numerous record documents, but the Court will refer to the 35,000 and 40,000 cfs Minnesota plans together as "the NED plan" because the differences between the two are slight and the parties agree that the distinction is without a difference for the Court's purposes today.

feet"; the "total footprint [would have] maximum width of 2150 feet, and [would] affect 6,415 acres of land"; and would require seven property "buyouts," "elevating the main floor on 22 structures, elevating the entire structure on 22 [other structures]," as well as "construct[ing a] flood wall" around the public school in Harwood, North Dakota. (*Id.* at 6,958-59.) A similar study of the LPP was included too. (*Id.* at 6,959-61.)

In a later Supplemental Draft EIS, and eventually in the Final EIS, the Corps continued to refine its plans, and to publish and describe the varying drawbacks and advantages of the NED plan and the LPP. In the Final EIS, the Corps explicitly highlighted the NED plan's advantage with respect to one particular factor: protecting floodplains from development.

> The LPP . . . significantly reduce[s] flood frequency on approximately 70 and 80 square miles, respectively, currently located in the 1-percent chance event FEMA floodplain. The LPP . . . reduce[s] flood risk from all of the rivers in the North Dakota portion of the study area. The [NED plan] significantly reduces flood frequency on approximately 30 square miles currently located in the 1-percent chance event floodplain, but it does not address the Sheyenne River and its tributaries. **Because of the different impacts on existing floodplain, the [NED plan] is more acceptable than the LPP . . . to people and agencies concerned with expanding floodplain development and protection of existing floodplain function.** However, . . . the Fargo-Moorhead metropolitan area is expected to grow at a rate of 266 acres per year, regardless of whether a flood risk management project is constructed. The LPP would generally prohibit development in portions of the staging area that would have flood depths of 3 feet or greater at the 1-percent chance event, reducing impacts on the floodplain.

(*Id.* at 49,777 (emphasis added).) In other words, the Corps weighed the NED plan's advantage of being marginally better for the protection of floodplain with the LPP's advantage of reducing flood risk in a larger geographic area and covering additional tributaries, all before concluding that the latter factor weighed more heavily. (*Id.*)

The Corps finally selected the LPP plan as its proposed action, and the Corps' Acting Chief of Engineers endorsed the action in December 2011.  (*Id.* at 48,864-71.) The Assistant Secretary of the Army signed a "Record of Decision" and forwarded the Corps' relevant reports and studies to Congress in April 2012.  (*Id.* at 49,574-75.)  And then in 2014, Congress passed and the President signed the Water Resources Reform and Development Act of 2014, specifically authorizing the Corps' project.  Pub. L. No. 113-121, § 7002(2)(4), 128 Stat. 1193 (2014).

## III.   PROCEDURAL BACKGROUND

The JPA filed its initial complaint in this action on August 19, 2013, naming only the Corps as a defendant.  (Compl., Aug. 19, 2013, Docket No. 1.)  At first, the JPA alleged that in developing and choosing the LPP, the Corp violated Minnesota law, Executive Order 11988 ("E.O. 11988"), and the National Environmental Protection Act ("NEPA").  (First Am. Compl., Oct. 22, 2013, Docket No. 14.)  In November 2013, the Court granted the Diversion Authority leave to intervene.  Then in May 2014, the JPA amended its complaint upon stipulation of the parties, this time naming both the Corps and the Diversion Authority as defendants and limiting their allegations to violations of NEPA; the new complaint excluded not only the counts related to Minnesota law, but also those alleging violations of E.O. 11988.  (Second Am. Compl., May 2, 2014, Docket No. 47.)

One month later, in June 2014, the Diversion Authority began construction on a "ring levee" located in the Oxbow-Hickson-Bakke area of North Dakota (the "OHB ring levee").  Almost immediately, the JPA filed a new action in Wilkin County, North

Dakota Court requesting an injunction prohibiting the Diversion Authority (but not the Corps) from building the diversion project.  (Diversion Auth.'s Mot. for Prelim. Inj., Ex. 1 at 20-21, June 19, 2014, Docket No. 53.)  The JPA's North Dakota state court complaint alleged anticipated violations of some of the same Minnesota statutes that the JPA initially pursued but abandoned in federal court.  (*Compare id.* (alleging violations of Minn. Stat. § 116D), *with* First Am. Compl. (same).)

