# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2123

_____

Richland/Wilkin Joint Powers Authority, a Minnesota-North Dakota Joint Powers Authority

*Plaintiff - Appellee*

v.

United States Army Corps of Engineers; John McHugh, Secretary of the US Army Corps of Engineers (in his official capacity); Jo-Ellen Darcy, Assistant Secretary of the Army for Civil Works (in her official capacity); Col. Dan Koprowski, District Commander, St. Paul District, US Army Corps of Engineers (in his official capacity)

*Defendant*s

Fargo-Moorhead Flood Diversion Board of Authority

*Intervenor Defendant - Appellant*

-------------------------------

State of North Dakota

*Amicus on Behalf of Appellant(s)*

Minnesota Department of Natural Resources

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

—————————

Submitted: February 11, 2016
Filed: June 20, 2016

—————————

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

—————————

SHEPHERD, Circuit Judge.

The local sponsor, the Fargo-Moorhead Diversion Board of Authority ("Authority"), in the development of a diversion project on the Red River with the United States Army Corps of Engineers ("Corps") alleges that the district court made numerous errors in granting a preliminary injunction to the Joint Powers Authority of Richland County, North Dakota, and Wilkin County, Minnesota ("JPA"), prohibiting the Authority's continued construction of a ring levee around the communities of Oxbow, Hickson, and Bakke, North Dakota ("OHB" and "OHB ring levee"). Holding that the district court[1] did not err in determining that the OHB ring levee is a component of the larger diversion project, we affirm the district court's injunction.

## I.

The north-flowing Red River runs between Minnesota and North Dakota. In the spring, snow melt contributes to the river's volume and routinely causes the river's waters to migrate suddenly and unpredictably in all directions, sometimes causing flooding as far as three miles from the river's banks throughout its flat natural flood

—————————

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

-2-

plain, extending from Oxbow to Fargo, North Dakota. Efforts to prevent flooding on one side of the river can redirect water to the other side and cause flooding.

After the 2009 flood, several entities proposed various permanent measures to reduce the flood risk to the Fargo-Moorhead metropolitan area. The alternatives were analyzed and two were carried forward, each involving a "control structure," or high-hazard dam. A draft Environmental Impact Statement ("EIS") was completed, proposing three possible plans. One plan, the Locally Preferred Plan ("LPP"), would divert 35,000 cubic feet of water per second on the North Dakota side. Pursuant to the joint request of Fargo, Moorhead, as well as Clay and Cass counties, the Assistant Secretary of the Army for Civil Works approved designation of the LPP as the tentatively selected plan.

Further modeling indicated that the LPP would have a more extensive downstream impact than had been anticipated. A supplemental EIS was released, tentatively recommending several changes, including reducing the diversion channel's capacity, adding storage and staging areas, and then compensating most affected landowners within the storage and staging areas. A Final Feasibility Report and EIS was released in July 2011, and the project was recommended for authorization. Subsequent design and engineering studies led to additional modification proposals, including the OHB ring levee, which would protect the OHB communities, all now within the flood-water staging area, from flooding caused by the larger diversion project. An additional supplemental environmental assessment evaluated different versions of this modification.

The Minnesota Department of Natural Resources ("MDNR") determined that because the larger diversion project included a high-hazard dam, it required the MDNR, as the responsible government unit, to complete a full EIS. In May 2013, Minnesota environmental review commenced. In January 2014, the MDNR decided that the OHB ring levee was a step to advance the environmentally controversial part

-3-

of the larger project still under review, so any construction on the OHB ring levee before the completion of MDNR's EIS would violate the Minnesota Environmental Procedure Act ("MEPA"). In reaching this conclusion, the MDNR considered the fact that the levee was designed to reach heights nine feet above the FEMA 100-year flood event level and the communities' existing flood protection, which had been reexamined and modified in response to the 2009 flood. In August 2014, Minnesota Governor Mark Dayton wrote to the Assistant Secretary of the Army for Civil Works to express strong concern over the diversion project, including construction of the OHB ring levee. In the letter, Governor Dayton stated that "construction of the [OHB] Ring Levee, prior to the completion of Minnesota's EIS, violates our state's law." In response, the Authority offered to build the OHB ring levee to only 100-year flood levels, but did not change the base width of the levee structure. The Authority began construction on the OHB levee in June 2014, under the Corps' supervision. The larger diversion project is not expected to be operational before 2022.