Back in federal court, the Diversion Authority requested and the Court granted an injunction preventing the JPA from further pursuing its Wilkin County state court action, because the state court action pursued essentially the same relief as that requested in federal court.  *Richland/Wilkin*, 38 F. Supp. 3d at 1059.  The Court explicitly welcomed the JPA to assert its state law allegations in the federal proceeding.  *Id.* at 1045.

The JPA followed the Court's suggestion and filed the now-operative complaint – the Third Amended Complaint – on November 4, 2014.  (Third Am. Compl.)  It contains five counts:  Counts I and II allege NEPA violations against the Corps and the Diversion Authority.  (*Id.* ¶¶ 88-122.)  The remaining counts involve state law allegations, again against both the Corps and the Diversion Authority:  Count III alleges violations of the Minnesota Environmental Rights Act ("MERA"), Count IV alleges violations of the Minnesota Environmental Policy Act ("MEPA"), and Count V alleges violations of state and local permitting laws.  (*Id.* ¶¶ 123-39.)  The Third Amended Complaint does not contain an E.O. 11988 claim.

Next, the JPA filed a motion for a preliminary injunction with this Court, asking the Court to do what the JPA had originally asked of the Wilkin County Court:  enjoin

the Diversion Authority from constructing the OHB ring levee.   (Pl.'s Mot. for Prelim. Inj., Feb. 11, 2015, Docket No.122.)   In turn, the Diversion Authority and the Corps filed motions to dismiss Counts III, IV, and V – the state and local law claims.   (The Corps' Partial Mot. to Dismiss Third Am. Compl., Feb. 11, 2015, Docket No. 141; Diversion Auth.'s Mot. to Dismiss, Feb. 11, 2015, Docket No.145.)   The Court ruled on the motions together in a single order in May 2015.   *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, No. 13-2262, 2015 WL 2251481 (D. Minn. May 13, 2015).   The Court dismissed Counts III, IV, and V against the Corps because the Corps is not bound by the relevant state laws.   *Id.* at *7-8.   The Court also dismissed Count V against the Diversion Authority because the JPA had not shown that the relevant state and local permitting laws were broad enough to support the requested relief.   *Id.* at 13 n.7.   But the Court declined to dismiss Counts III and IV – the MERA and MEPA claims – against the Diversion Authority.   The Diversion Authority had argued that those claims must be dismissed because any injunction based on Minnesota law prohibiting construction activities inside the borders of North Dakota would impermissibly extend the reach of Minnesota's law outside of the state's borders.   The Court disagreed, however, and held that such an injunction would not impinge on extraterritoriality or dormant Commerce Clause principles because of the cross-border nature of diversion project, as well as the fact that the JPA and the Diversion Authority entities are partially composed of Minnesota governmental units – Minnesota cities and counties, for example – that are subject to Minnesota law.   *Id.* at *10-15.   Finally, the Court granted the JPA's request for a preliminary injunction with respect to Counts III and IV against the Diversion Authority,

ordering that all construction on the OHB levee be immediately put to a halt.  *Id.* at \*24-25.  The Court held that the JPA had a fair chance of succeeding on the merits of its claim that the Diversion Authority's decision to begin construction on the OHB ring levee prior to Minnesota's issuance of an EIS would violate Minnesota law.  *Id.* at \*16-24.   The Court took care to note,

> [T]he scope of this injunction is narrow – it applies only to construction of the OHB ring levee – and the length of the injunction may be short – it applies only until the State of Minnesota has completed its environmental review of the diversion project and the Court has had the opportunity to review the legal landscape at that time.

*Id.* at \*24.