Minnesota environmental review process is still ongoing. At the time of the district court's opinion, the MDNR expected to release its own State EIS in August 2015. MEPA prohibits approval of environmentally damaging projects where feasible and prudent alternatives exist; the JPA alleges that the National Economic Development ("NED") plan, which had been considered earlier along with the LPP, is such a prudent alternative. The NED plan would not require construction of the OHB ring levee or cause the same flooding to the JPA's members' properties.

In 2014, Congress enacted the Water Resources Reform and Development Act of 2014 ("WRRDA"), specifically authorizing the project. See Pub. L. No. 113-121, 128 Stat. 1193 (2014), § 7002. It authorized a total project cost of $1,924,300,000, with $846,700,000 federally funded. The law noted that the project should be "carried out by the Secretary [of the Army] substantially in accordance with the plan, and subject to the conditions, described in the respective reports designated in this section." As of the May 13, 2015 district court's decision, the project had received

-4-

$40,000,000 in federal funds.  The Corps has determined that the OHB ring levee is integral to the diversion project, so the Diversion Authority would receive in-kind contribution credit for its work on the levee toward the required non-federal cost of the project.  In January 2013, North Dakota enacted HB 1020, which appropriated funding for flood control, including levees.  The bill conditioned expenditure for most elements of the larger project on receipt of congressional authorization, but exempted levee work from this requirement.

In November 2014, the JPA filed its third amended complaint, listing the Authority as defendant-intervenor.  In the complaint, the JPA alleged that the ongoing construction of the OHB ring levee violated MEPA, specifically, its ban on starting a project before an EIS has been completed and determined adequate.  See Minn. R. 4410.3100.  The JPA filed a motion for a preliminary injunction to halt construction on the OHB ring levee, claiming that construction would harm its members by prejudicing the environmental review and permitting system and forcing selection of a project which would flood its members' properties.  The district court found that the OHB ring levee was an integral part of the larger diversion project and granted a preliminary injunction.  No bond was required.  The Authority proposes that the loss of a construction season equates to approximately $1.17 million in construction costs.

II.

"A district court has broad discretion when ruling on a request for preliminary injunction, and it will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion."  Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 893 (8th Cir. 2013) (internal citation omitted).  "We will not disturb a district court's discretionary decision if such decision remains within the range of choice available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error of judgment."  PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1142 (8th Cir. 2007).  "Abuse of discretion

-5-

occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions." Id.  Clear error exists when "despite evidence supporting the finding, the evidence as a whole leaves us with a definite and firm conviction that the finding is a mistake." United States v. Williams, 346 F.3d 796, 798 (8th Cir. 2003) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  "In every case, an appellate court must remain mindful as to the district courts being closer to the facts and parties." PCTV Gold, Inc., 508 F.3d at 1142.

A district court's decision to issue a preliminary injunction "depends upon a 'flexible' consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest." Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 729 n.3 (8th Cir. 2008) (en banc) (citing Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  The Authority argues that the district court erred in its determination regarding each of the first three factors.  Regarding harm, the Authority argues that the district court erred in determining that the continued construction of the OHB ring levee, prior to the MDNR's completion of an EIS, constituted a sufficient threat of irreparable harm, in part, because procedural harm alone cannot constitute irreparable harm.  Next, the Authority argues that the court erred in balancing the harm that the Authority would face from potentially missing an additional construction season against the potential impact of continuing construction.

The Authority challenges the district court's determination regarding the probability that JPA will succeed on the merits as well.  First, the Authority alleges that the district court applied the wrong threshold standard for likelihood of success. Second, the Authority argues that the district court erred in determining the likelihood that JPA's MEPA claim would succeed on the merits because MEPA does not apply

to conduct outside of Minnesota and the OHB ring levee is not a part of the diversion project under MEPA, and such an application of MEPA would violate the dormant Commerce Clause of the United States Constitution.  Finally, the Authority contends that the district court abused its discretion when it did not require JPA to post an injunction bond.[2]  We address the district court's findings of fact, determination regarding each of the first three factors, and bond waiver below.