Now the following claims remain:  Counts I and II against the Corps and Counts I-IV against the Diversion Authority.  Count V has been dismissed in the entirety.   On June 30, 3015, the JPA moved the Court to grant summary judgment.  (JPA's Mot. for Summ. J., June 30, 2014, Docket No. 254.)  On August 28, 2015, the Corps and the Diversion Authority each filed their own separate motions for summary judgment on Counts I and II.  (Diversion Auth.'s Cross Mot. for Summ. J., Aug. 28, 2015, Docket No. 298; U.S. Army Corps' Cross Mot. for Summ. J., Aug. 28, 2015, Docket No. 300.)

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable

jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.     NEPA CLAIMS AGAINST THE CORPS

### A.     COUNT I:  NEPA

#### 1.     E.O. 11988

Count I of the JPA's complaint alleges NEPA violations against the Corps. (Compl. ¶¶ 88-117.)  Yet in the present motions the JPA declined to base its argument on NEPA's statutory commands.  Instead, the JPA relies almost entirely on an argument that the Corps violated E.O. 11988, a 1977 executive order that prescribes a process by which federal agencies are to consider environmental effects when taking actions in floodplains. Exec. Order 11988, 42 F.R. 26951 (May 24, 1977).

As an initial matter, the Court notes that the operative complaint does not contain an E.O. 11988 claim.  It appears that the JPA's theory is that a violation of E.O. 11988 is necessarily a violation of NEPA; the two are somehow coextensive.  Even if the Court were to accept this as true – although the Court does not – the Court still could not review the Corps' actions for compliance with the executive order.  Most executive orders "are not judicially enforceable in private civil suits."  *In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1357 (D.C. Cir. 1980).  The exception is when an executive order (1) possesses a "specific foundation in congressional action," *id.*, and "the force and effect of law," *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235-36 (8th Cir. 1975); and (2) was "intended" by the President to be "a legal framework enforceable by private civil action," as opposed to a "managerial tool for implementing the President's personal . . . policies," *id.* at 235-36.  Thus, "[a]n Executive Order devoted solely to the internal management of the executive branch – and one which does not create any private rights – is not . . . subject to judicial review."  *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993).  At least three strong bases support the rule against judicial review of compliance with an executive order:  first, courts lack federal question jurisdiction over claims brought to enforce executive orders not coextensive with a statute or some constitutional provision; second, a party may always petition the president with concerns about purported violations of an executive order; and third, principles of separation of powers counsel the Judiciary to remain uninvolved in the Executive's internal management.  Erica Newland, Note, *Executive Orders in Court*, 124 Yale L. J. 2026, 2076-77 (2015).

In light of these principles, the Court finds that it may not review the Corps' actions in this case for purported violations of E.O. 11988.  First, E.O. 11988 does not have the force and effect of law.  When President Carter promulgated the order, he did so under authority vested in him by the Constitution and unspecified "statutes," never specifying what exact laws the order was meant to enforce.  42 F.R. at 26951 ("By virtue of the authority vested in me by the Constitution and statutes of the United States of America . . . .").  While the executive order states that its provisions are "in furtherance" of NEPA as well as two other flood-related federal statutes, the executive order does not suggest its provisions are coextensive with any of those statutes.  *Id.*  In other words, nothing in E.O. 11988 indicates it is anything more than a managerial tool for implementing the President's personal policies.

Second and perhaps more importantly, President Obama amended E.O. 11988 in January 2015, adding the following text:  "This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."[4]  The President could not have been more explicit that he did not intend for E.O. 11988 to create an enforceable legal framework.

---

[4] Barack Obama, Executive Order Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input § 5(c) (Jan. 30, 2015), https://www.whitehouse.gov/the-press-office/2015/01/30/executive-order-establishing-federal-flood-risk-management-standard-and-.

The Court therefore finds that it lacks the ability to review the Corps' actions for violations of E.O. 11988.[5]

## 2. NEPA

Although the JPA's E.O. 11988 arguments cannot succeed on their own terms, the Court will consider whether they may be successful if restyled under NEPA. The provisions of NEPA applicable here require all federal agencies to prepare, for all "legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" that addresses, among other topics, the action's "environmental impact" and "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C). This statement is termed an "environmental impact statement" ("EIS") in communities familiar with NEPA. NEPA also requires federal officials to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available