### III.

### A. Findings of Fact

As an initial matter, the district court's finding of fact that the OHB project is a part of the larger diversion project is not clearly erroneous and broadly supports the district court's decision to grant the injunction.  The district court determined that "[w]hile the OHB ring levee is being constructed in North Dakota, and while many other aspects of the diversion project will be built in North Dakota, they are all integral parts of a larger project that indisputably will be constructed, in part, in Minnesota."  The district court found that "arguments to the contrary – that the OHB ring levee is of independent value, for example – ignore[] the project's practical reality."  The district court based this on its finding that the OHB communities "do not appear to face the same risk or present the same sense of urgency, unless the diversion project is constructed," as the Fargo-Moorhead metropolitan region.  For this reason, the court was able to determine that the OHB ring levee was not being built because "its independent value is so great that North Dakota has prioritized the OHB communities over the Fargo-Moorhead region, but because it is an integral part of the overall diversion project," and a part which could easily be funded and constructed.

---

[2]The Authority does not challenge the district court's determination regarding the fourth factor, the public interest, so we do not address it.

-7-

There is evidence supporting the district court's determination.  The Corps' supplemental environmental assessment labels the OHB levee as a component of the overall diversion project and states that OHB levee serves the purpose of mitigating the effects of the to-be-constructed high-hazard dam. (Decl. of Coleman, Jan. 23, 2015, para 6).  Indeed, the OHB levee was originally designed to protect against the depth of flooding that the diversion project would create, and even as modified, maintains a base width which permits for an increase in height that would provide that same protection.  The district court's determination regarding the levee's purpose is further supported by evidence stating that the Oxbow community already has flood protection in place designed to protect that community.  (Decl. of Miller, Berg, Hovland, Feb. 13, 2015, para 7).  The Authority has not provided sufficient evidence that the OHB levee would have been funded irrespective of its ties to the larger diversion project to cause the district court's conclusion—that the OHB ring levee is a part of the larger project—to be clearly erroneous.

## B. Threat of Irreparable Harm

For an injunction to be appropriate, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011) (quoting Iowa Utilities Bd. v. Fed. Commc'ns Comm'n, 109 F.3d 418, 425 (8th Cir. 1996)).  However, "the alleged harm need not be occurring or be certain to occur before a court may grant relief." Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 788 (7th Cir. 2011) (citing United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)). Failure to comply with the process required by a national analogous statute, the National Environmental Policy Act ("NEPA"), does not automatically warrant injunctive relief.  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010); Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169, 1171 (8th Cir. 1994) ("Procedures under MEPA are in large measure similar to, and coextensive with, those under NEPA."). However, this court has found that failure to comply with

-8-

NEPA, "causes harm itself, specifically the risk that real environmental harm will occur through inadequate foresight and deliberation." Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 995 (8th Cir. 2011) (internal quotations omitted) (recognizing the "difficulty of stopping a bureaucratic steam roller, once started" (internal quotations omitted)).  Harm to the environment "may be presumed when an agency fails to comply with the required NEPA procedure." Id. (internal quotations omitted).

The plaintiff must additionally show irreparable harm to themselves, which can be accomplished through demonstrating "injury to their specific environmental interests," created by the actions taken with "inadequate foresight and deliberation." See id.  This may be established by showing that not only will the environment suffer harm, but that the party in question uses the area which will suffer environmental harm, and that their use of it will be negatively impacted by the environmental harm. For example, injury to a Plaintiff's "aesthetic, educational and ecological interests" and enjoyment of an area may suffice.  See id.  In Sierra Club, the court concluded that absent an injunction, the effects of constructing a plant would necessarily harm the plaintiffs' environmental interests because they inhibited the plaintiffs' abilities to engage in hunting, bird-watching, and nature-indulging. Id. at 994-995; see also, Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 25 (2008) (considering the harm to ecological, scientific, and recreational interests caused by injuring marine mammals as harms).  Flooding of a plaintiff's lands would certainly cause injury to their specific environmental interests, because it would severely limit their use of the flooded lands.