---

[5] The Court conducted a review of cases discussing E.O. 11988 to determine whether other courts, as a matter of practice, find government application of the order subject to judicial review. While a number of courts have reviewed government actions under E.O. 11988, those courts have typically done so without ever discussing whether they had the power to do so, and the Court is aware of no case where a court both applied E.O. 11988 and found a violation. *See, e.g.*, *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1214 (11th Cir. 2012) (applying E.O. 11988 without considering whether the court could, but then finding no violation); *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1018-19 (10th Cir. 2012) (same); *Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 447 (D.C. Cir. 1994) (same); *Olmstead Citizens for a Better Cmty. v. United States*, 606 F. Supp. 964, 980 (D. Minn. 1985) (same). The Court found only one case where a court actually considered whether it had the power to apply E.O. 11988 and did so, but that case was decided prior to President Obama's January 2015 amendment to E.O. 11988 explicitly stating that the order is not intended to be subject to judicial review. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1165-66 (9th Cir. 1997).

resources."[6]  *Id.* § 4332(2)(E).  The purpose of these provisions is to ensure that agencies informedly consider environmental concerns when making decisions and disclose as much to the public.  *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973

---

[6] The full text of the relevant parts of the statute reads,

The Congress authorizes and directs that, to the fullest extent possible:  . . . (2) all agencies of the Federal Government shall—

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

    (i) the environmental impact of the proposed action,

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    (V) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

    Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.  Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

. . . .

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

42 U.S.C. § 4332(2)(C), (E).)

(8th Cir. 2011) (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) and *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).  But while "NEPA does set forth significant **substantive goals** for the Nation, . . . its mandate to the agencies is essentially **procedural**." *Vt. Yankee*, 435 U.S. at 558 (emphasis added).  A court may not set aside a NEPA-related agency decision "simply because the court is unhappy with the result reached," and it is not the Court's role to decide whether an agency's decision is one the Court "would have reached had [it] been [a] member[] of the decisionmaking unit of the agency." *Id.*  Courts may set aside agency decisions "for substantial procedural" reasons, but not for disagreements about the outcome of that decision.  *Id.*

Judicial review of agency decisions for NEPA violations is also highly deferential. NEPA itself "does not authorize a private right of action," and so courts review agency compliance with NEPA under the Administrative Procedures Act ("APA").  *Friends of the Norbeck*, 661 F.3d at 973.  "Under the APA, a reviewing court will not set aside agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Sierra Club v. Kimbell*, 623 F.3d 549, 559 (8th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

The JPA's first argument with a basis in NEPA is that the Corps failed to recognize that the NED plan was "a [s]uitable [a]lternative to [f]loodplain [d]evelopment," and, as the Court understands the argument, the Corps therefore violated § 4332(C) and (E)'s commands that the Corps "study the environmental impact" of its proposed action and "study, develop, and describe" alternative actions.  (JPA's Mem. in Supp. of Mot. for Summ. J. at 17-19, June 30, 2015, Docket No. 256.)  The Corps,

however, did study the NED plan and its admittedly better effect on floodplains as compared to the LPP.  As described above, the Corps extensively studied a variety of diversion plans and eventually narrowed its process to only the NED plan and the LPP.  The best evidence that the Corps took the NED plan seriously is the fact that it called the plan the "NED plan" at all; that designation could only belong to the plan that the Corps thought would maximize economic benefit while protecting the environment.  It is simply incorrect to say the NED plan's environmental effects were not studied – they were studied at length.

The Corps also explicitly compared the LPP and the NED plan's respective environmental effects on floodplains.  In the Final EIS, the Corps acknowledged that the NED plan was the "more acceptable" approach to "people and agencies concerned with expanding floodplain development and protection of existing floodplain function."  (A.R. at 49,777.)  But in the same breath, the Corps noted that floodplain impact was not the only factor at issue:  the LPP would reduce flood frequency on 40 to 50 more square miles than the NED plan would, and the LPP would address flooding on the Sheyenne River and its tributaries, while the NED plan would not.  (*Id.*)  Just because the Corps did not select the NED plan does not indicate it did not notice its environmentally superior effect on affected floodplains.  It is also worth noting that when presented with the option, the Corps did not always take the path that diverged from floodplain concerns.  For example, the Corps narrowed its focus to eastern alignments of the North Dakota diversion in part because of the western alignment's more severe negative effects on floodplains.  (*Id.* at 49,752-56.)  Similarly, the Corps declined to move the inlet of the

LPP to the south of the North Dakota towns of Oxbow and Hickson and the Bakke subdivision in part because of concerns about effects to floodplains.  (*Id.* at 49,756.)