The district court found adequate procedural harm and harm to the JPA's specific  environmental interests sufficient to support a preliminary injunction.  The procedural harm identified by the court was the Authority's continued work on "an integral part of the diversion project prior to the completion of the MDNR's environmental review."  This construction, prior to completing the review, could be presumed to risk real environmental harm.  See Sierra Club, 645 F.3d at 995.  To

-9-

connect this harm to JPA's specific environmental interests, the court looked to declarations provided, specifically noting a declaration from Pleasant Township, a member of the JPA, stating that Pleasant Township faces significant flooding from the diversion project.  (Decl. of Nipstad, Pleasant Township Clerk, Feb. 11, 2015).  The district court recognized that any flooding that would occur "is likely years down the road[,]" but determined that "construction here is critically tied to that eventual harm, because the OHB levee is tied to one specific configuration of the diversion project that, if completed, will have a certain and significant impact on citizens in Pleasant Township and elsewhere."  Based on this certain impact, the court noted that there "will no doubt [be] immediate consequences in terms of property value, at minimum," before reaffirming that the JPA had shown the procedural injury and sufficient threat of harm to specific environmental interests necessary to meet the standard set forth in Sierra Club.  See Sierra Club, 645 F.3d at 995-96.

The Authority asks us to find that the district court erred.  First, the Authority argues that only procedural harm has been established and procedural harm is not enough to create irreparable harm.  Second, it argues that any impact on Pleasant Township or the JPA will not occur for at least seven years, and would occur as a result of the larger project, not the OHB ring levee.  The Authority further argues that these potential future consequences are not certain, as they would result from only one formation of the project.  The Authority points out that Sierra Club differs from the case at hand, in that the actual construction process in Sierra Club harmed the parties' specific environmental interests by preventing Plaintiffs from using and enjoying the area through noise and pollution, while here, the construction process itself will not cause the flooding.  This added a level of immediacy and certainty to the harm alleged in Sierra Club, which the Authority asserts is not present in this case.  The Authority then points to James River Flood Control Ass'n v. Watt, for the proposition that harm from flooding, years in the future, cannot support a preliminary injunction.  680 F.2d 543, 544-45 (8th Cir. 1982) (per curiam) (granting a stay for a preliminary injunction halting progress on a project, pending proceedings regarding the adequacy of the EIS).

-10-

Based on the district court's finding that the OHB ring levee is a part of the larger diversion project, we find the district court did not abuse its discretion or commit an error of law in finding irreparable harm. JPA members face procedural harm because, as noted by the district court, there would be added difficulty in stopping the specific iteration of the larger project once construction has begun on the OHB levee. See Sierra Club, 645 F.3d at 994-95 (recognizing "a risk that real environmental harm will occur through inadequate foresight and deliberation" and recognizing "the difficulty of stopping a bureaucratic steam roller, once started" as proper factors for the district court to take into account (internal quotations omitted)). And the district court found that this iteration of the larger project, based on the Nipstad Declaration, risks flooding JPA's members' lands. If the OHB ring levee is a part of that larger project, construction of the OHB ring levee prior to completion of the MDNR's review also leads to the harms caused by the larger project. This flooding harm specifically impacts JPA's members' interests, because it limits the ways in which they will be able to use their lands during flooding. Unlike in James River Flood Control, where the district court did not provide "any factual basis for the conclusion that the [plaintiff] or the public will suffer irreparable harm if construction proceeds," 680 F.2d at 544, the district court here, citing specific evidence, found that the OHB ring levee's construction is "critically tied" to the larger project, and thus also to the flooding which will occur in Pleasant Township. See Sierra Club, 645 F.3d at 995. Based on the district court's findings of fact, this record discloses both the procedural harm of inadequate review and the concrete, substantive environmental harm of flooding in JPA's members' land.