The JPA's second argument that sounds in NEPA is that the State of Minnesota raised a variety of concerns in comments to which the Corps did not adequately respond in its EIS.  As mentioned above, NEPA requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves **unresolved conflicts** concerning alternative uses of available resources."  42 U.S.C § 4332(2)(E) (emphasis added).  Federal regulations interpret this provision to require an agency's EIS to address "unresolved conflicts" in a variety of ways:  An "agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."  40 C.F.R. § 1502.9(a).  An agency's EIS "shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)" and "[w]here any inconsistency exists, the [EIS] should describe the extent to which the agency would reconcile its proposed action with the plan or law."  *Id.* § 1506.2(d).  And an EIS must include discussions of "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned."  *Id.* § 1502.16 (citing § 1506.2(d)).

Here, however, the Corps undisputedly did respond to numerous comments made by the State of Minnesota.  (*See* Corps' Mot. for Summ. J. at 33-34 (detailing in a two-page table 31 different topics raised by the State of Minnesota and providing

administrative record citations to the Corps' response for each).)  And the JPA provided

the Court with no citations to comments that the State of Minnesota made that the Corps

left unaddressed.  (JPA's Mem. in Supp. of Mot. for Summ. J. at 20-24.)  Perhaps the

Corps did not give as full-throated of a response to some of the comments as the JPA

would have liked, but NEPA does not require a lengthy response to every comment, just

the disclosure and discussion of unresolved conflicts.  "It is up to the Corps to decide

which comments of other agencies are of value to its projects, and we are hesitant to

second guess its judgment."  *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d

1096, 1101 (8th Cir. 2005).

In sum, the Corps adequately considered the NED plan as an alternative to the

LPP plan for NEPA's purposes.  The Court will therefore grant the Corps' motion with

respect to Count I and deny the JPA's motion.[7]

## B.    COUNT II:  FONSI

Count II of the JPA's complaint contains allegations of additional NEPA

violations based on the Corps' Finding of No Significant Impact ("FONSI").  (Third Am.

Compl. ¶¶ 118-22.)  The Court will grant summary judgment to the Corps on Count II

---

[7] Defendants also make a brief justiciability argument that because Congress eventually authorized the LPP as the selected project, the Court may not review the Corps' pre-authorization actions for NEPA violations.  (*See, e.g.*, Diversion Auth.'s Cross Mot. for Summ. J. at 9.)  Perhaps Congress's authorization creates a justiciability issue as to the Corps' post-authorization activities, but there is little question that NEPA's terms govern the Corps' pre-authorization "legislative proposals."  40 C.F.R. § 1508.18(a).  The more complex justiciability question is arguably whether there remains a proper remedy for any theoretical NEPA violation now that Congress has authorized the project – but the parties did not raise that issue, and in light of the Court's order today, the Court will not address it.

because the JPA has not provided a sufficient legal or factual basis to defeat the Corps' motion.

It is not altogether clear whether the JPA requested summary judgment on the Count II claims. The JPA was the first party to request summary judgment, but its motion requested summary judgment generally and without specification to any particular count or claim. The JPA's first memorandum in support of its motion, however, contains argument only with respect to Count I; the memorandum does not mention Count II or any of its claims.

When Defendants, on the other hand, filed their respective cross motions for summary judgment, they explicitly requested summary judgment on both Count I and Count II, and for Count II each defendant presented argument that (i) the JPA had abandoned its claims under Count II by not raising those claims in its moving memorandum, and (ii) Defendants were entitled to summary judgment on the merits of the Count II claims even if JPA had not abandoned them. In support of the second argument, the one on the merits, Defendants cited case law and the administrative record to argue NEPA did not require the Corps to prepare a supplemental EIS because the Corps' additions of certain mitigation measures and channel realignments to the LPP did not substantially change the proposed action, and therefore the JPA's Count II claims must fail. (Diversion Auth.'s Cross Mot. for Summ. J. at 32-33; U.S. Army Corps' Cross Mot. for Summ. J. at 38-39.)