C. Balance of Harms

Once the court has determined that there is a threat of irreparable harm to the moving party, it must balance this harm with any injury an injunction would inflict on other interested parties. Rounds, 530 F.3d at 729 n.3. The Authority argues that the district court erred in determining that the balance of harms favored granting the

-11-

preliminary injunction.  The district court acknowledged that the delay "may result in higher construction costs, continued risk of flooding for the OHB communities, and uncertainty for homeowners within the ring levee that are attempting to sell their homes," but found these concerns were outweighed by the risk of irreparable harm to JPA.  The district court based this determination, first, on its finding that the injunction would likely be short in duration because Minnesota's environmental review was likely to be completed soon.[3]  Second, the district court explained that the OHB community had already constructed significant flood protection; the new OHB ring levee was designed to protect the community from the flooding caused by the larger diversion project.

The district court did not abuse its discretion in finding that the balance of harms favored an injunction.  The district court determined that the OHB communities were already somewhat protected, and that the real motivation for the project was to pave the way for the larger diversion project and protect against flooding which would only occur if the larger diversion project went forward.  In light of these conclusions, the district court did not err in finding that the flooding risk to the OHB communities alleged by the Authority did not weigh heavily in comparison to the risk of harm JPA faced.  Further, the Authority, by proceeding with construction before Minnesota could complete its EIS or the court could determine whether permitting was required, "jumped the gun," placing some of the responsibility for its harm on itself.  See Sierra Club, 645 F.3d at 997.  And while the loss of a building season is expensive, even irreparable, as the district court noted, the permitting process could be completed soon.[4]  See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 38 F.

---

[3]The Final EIS was made available for public review on May 16, 2016, with a comment period lasting through May 31, 2016.  Final Environmental Impact Statements, Project Title: Fargo-Moorhead Flood Risk Management Project, EQB Monitor, May 16, 2016, Vol. 40, No. 20.

[4]While some time has passed since the district court predicted that the permitting process should be completed soon, this does not mean that the court clearly

-12-

Supp. 3d 1043, 1060 n.9 (D. Minn. 2014).   Thus, the court did not err in its consideration of this factor.

### D. Likelihood of Success on the Merits

#### i. Standard

Once the court has considered the threat of irreparable harm and the balance of harms, the appropriateness of an injunction still depends on "the probability that the moving party would succeed on the merits."   Rounds, 530 F.3d at 729 n.3.   The plaintiff "need only establish a likelihood of succeeding on the merits of any one of [its] claims."   Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 250 (D.D.C. 2003).

In determining the likelihood of succeeding, the district court applied the "fair chance of prevailing" standard.   See 1-800-411-Pain Referral Serv., LLC v. Otto, 744 F.3d 1045, 1054 (8th Cir. 2014) (describing "this circuit's ordinary preliminary injunction test, [as] ask[ing] only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation").   The Authority argues that this was the wrong standard because under Rounds, the court must sometimes apply a more stringent standard of "likely to prevail." 530 F.3d at 730.   In Rounds this court held that where a party seeks to enjoin the enforcement of a state statute, the court must apply a more rigorous threshold and determine whether the movant is "likely to prevail."   Id.   For "administrative actions by federal, state or local government agencies," the court may evaluate whether "the full play of the democratic processes" was involved in enactment, then determine which standard would be more appropriate.   Id. at 732 n.6 (internal quotation omitted).   The district court found that the democratic process required by Rounds was not satisfied by the environmental

---

erred, based on the evidence available to the court at that time.

-13-

planning process.  As for the project's authorization under the WRRDA, the district court reasoned that the project was adopted pursuant to expert agency recommendation, something "far different than adopting a complex statute through fulsome debate."  The district court also noted that the injunction did not seek to enjoin the WRRDA, but merely delay a local partner's construction of part of a project pending Minnesota environmental review.