The JPA's reply brief, however, responded substantively only to the abandonment argument. (JPA's Reply Mem. in Supp. of Mot. for Summ. J. ("JPA's Reply Mem.") at

35-39, Sept. 25, 2015, Docket No. 307.)  On the merits, the JPA cited no case law, and its lone record citation was to 21 pages of the administrative record without any accompanying explanation as to how or why that portion of the record was relevant to, let alone sufficient to defeat, Defendants' motion on Count II.  (*Id.* at 37 (citing A.R. at 62,415-62,436, which contains a full copy of a JPA comment to the Corps and an accompanying affidavit, both filed prior to the initiation of the present litigation).  In this context, the Court has no option but to rule in Defendants' favor, because if a nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the Court must award summary judgment.  *Celotex*, 477 U.S. at 322.  The JPA "may not rest upon allegations"; it "must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport*, 553 F.3d at 1113.  The JPA has not done so here.[8]

The Court will grant the Corps' motion with respect to Count II.

## III.   NEPA CLAIMS AGAINST THE DIVERSION AUTHORITY

The JPA's complaint alleges its NEPA claims not only against the Corps, but also against the Diversion Authority.  (Third Am. Compl. ¶ 27 ("Diversion Authority . . . is named as Intervenor-Defendants as to Counts I and II.".)  However as mentioned above,

---

[8] On page 37 or the JPA's 41-page reply brief, the JPA explains that it failed to make a Count II argument because "[i]f each party were to be forced to copy their arguments made in the record into their briefs, a greatly enhanced word limit would be required."  (JPA's Reply Mem. at 37.)  However, the Court provided the JPA with more than enough space to make all of its arguments.  (*See* Order Granting the JPA's Mot. for Increased Word Limit, Sept. 18, 2015, Docket No. 306.)

the relevant terms of NEPA generally apply only to the actions of "agencies of the Federal Government," 42 U.S.C. § 4332, and the Administrative Procedure Act generally only permits the Court to review NEPA-related actions taken by federal agencies, *see* 5 U.S.C. § 551(1).  No party has made any argument to the contrary.  Here, the Diversion Authority is composed of state government units from North Dakota and Minnesota; the Diversion Authority is not a federal entity, even if it is the sponsoring entity for the purposes of the diversion project.  The Court therefore finds that as a matter of law Counts I and II of the complaint cannot succeed against the Diversion Authority.

## CONCLUSION

The Court's role in deciding these summary judgment motions is to examine the process by which the Corps arrived at its decision.  Whether the Corps arrived at the correct decision, in terms of what is better for the environment, or better generally for the people in the affected area, is beyond the scope of the matter at issue today.  The Court's finding is limited:  the Corps did not act arbitrarily and capriciously in studying the environmental effects of the relevant Minnesota alternative plan for the flood diversion project.  While reasonable people can and will disagree as to whether the Corps made a good or bad decision in deciding against the Minnesota option, the Corps' process was not illegal.

The Court's order today is not the end of this case.  The JPA's Minnesota law claims are still pending against the Diversion Authority – those claims were not at issue in the motions decided in this order – and the Court's injunction preventing construction

of the OHB ring levee remains in place.  Those matters will await resolution on another day.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff JPA's Motion for Summary Judgment on Counts I and II [Docket No. 254] is **DENIED**.

2.     Defendant Diversion Authority's Cross Motion for Summary Judgment on Counts I and II [Docket No. 298] is **GRANTED**.

3.     Defendant Corps' Cross Motion for Summary Judgment on Counts I and II [Docket No. 300] is **GRANTED**.

4.     Counts I and II are **DISMISSED with prejudice** and the Corps is **DISMISSED** from the case.

DATED:  March 31, 2016                          ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                                Chief Judge
                                                    United States District Court