The Authority argues that the district court drew the category of government action that requires the "likely to prevail" standard too narrowly and that, in any case, the injunction did enjoin a state and federal statute, North Dakota's appropriation of funds and the WRRDA.   However, Rounds notes that where an injunction is sought to stop anything other than "government action based on presumptively reasoned democratic process," the familiar "fair chance of prevailing" test will still apply.  Id. at 732.  The district court did not err in finding that the WRRDA, which did not appropriate funds, merely represented the "authorization of a project pursuant to expert agency recommendation."  Thus the district court was well within its discretion when it determined that the process involved in the project's approval, including the WRRDA, made the "fair chance of prevailing" standard more appropriate.  The district court also noted that the injunction in question would "simply . . . delay the local partner's construction of part of the project pending Minnesota environmental review."  The fact that this injunction only seeks to delay the project through the environmental review rather than until the court makes its final determination also supports the district court's determination.  Further, the Authority did not mention North Dakota's HB 1020, which makes no explicit mention of the OHB ring levee, before the district court below.  Based on the district court's fact findings, it was not error for the district court to determine that the "fair chance of prevailing" standard was more appropriate in these circumstances.

-14-

ii. MEPA

The Authority next argues that JPA's likelihood of succeeding on its MEPA claims is insufficient for an injunction, because MEPA is not intended to apply to out-of-state action and the OHB ring levee is separate from the larger diversion project under MEPA. The district court determined that the OHB ring levee was a part of the larger diversion project and clearly subject to the State of Minnesota's environmental review. Thus, JPA's showing that the OHB ring levee's construction was underway sufficiently demonstrated a fair chance of prevailing on the merits.

MEPA prevents governmental agencies from taking action on proposed projects until the agency has considered the project's environmental consequences by first requiring an adequate EIS. See Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs, 713 N.W.2d 817, 823 (Minn. 2006). The regulations define a governmental unit as "any state agency and any general or specific purpose unit of government in the state, including . . . counties, towns, cities, port authorities, housing authorities, and the Metropolitan Council, but not including courts, school districts, the Iron Range Resources and Rehabilitation Board, and regional development commissions." Minn. R. 4410.0200, subp. 34. Under MEPA, a plaintiff "aggrieved by a final decision on . . . the adequacy of an environmental impact statement is entitled to judicial review of the decision." Minn. Stat. § 116D.04, subd. 10.

The Authority's first argument is that the district court erred because MEPA cannot apply out-of-state. This argument is largely based on the fact that MEPA had not previously been applied, what the Authority characterizes as "extraterritorially." The Authority also argues that MEPA should not apply out-of-state, because the effects could be present in "innumerable contexts." However, the district court noted that Minnesota has a strong and unique interest in preventing flooding within its lands. The district court's finding that the OHB ring levee is a part of the larger, interstate project further supports the district court's determination.

-15-

Next, the Authority argues that the OHB ring levee has independent utility, so MEPA does not prohibit its construction. Under MEPA, "[t]wo projects are 'connected actions' if a responsible government unit determines they are related in any of the following ways: A. one project would directly induce the other; B. one project is a prerequisite for the other and the prerequisite project is not justified by itself; or C. neither project is justified by itself." Minn. R. 4410.0200, subp. 9c. The district court found that under this definition, the OHB ring levee had a fair chance of being a "connected action." The Authority argues that the court should read an exception for projects with "independent utility," into MEPA where none is stated, to mimic NEPA, and find that there is independent utility to the OHB levee, so it cannot be a "connected action." The Authority provides no case requiring such a reading. As explained above, despite the Authority's contentions, the district court found that the OHB levee is not independently justified, and that its construction was integral to the larger diversion project and would lock the Authority into one design for the project. Thus, the district court's determination that the JPA showed a fair chance of prevailing on the merits under MEPA is not erroneous.

### iii. Dormant Commerce Clause

Next, the Authority argues that MEPA cannot prevent construction of the OHB ring levee, because to do so would breach the dormant Commerce Clause of the United States Constitution. The Authority contends that this project's construction will take place "wholly" within North Dakota because the presence of Minnesota actors on the Authority is insufficient to connect the project to Minnesota. We find that the district court did not err in finding that the dormant Commerce Clause does not prevent MEPA's application.

The dormant Commerce Clause is the negative consequence of the Commerce Clause. Quill Corp. v. North Dakota, 504 U.S. 298, 312 (1992). Under it, states are barred from discriminating against or unduly burdening interstate commerce. Id. The

-16-

dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." Healy v. Beer Inst., 491 U.S. 324, 336 (1989). If the regulation is not per se invalid and not discriminatory, the court balances whether the burdens are "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

The district court determined that "[w]hile the OHB ring levee is being constructed in North Dakota, and while many other aspects of the diversion project will be built in North Dakota, they are all integral parts of a larger project that indisputably will be constructed, in part, in Minnesota." The Authority disagrees, arguing that only the effects of the OHB ring levee will reach Minnesota. The district court reasoned that "laws governing a project that crosses the border between two states are bound to have some extraterritorial effect;" if North Dakota were permitted to begin building the diversion project in North Dakota, and could only be stopped once it reached the Minnesota border, the practical effect would be that for interstate projects, the state with more lenient laws would always control. Thus, as the district court found, "both states clearly have an interest in regulating the diversion project and their regulatory regimes will no doubt intersect." The Authority points out that the presence of Minnesota actors within the Authority is not sufficient, but as already stated, such actors are not the lone connection between this project and Minnesota. By virtue of OHB ring levee's connection with the larger diversion project, its construction does not take place "wholly outside" Minnesota's borders. Minnesota has an interest in regulating the larger diversion project and its parts. Thus, the district court did not err in finding that the dormant Commerce Clause does not preclude JPA's MEPA claim.

-17-

IV.

Finally, the Authority argues that the district court erred in failing to require the JPA to post a bond. The district court waived the security requirement, based on its characterization of the suit as public interest environmental litigation. The district court acted within its discretion in doing so.

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." Stockslager v. Carroll Elec. Coop. Corp., 528 F.2d 949, 951 (8th Cir. 1976). This court will reverse if the district court "abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determination." Hill v. Xyquad, Inc., 939 F.2d 627, 632 (8th Cir. 1991); Rathmann Grp. v. Tanenbaum, 889 F.2d 787, 789 (8th Cir. 1989) (citing Roth v. Bank of the Commonwealth, 583 F.2d 527, 539 (6th Cir. 1978) (finding error, not because the trial court failed to require a bond in any particular amount, but because the court failed to exercise the discretion required by Rule 65(c) of considering the question of requiring a bond)). Courts in this circuit have almost always required a bond before issuing a preliminary injunction, Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1278 (N.D. Iowa 1995), but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown. Fantasysrus 2, LLC v. City of East Grand Forks, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012); Bukaka, Inc. v. Cnty. of Benton, 852 F. Supp. 807, 813 (D. Minn. 1993).

-18-

The Authority argues that it was error to not require a bond.  But, in analogous NEPA claims, some courts have not required a bond, or have only required a minimal bond, because of the important public interest in the enforcement of NEPA.  See Davis v. Mineta, 302 F.3d 1104, 1126 (10th Cir. 2002) (directing the district court to determine the bond, but stating that, "[o]rdinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered"); Monarch Chem. Works, Inc. v. Exon, 452 F. Supp. 493, 503 (D. Neb. 1978), aff'd, 604 F.2d 1083 (8th Cir. 1979) (setting a bond of $10,000 in a NEPA case, based on the district court's recognition that the plaintiff had the ability to pay and that "private enforcement of environmental duties would be hindered if more than a nominal bond were required"); Landwatch v. Connaughton, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) (requiring no bond, based on public interest and the potential chilling effect of requiring one).  And notably, the Authority proceeded with construction before the proposed required environmental studies were completed, as the party did in Mineta.  See Mineta, 302 F.3d at 1126 (factoring into account the defendants' "apparent prejudgment to proceed prematurely with the Project before the required environmental studies were considered" in its determination to suggest a smaller bond).  Thus, it was permissible for the district court to waive the bond requirement based on its evaluation of public interest in this specific case.

V.

For these reasons, we affirm the district court's ruling in its entirety.

————————————

-19-