# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| RICHLAND/WILKIN JOINT POWERS AUTHORITY, | Civil No. 13-2262 (JRT/LIB) |
| Plaintiff, | |
| and | |
| MINNESOTA DEPARTMENT OF NATURAL RESOURCES | |
| Intervenor-Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, ROBERT SPEER, ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS, and COL. SAM CALKINS, | |
| Defendants, | |
| and | |
| FARGO-MOORHEAD FLOOD DIVERSION BOARD OF AUTHORITY and CITY OF OXBOW, | |
| Intervenor-Defendants. | |

Gerald W. Von Korff and Anna K.B. Finstrom, **RINKE NOONAN**, P.O. Box 1497, Saint Cloud, MN 56302, for plaintiff.

Colin Patrick O'Donovan and Max H. Kieley, Assistant Attorneys General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, Saint Paul, MN 55101, for intervenor-plaintiff.

Devon Lehman McCune, **UNITED STATES DEPARTMENT OF JUSTICE**, 999 18th Street, South Terrace, Suite 370, Denver, CO 80202, for defendants.

Robert E. Cattanach, Michael R. Drysdale, and Theresa M. Bevilacqua, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for the Fargo-Moorhead Flood Diversion Board of Authority.

For as long as people have lived and worked in the Red River Valley that borders the States of North Dakota and Minnesota, the Red River of the North ("Red River") has caused significant flooding problems for local communities. The parties to this case and the Court all recognize the need for permanent flood protection for the individuals residing in the Red River Valley, especially the growing Fargo-Moorhead community. In addition to the serious flood-related issues, this case presents difficult and complex questions regarding a state's ability to regulate border projects on major waterways when non-Federal actors undertake significant portions of a federally-approved project.

Here, Plaintiff Richland/Wilkin Joint Powers Authority ("JPA") and Intervenor-Plaintiff Minnesota Department of Natural Resources (the "DNR") allege that Defendant U.S. Army Corps of Engineers (the "Corps")[1] and Defendant-Intervenor Fargo-Moorhead Flood Diversion Board of Authority (the "Diversion Authority") violated state and federal laws by signing a project partnership agreement and beginning construction on a permanent flood protection project without the Diversion Authority obtaining requisite permits from the State of Minnesota. The DNR and JPA seek a preliminary injunction to

---

[1]   The Court refers to the U.S. Army Corps of Engineers, Robert Speer, Assistant Secretary of the Army for Civil Works, and Colonel Sam Calkins collectively as "the Corps" unless indicated otherwise.

prevent the Corps and the Diversion Authority from continuing construction until the Diversion Authority obtains the allegedly requisite permits.

In response, both the Corps and the Diversion Authority argue that a preliminary injunction is inappropriate. The Corps and the Diversion Authority further move to dismiss certain claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. After the hearing on these motions, JPA filed a motion for sanctions under Rule 37(c)(1) of the Federal Rules of Civil Procedure, seeking postponement of the Court's ruling on the pending motions until the record is fully supplemented and supplemental briefing is completed.

The Court will grant the Diversion Authority's limited motion to dismiss, grant in part and deny in part the Corps' motion to dismiss, grant the DNR's and JPA's motions for a preliminary injunction, and deny JPA's sanctions motion.

## BACKGROUND

## I.    THE PARTIES

JPA is a joint authority created by Richland County, North Dakota, and Wilkin County, Minnesota, pursuant to statutes in each state allowing their respective government units to jointly and cooperatively exercise power with other government units, even those in other states. (Pl. Fourth Am. Compl. ("JPA Compl.") ¶¶ 2-5,

April 3, 2017, Docket No. 419);[2] *see also* Minn. Stat. § 471.59 ("Joint Exercise Powers"); N.D. Cent. Code § 54-40.3 ("Joint Powers Agreements"). Richland and Wilkin Counties formed JPA to protect their citizens and their citizens' property from flooding. (JPA Compl. ¶ 2.)

The DNR is a statutory agency of the State of Minnesota responsible for administering and enforcing Minnesota statutes and rules related to the state's natural resources, including its navigable waters. (Compl. by the Minn. DNR ("DNR Compl.") ¶ 6, Mar. 24, 2017, Docket No. 411.)

The Corps is a federal agency involved in the development of the permanent flood protection project at issue in this case. (*Id.* ¶ 8; JPA Compl. ¶ 8.) Robert Speer, Assistant Secretary of the Army for Civil Works, and Colonel Sam Calkins are employees of the Corps. (DNR Compl. ¶¶ 9-11; JPA Compl. ¶¶ 7, 9-10.)

The Diversion Authority is also a joint authority formed pursuant to Minnesota's and North Dakota's joint powers statutes. (DNR Compl. ¶ 12; JPA Compl. ¶ 11.) The Diversion Authority was formed by the following government units: the City of Fargo, North Dakota; Cass County, North Dakota; Cass County Joint Water Resources District,

---

[2] JPA originally filed the Fourth Amended Complaint on March 24, 2017. (Pl.'s Fourth Am. Compl., Mar. 24, 2017, Docket No. 410.) The Corps and the Diversion Authority moved to dismiss the Fourth Amended Complaint filed on March 24, 2017. (*See* Federal Defs.' Mem. in Supp. of Mot. to Dismiss at 1, May 23, 2017, Docket No. 447 (referencing "ECF No. 410"); Diversion Authority's Mem. in Supp. of Mots. to Dismiss at 2, May 23, 2017, Docket No. 453 (referencing "ECF #410").) But on April 3, 2017, JPA filed a "CORRECTED CAPTION ONLY" version of the Fourth Amended Complaint. (*See* JPA Compl.) The Court will construe all of the JPA-related motions as properly referring to the Fourth Amended Complaint with corrected caption filed on April 3, 2017.

North Dakota; the City of Moorhead, Minnesota; Clay County, Minnesota; and the Buffalo-Red River Watershed District, Minnesota. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Dist. Court Order II*), 176 F. Supp. 3d 839, 842 (D. Minn. 2016). The Corps designated the Diversion Authority as the non-Federal sponsor of the permanent flood protection project at issue in this case, meaning the Diversion Authority is the local entity tasked with developing and managing the project. *Id.*

## II. FACTUAL BACKGROUND

The Red River originates at the confluence of two tributaries, demarking the Minnesota-North Dakota border. *Id.* The broader, flat valley of the Red River was formed over thousands of years as the lakebed of Glacial Lake Agassiz which receded slowly as the ice melted to the north. Through this flat valley, the Red River flows northward, eventually emptying into Lake Winnipeg in Canada. *Id.* For as long as humans have lived along the Red River, the river has flooded. *Id.* In 2008, the Corps, along with the cities of Fargo, North Dakota, and Moorhead, Minnesota, began a feasibility study to examine "alternatives . . . to reduce flood risk in the entire Fargo-Moorhead Metropolitan area." *Id.* After a major flood in 2009, the project gained momentum and eventually the Fargo-Moorhead Flood Risk Project (the "Project") was developed. *Id.*; (DNR Compl. ¶ 57).

As required by federal law, the Corps conducted an environmental review of the Project. (DNR Compl. ¶ 71.) In May 2010, the Corps published a Draft Environmental Impact Statement ("EIS"). *Dist. Court Order II*, 176 F. Supp. 3d at 843-44. The Draft

EIS discussed how the Corps had studied the benefits and costs of several potential options for flood control in the area. *Id.* In a later Supplemental Draft EIS, the Corps continued to refine its plans, and to publish and describe the varying drawbacks and advantages of specific plans. *Id.* at 844. During this process, the DNR submitted multiple comment letters to the Corps regarding its concerns with the Project. (DNR Compl. ¶ 72.) The Corps acknowledged the DNR's concerns during the process and "ensured the DNR that the Project required compliance with obligations imposed by Minnesota's statutes and regulations." (*Id.* ¶ 73.)

In July 2011 the Corps issued its Final Feasibility Report and Environmental Impact Statement ("FFREIS") regarding the Project. (*Id.* ¶¶ 19, 71.) In section 3.14.4 for the FFREIS, the Corps acknowledged that

> [a]s part of implementing this project, the non-federal sponsors [were] required to obtain a [DNR] protected waters permit . . . . In order to obtain the necessary permits from the State of Minnesota, the non-federal sponsors [were required to] complete the scoping and review process required by the Minnesota Environmental Policy Act. . . . The construction contractors [were] responsible for acquiring all local licenses/permits required to comply with state and municipal laws, codes and regulations.

(DNR Compl. ¶ 74; *accord* JPA Compl. ¶ 34; Notice of Submission of Exs., Ex. F at 109, Feb. 12, 2015, Docket No. 162.)

The Corps ultimately selected the "locally preferred plan" ("LPP") as its proposed action. *Dist. Court Order II*, 176 F. Supp. 3d at 844. In December 2011, the Corps issued its Chief's Report recommending the Project to Congress. (DNR Compl. ¶ 75; JPA Compl. ¶ 35; Notice of Submission of Exs., Ex. I ("Chief's Report").) The Chief's Report endorsed the FFREIS and noted in several locations that the Project would

comply with "Federal and State laws and regulations."  (DNR Compl. ¶ 75; JPA Compl. ¶ 35 n.2; Chief's Report at 4, 6-7.)

The Assistant Secretary of the Army signed a Record of Decision ("ROD") and forwarded the Corps' relevant reports and studies to Congress in April 2012.  *Dist. Court Order II*, 176 F. Supp. 3d at 844.  In 2014 Congress passed and the President signed the Water Resources Reform and Development Act of 2014 ("WRRDA-2014"), authorizing the Project.  *Id.* at 845 (citing Pub. L. No. 113-121, § 7002(2)(4), 128 Stat. 1193 (2014)).

In February 2016 the Diversion Authority submitted its application for a Dam Safety and Public Waters Work Permit ("Permit") to the DNR.  (DNR Compl. ¶ 82.)  In July 2016  the Corps and the Diversion Authority signed a project partnership agreement ("PPA"), "which set forth the rights and obligations of the Corps and the Diversion Authority pertaining to Project construction and operation."  (*Id.* ¶¶ 26, 91; JPA Compl. ¶ 46; Decl. of Michael Drysdale in Supp. of Mot. for Summ. J., Ex. G ("PPA"), Dec. 1, 2016, Docket No. 354.)  The PPA divided construction responsibilities into two categories – "Federal Work" and "Non-Federal Work" – and primarily limited the "Non-Federal Work" to construction occurring on the North Dakota side of the Red River.  (DNR Compl. ¶ 93; PPA at 2.)  The Corps took responsibility for most of the work to occur in Minnesota, excluding certain "flood risk reduction projects undertaken in the F-M Metro Area."  (DNR Compl. ¶ 93.)  The PPA further provided that the Diversion Authority "will operate, maintain, repair, rehabilitate, and replace the Project" after the parties complete construction.  (*Id.* ¶ 94; PPA at 7.)  At the time the Corps and the Diversion Authority signed the PPA, both the DNR Commissioner and Minnesota's

Governor expressed concerns that the PPA was premature in light of the Diversion Authority's outstanding Permit application. (DNR Compl. ¶¶ 89, 92.)

The DNR denied the Permit in October 2016 finding the Project did "not adequately protect the public, health, safety and welfare of [Minnesota's] citizens, [did] not represent the minimal impact solution, and [was] neither reasonable nor practical." (*Id.* ¶ 83-84 & Ex. 1 ("DNR Permit Denial") ¶¶ 123-137, 198; *see also* JPA Compl. ¶ 48.) The DNR further found the Project non-compliant with environmental requirements, floodplain requirements, and local and other land resources management plans. (DNR Compl. ¶¶ 85-87; DNR Permit Denial ¶¶ 138-97.) The Diversion Authority requested a contested case hearing regarding the Permit denial. (DNR Compl. ¶ 88.)

In spite of the Permit denial, the Corps and the Diversion Authority publicly "announced their intent to move forward with Project construction." (*Id.* ¶¶ 96-97; JPA Compl. ¶ 49.) The DNR responded to this announcement by sending a letter "unequivocally" stating "that Minnesota permits are needed in order for either the Corps or the Diversion Authority to construct this project lawfully." (DNR Compl. ¶ 99 & Ex. 2 at 1.) Both the DNR and JPA allege the Corps and the Diversion Authority have begun construction on the project without the required Permit. (*Id.* ¶ 100; JPA Compl. ¶ 50.)

## III.    PROCEDURAL HISTORY

JPA filed its initial complaint on August 19, 2013, naming only the Corps and certain individuals employed by the Corps as defendants. (Compl., Aug. 19, 2013, Docket No. 1.) At first, JPA alleged that in developing and choosing the LPP, the Corp

violated Minnesota law, Executive Order 11988 ("E.O. 11988"), and the National Environmental Protection Act ("NEPA"). (First Am. Compl. ¶¶ 62-100, Oct. 22, 2013, Docket No. 14.) In November 2013 the Court granted the Diversion Authority leave to intervene. Then in May 2014 JPA amended its complaint, naming both the Corps and the Diversion Authority as defendants and limiting their allegations to violations of NEPA. (Second Am. Compl. 1 & ¶¶ 62-91, May 2, 2014, Docket No. 47.)

After certain proceedings occurred in North Dakota state court regarding the OHB Ring Levee,[3] JPA filed a Third-Amended Complaint against the Corps and the Diversion Authority alleging five counts, including violation of: NEPA (Counts I and II), Minnesota Environmental Rights Act ("MERA") (Count III), the Minnesota Environmental Policy Act ("MEPA") (Count IV), and state and local permitting laws (Count V). (Third Am. Compl. ¶¶ 88-139, Nov. 4, 2014, Docket No. 112.) Then JPA filed a motion for a preliminary injunction regarding the OHB Ring Levee. (Pl.'s Mot. for Prelim. Inj., Feb. 11, 2015, Docket No. 122.) In turn, the Corps and the Diversion Authority filed motions to dismiss the state and local claims in Counts III, IV, and V. (Corps' Partial Mot. to Dismiss Third Am. Compl., Feb. 11, 2015, Docket No. 141; Diversion Auth.'s Mot. to Dismiss, Feb. 11, 2015, Docket No. 145.)

---

[3] The OHB Ring Levee is part of the Project that involves a ring levee around three North Dakota communities: Oxbow, Hickson, and Bakke. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Dist. Court Order I*), No. 13-2262, 2015 WL 2251481, at *1 (D. Minn. May 13, 2015).

The Court ruled on the motions together. The Court dismissed Counts III, IV, and V against the Corps because the Corps is not bound by the relevant state laws. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Dist. Court Order I*), No. 13-2262, 2015 WL 2251481, at *7-8 (D. Minn. May 13, 2015). The Court also dismissed Count V against the Diversion Authority because JPA had not shown that the relevant state and local permitting laws were broad enough to support the requested relief. *Id.* at *13 n.7. But the Court declined to dismiss Counts III and IV – the MERA and MEPA claims – against the Diversion Authority. The Diversion Authority argued that those claims must be dismissed because any injunction based on Minnesota law prohibiting construction activities inside the borders of North Dakota would impermissibly extend the reach of Minnesota's law outside the state's borders. The Court disagreed, however, and found that such an injunction would not impinge on extraterritoriality or Dormant Commerce Clause principles because of the cross-border nature of the Project, as well as the fact that JPA and the Diversion Authority are partially composed of Minnesota governmental units subject to Minnesota law. *Id.* at *10-15. Finally, the Court granted JPA's request for a preliminary injunction with respect to Counts III and IV against the Diversion Authority, ordering that all construction on the OHB Ring Levee cease. *Id.* at *24-25. The Eighth Circuit affirmed the Court's order on June 20, 2016. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Appellate Court Order*), 826 F.3d 1030, 1033-34 (8th Cir. 2016).

The parties filed cross-motions for summary judgment regarding the Third Amended Complaint. The Court granted the Corps' and the Diversion Authority's

motions for summary judgment on Counts I and II (NEPA) with prejudice. *Dist. Court Order II*, 176 F. Supp. 3d at 852-53. The Court found the Corps had complied with NEPA and the Administrative Procedure Act (APA) in considering the environmental impacts of the Project. *Id.* at 847-852. The Court further found the NEPA claims against the Diversion Authority failed because the Diversion Authority "is not a federal entity, even if it is the sponsoring entity for the purposes of the diversion project." *Id.* at 852. The Court dismissed the Corps from the case; leaving only state-law claims against the Diversion Authority. *Id.* at 841, 852-53.

Following the DNR Permit Denial in October 2016, the DNR moved to intervene and the Court granted the motion. (Mem. Op. & Order at 6, Jan. 13, 2017, Docket No. 398.) JPA also moved to reinstate the Corps as an active defendant and to supplement the pleadings. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs* (*Dist. Court Order III*), No. 13-2262, 2017 WL 740994, at *1 (D. Minn. Feb. 24, 2017). The Court granted JPA's motion and directed both the DNR and JPA to file supplemental pleadings. *Id.* at *2-3. The DNR filed its Complaint and JPA filed its Fourth Amended Complaint on March 24, 2017. The DNR alleges four counts: pursuant to the APA, violation of 33 U.S.C. § 2232 against the Corps (Count I); pursuant to the APA, violation of WRRDA-2014 § 7002 against the Corps (Count II); violation of MERA against the Diversion Authority (Count III); and violation of Minn. Stat. chs. 103G and 103F against the Diversion Authority (Count IV). JPA also alleges four counts: violation of NEPA against the Corps (Count I); violation of MERA against the Diversion Authority (Count II); violation of Minnesota permitting requirements against the Diversion Authority

(Count III); and violation of section 2232 and section 7002 against the Corps and the Diversion Authority (Count IV).

Both the DNR and JPA then filed motions for preliminary injunctions, seeking to enjoin the Corps, the Diversion Authority, or anyone in active concert with either party from continuing construction on the Project until the DNR issues a Permit. The Corps and the Diversion Authority, in turn, filed motions to dismiss the DNR Complaint and Fourth Amended Complaint. The Corps moves to dismiss all claims against it and the Diversion Authority moves to dismiss Count IV in JPA's Fourth Amended Complaint.[4]

The Court held a hearing regarding the four motions on July 18, 2017. (Min. Entry, July 18, 2017, Docket No. 497.) Two days after oral argument, the Corps and the Diversion Authority allegedly disclosed certain documents relevant to the pending motions. (Mot. for Rule 37(c)(1) Sanctions & for Order Granting Leave to Suppl. Prelim. Inj. & Dispositive Mot. R. at 2, Aug. 4, 2017, Docket No. 505.) JPA filed a motion for sanctions under Rule 37(c)(1), requesting that the Court postpone decision on the pending motions, allow supplementation of the record, and order supplemental briefing on the new information.

---

[4] The Diversion Authority did not move to dismiss Counts III and IV of the DNR's Complaint or Counts II and III of JPA's Complaint.

**DISCUSSION**

## I.    MOTIONS TO DISMISS

### A.    Standard of Review

The Corps and the Diversion Authority move to dismiss under Rules 12(b)(1) and 12(b)(6). "A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1063 (D. Minn. 2013). In deciding a motion under Rule 12(b)(1), the Court must first "distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In other words, in a facial challenge, the Court "determine[s] whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint[] and drawing all reasonable inferences in favor of the plaintiff." *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005) (citations omitted). In a factual attack, the court "inquires into and resolves factual disputes," *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002), and is free to "consider[] matters outside the pleadings," *Osborn*, 918 F.2d at 729 n.6. The nonmoving party in a factual challenge "does not have the benefit of 12(b)(6) safeguards." *Id.*

The Court construes the jurisdictional arguments to present a facial challenge. The Court finds no need to resolve any factual disputes to decide the jurisdictional questions and relies only on facts that are not in dispute and that are appropriate for consideration under a Rule 12(b)(6) motion. *Degnan v. Sebelius*, 959 F. Supp. 2d 1190, 1193 (D. Minn. 2013) (limiting its analysis of a facial jurisdictional challenge to "the pleadings, matters of public record and materials necessarily embraced by the pleadings"), *aff'd sub nom. Degnan v. Burwell*, 765 F.3d 805 (8th Cir. 2014).

In reviewing a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557)).

**B.    The Corps' Motion to Dismiss – Sovereign Immunity**

The Corps first challenges all claims filed against the Corps on the grounds of sovereign immunity.  A district court lacks jurisdiction to hear a case against the United States or its agents unless sovereign immunity has been expressly waived.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *United States v. Kearns*, 177 F.3d 706, 709 (8th Cir. 1999) ("The United States is immune from suit except where Congress has waived that immunity.").

The Corps argues the Court lacks jurisdiction because both the DNR and JPA failed to identify a final agency action subject to review under the APA.  The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The APA "evinces Congress' intention and understanding that judicial review should be widely available to challenge the actions of federal administrative officials."  *Califano v. Sanders*, 430 U.S. 99, 104 (1977).  "When an agency action is final and, if final, appropriate for judicial review[,] are issues that have arisen in a variety of federal agency contexts in the past one hundred years." *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 999 (8th Cir. 2015), *aff'd*, 136 S. Ct. 1807 (2016).  In *Bennett v. Spear*, the Supreme Court set forth a two-part test for determining whether an agency action is "final":   (1) "the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or

obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. 154, 177-78 (1997) (citations omitted).

The DNR and JPA both argue the PPA is a final agency action subject to review under the APA. They argue the PPA satisfies the *Bennett* test because the PPA is a binding agreement that determines the rights and obligations of the Corps and the Diversion Authority for completion of the Project. In response, the Corps argues the PPA is not a final agency action because it does not mark the consummation of the agency's decision-making process. Instead, says the Corps, the PPA is a step in the process of implementing final agency actions already taken – the ROD and the Chief's Report.

It is certainly true that the performance and/or implementation of a project is generally not considered "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" as required by the APA. *See, e.g.*, *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (quoting APA, 5 U.S.C. § 551(13)); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013). But entering into the PPA is not necessarily implementation.

In *Louisiana State v. U.S. Army Corps of Engineers*,[5] the Fifth Circuit addressed the issue of whether a Deauthorization Report sent to Congress or an agreement later

---

[5] Citing general contract law principles, the Corps argues the DNR and JPA lack standing to challenge the PPA because they are not parties to the agreement or third party beneficiaries. The Corps uses this argument as a way to distinguish *Louisiana State*. But numerous courts have allowed a non-party to challenge a government contract on the basis that the contract is a final agency action that violated federal law. *E.g.*, *Students v. U.S. Dep't of Educ.*, No. 16-4945, 2016 WL 6134121, at *4 (N.D. Ill. Oct. 18, 2016) (finding a final agency action reviewable by the

(Footnote continued on next page.)

signed by Louisiana and the Corps were final agency actions. 834 F.3d 574, 581-85 (5th Cir. 2016). The Fifth Circuit held that the Deauthorization Report was not a final agency action, in part because the recommendation to Congress noted that it was "subject to the non-Federal sponsor executing an agreement with the Department of the Army prior to the Federal Government initiating construction of the closure structure." *Id.* at 582. Thus, said the Fifth Circuit, the Deauthorization Report "anticipate[d] the necessity of further agency action before the . . . project [could] be implemented." *Id.* In contrast, the Fifth Circuit found an agreement entered between Louisiana and the Corps was the "final agency action" because it was a "binding agreement . . . that clearly set[] out the cost allocation for the . . . project." *Id.* at 583. And, as a binding agreement with legal consequences, the agreement "consummat[ed] the agency's decision-making process." *Id.*

Here, while complaining about actions after Minnesota denied the Permit, both the DNR and JPA set forth allegations that the PPA is a final agency action and that the Corps acted arbitrarily and capriciously when it entered into the PPA prior to the Diversion Authority securing the Permit. (*See* DNR Compl. ¶ 26 ("Federal funding . . .

_____

(Footnote continued.)

court where students and parents challenged a contract entered between the U.S. Department of Education and a school district); *Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1097-98 (C.D. Cal. 2012) (denying motion to dismiss an APA claim brought by disabled veterans challenging land-use agreements signed by the U.S. Department of Veterans Affairs and private and commercial entities); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1324 (N.D. Ala. 2005) (finding a final agency action reviewable by the court where the State of Alabama sued the Corps for contracts it entered for water-supply storage with third parties).

was contingent on the execution of a [PPA] and a finding by the Corps that all outstanding regulatory issues facing the project would likely be resolved . . . ."); *id.* ¶ 92 ("[S]igning the PPA was premature and inconsistent with the guidance from the OMB when allocating Project funding."); *id.* ¶¶ 107, 118 (signing the PPA "constitute[d] final agency action"); *id.* ¶¶ 109, 120 (signing the PPA "[was] arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law"); JPA Compl. ¶ 46 ("The [Corps'] actions [signing the PPA] represent[] the consummation of the agency's decision-making process and it constitutes an action from which rights or obligations have been determined, or from which legal consequences will flow. These actions were outside the scope of the authority granted by [WRRDA-2014] and were arbitrary and capricious").)

Like in *Louisiana*, the ROD and Chief's Report are not the final agency action for the DNR's and JPA's claims because the ROD and Chief's Report specifically informed Congress that in order to implement the Project "the non-Federal sponsors [had to] agree" to certain requirements "prior to project implementation," including compliance "with all applicable Federal and **State** laws and regulations." (Chief's Report at 4, 7 (emphasis added).) Thus, the ROD and Chief's Report "anticipate[d] the necessity of further agency action before" the Project could be implemented. *Louisiana*, 834 F.3d at 582.

Instead, applying *Bennett*, the PPA is the final agency action. First, the PPA consummates the Corps' decision-making process in that "it is a binding agreement between the Corps and [the Diversion Authority] that clearly sets out" the rights and responsibilities for both the Corps and the Diversion Authority pertaining to Project

construction and operation. *Id.* at 853; (*see also* DNR Compl. ¶ 91; JPA Compl. ¶ 46; PPA at 3-15). Further, entering into the PPA "was an act that, by its very nature, determined rights and obligations and had legal consequences, which is precisely what contracts do." *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1324 (N.D. Ala. 2005).

For these reasons, under the APA, the Court has jurisdiction to hear the DNR's and JPA's claims against the Corps and the Court will deny the Corps' Motion to Dismiss Counts I and II in the DNR's Complaint and Count IV in JPA's Complaint.[6]

---

[6] JPA also argues a report issued by the Corps regarding compliance with all regulatory requirements was a final agency action. This report was issued prior to the PPA and did not directly determine any "rights or obligations" from which "legal consequences . . . flow[ed]." *Bennett*, 520 U.S. at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Thus, the report was not a final agency action under the APA.

The Corps also claims the DNR's and JPA's claims are barred by sovereign immunity on the grounds that the claims improperly subject the Corps to state permitting requirements. But neither the DNR nor JPA allege that the Corps is subject to Minnesota's permitting requirements. (*See, e.g.*, DNR Compl. ¶ 111 (seeking to enjoin "construction of the project by the Corps until such time as **the Diversion Authority has obtained dam safety and public waters work permits from the DNR as required by WRRDA 2014**" (emphasis added)); *id.* ¶ 122 (same); JPA Compl. ¶ 32 (alleging that "**the local sponsor**" is required "to comply with state law concerning authorizations and permits" (emphasis added)); *id.* ¶ 35 (same).) Instead, both allege the Project should not be constructed until the Diversion Authority obtains the Permit.

Finally, the parties debate whether WRRDA-2014 contains an express waiver of sovereign immunity requiring federal compliance with state law. The Supreme Court has firmly held that general statements about federal compliance with state law are not sufficient to waive sovereign immunity. *See Envtl. Prot. Agency v. California* (*EPA*), 426 U.S. 200, 212, 227-28 (1976); *Hancock v. Train*, 426 U.S. 167, 178-81 (1976). Here, like in *EPA* and *Hancock*, WRRDA-2014 uses general language about the Corps' compliance with state law. Thus, the Court finds WRRDA-2014 does not contain an express waiver of sovereign immunity. While this may have implications with regard to the DNR's and JPA's claims going forward, for the purpose of the motions to dismiss, both the DNR and JPA couched their WRRDA-2014 claims

(Footnote continued on next page.)

## C. The Corps' Motion to Dismiss – Prudential Standing

The Corps also argues all of the WRRDA-2014 claims fail because the DNR and JPA lack prudential standing. "The Supreme Court has recognized prudential requirements for standing, including 'that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Nat'l Wildlife Fed'n v. Westphal*, 116 F. Supp. 2d 49, 53 (D.D.C. 2000) (quoting *Bennett*, 520 U.S. at 162) (interpreting a previous version of WRRDA).

Generally, the zone of interests test is "generous and relatively undemanding." *Id.* "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 491 (1998) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987)). Instead, the test only requires that "the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected by the statute." *Id.* at 492 (quoting *Ass'n of Data Processing Serv. Orgs.*, 397 U.S. 150, 153 (1970)). But where a plaintiff "is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

---

(Footnote continued.)

in the APA and the Court, therefore, finds a waiver of sovereign immunity for claims arising under the final agency action – the PPA. APA, 5 U.S.C. § 704 (waiving sovereign immunity where there is a "final agency action for which there is no other adequate remedy in a court.").

suit." *Clarke*, 479 U.S. at 399; *see also Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036 (8th Cir. 2002). "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175-76.

Here, the DNR and JPA are within the zone of interests that WRRDA-2014 protects. Numerous provisions of WRRDA-2014 require compliance with state law. *See* WRRDA-2014 § 7002 (authorizing the Project to be carried out "subject to the conditions[] described in the respective reports"); Chief's Report at 7 (requiring compliance "with all applicable . . . State laws and regulations"); 33 U.S.C. § 2232(b)(2) ("Before carrying out a water resources development project, or separable element thereof, under this section, a non-Federal interest shall . . . obtain any permit or approval required in connection with the project or separable element under Federal or State law . . . ."). Requiring state permits is evidence that when enacting WRRDA-2014, Congress had more in mind that just making project funding easier for non-Federal entities. In fact, by requiring state permits, Congress reiterated its consistent view that flood control projects relating to navigable waters must be completed in "cooperation with **States**, **their political subdivisions, and localities thereof**." *See* 33 U.S.C. § 701a (emphasis added). Thus, the Court finds the DNR and JPA are within the zone of interests meant to be protected by provisions of WRRDA-2014 requiring compliance with state law, and the Court will deny the Corps' motion to dismiss for lack of prudential standing.

### D.  The Corps' Motion to Dismiss – 33 U.S.C. § 2232

The Corps next argues the Court should dismiss Count I in the DNR's Complaint and part of Count IV in JPA's Complaint for failing to state a claim upon which relief may be granted.  The Corps asserts that section 2232 does not apply to the Project.

To address the Corps' argument, the Court must interpret the statute.  The Court begins with the statute's plain language.  *Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004).  "Courts resort to legislative history and other sources to guide their interpretation only if the meaning of the statute is ambiguous."  *United States v. Plummer Excavating, Inc.*, 65 F. Supp. 2d 1013, 1015 (D. Minn. 1999).

The Corps argues section 2232 does not apply because the section only applies when non-Federal sponsors carry out a "water resource development project" independently.  But nowhere in the language of the statute did Congress express this limitation.  Congress entitled section 2232 "Construction of water resources development projects by non-Federal interests" and defined "water resources development project" broadly, to include "a project recommendation that results from . . . a final feasibility study for water resources development and conservation and other purposes that is specifically authorized by Congress to be carried out by the Secretary."  The parties do not dispute that this definition describes the Project.

Congress then expressly laid out the authority for a non-Federal interest to "carry out a water resources development project, or a separable element thereof" on the condition that "[b]efore carrying out" a project the non-Federal interest "obtain **any**

**permit or approval** required in connection with the project or separable element under Federal or State law." 33 U.S.C. § 2232(b) (emphasis added). Nowhere in section 2232 did Congress provide that the authority to carry out a water resource development project under section 2232 applies only when the non-Federal interest carries out the project independently. Consequently, what the Corps asks is not a construction of the statute, but, in effect, a limitation on the statute's applicability that Congress allegedly omitted by inadvertence. *King v. IRS*, 688 F.2d 488, 491 (7th Cir. 1982) ("[C]ourts have no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress." (quoting *DeSoto Sec. Co. v. Comm'r*, 235 F.2d 409, 411 (7th Cir. 1956))). Supplying an omission, as the Corps requests, "transcends the judicial function," *Nichols v. United States*, 136 S. Ct. 1113, 1118 (2016) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)), and the Court will not add such a limitation here.

Further, while located in the "Credit and Reimbursement" subsection, Congress expressly requires the Corps to "monitor and audit **any** water resources development project, or separable element . . . constructed by a non-Federal interest under this section to ensure that . . . the construction is carried out in compliance with the requirements of this section." 33 U.S.C. § 2232(d)(4) (emphasis added).

As set forth above, the statute broadly defines the phrase "water resources development project" to include the Project at issue here. *Id.* § 2232(a)(3). And numerous places in the statute use the phrase "under this section" or similar language to refer to all of section 2232. *See, e.g.*, *id.* § 2232(a) ("In this section"); *id.* § 2232(b)(2)

("under this section"); *id.* § 2232(d)(1), (4), (5) ("under this section"); *id.* § 2232(e) ("under this section"). Further, section 2232 particularly identifies subsections when Congress deemed it necessary, *see, e.g.*, *id.* § 2232(c) ("undertaken under subsection (b)"); *id.* § 2232(d)(1)(B) ("identified under subsection(b)(1)(B)"); *id.* § 2232(d)(5) ("under this subsection"), eliciting Congress' cognizance of the difference between the word "section" and "subsection." Thus, based on the plain language of the statute, the monitoring requirement in section 2232(d)(4) includes a duty to monitor projects carried out under the authority delineated in section 2232(b).

The Corps' own assertions during the process of approving the Project – which were first disclosed in documents provided in discovery after the hearing on this matter – appear to support the Court's interpretation of section 2232.[7] In a January 2016 memorandum, the Corps indicated its intention that the Project

> be constructed using a "split delivery" concept relying on [section 2232] . . . . [the Diversion Authority would] be responsible for construction of **one separable element**, consisting of the diversion channel and associated structures, and the [Corps would] be responsible for construction of the other **separable element**, consisting of the southern embankment and all non-integrated mitigation.

---

[7] While the Court recognizes these internal documents are not proper to consider during a Rule 12(b)(6) motion, *see Degnan*, 959 F. Supp. 2d at 1193, they are relevant for the motion for preliminary injunction discussed later in this Order. The Court briefly notes the documents here because the question of statutory interpretation is relevant to both motions. The Court further clarifies that while the internal documents provide additional support for the Court's determination, the Court's interpretation of the statute's plain language does not depend on the statements made in the documents.

(Decl. of Gerald Von Korff ("Von Korff Decl."), Ex. 1 at 1, Aug. 4, 2017, Docket No. 508; *see also id.*, Ex. 4 at 1 (indicating the "Split Delivery" concept "[u]tilizes existing authorities" including section 2232); *id.*, Ex. 5 at 1-2 (discussing "Split Delivery" construction and the "separable elements" of the Project).)  And in a series of draft PPAs, the Corps and the Diversion Authority included the following language:

> WHEREAS, Section 204 of the Water Resources Development Act of 1986, Public Law 99-662, as amended by Section 1014(b) of [WRRDA-2014], allows a non-Federal interest to carry out a water resources development project, or a separable element thereof, in accordance with a plan approved by the Secretary of the Army and any conditions the Secretary of the Army may require[.]

(Von Korff Decl. ¶ 3 & Ex. 2 at 2-3; *see also* Decl. of Colin O'Donovan ("O'Donovan Decl."), Ex. P at 3-4, 8-9, Aug. 18, 2017, Docket No. 522.)

These documents appear to indicate that the Corps intended the Project to fall under section 2232, in that the Diversion Authority is "responsible for construction of one separable element, consisting of the diversion channel and associated structures."  (Von Korff, Ex. 1 at 1; *see also* PPA at 2 (indicating the non-federal work includes "an approximately 30 mile . . . diversion channel and associated features; the channel outlet; the Rush and Lower Rush River hydraulic structures; the Maple River aqueduct; the Sheyenne River aqueduct; the inflow design flood levee; associated railroad bridges; the in-town levees and the [OHB Ring Levee]; recreation features; environmental mitigation features located within the diversion channel and associated structures for the diversion

channel").)[8]   And the documents suggest that section 2232 was the basis for the apportionment of Project obligations under the PPA.  (*See* PPA at 2; Von Korf Decl. Ex. 1 at 1; O'Donovan Decl., Exs. O, R-T.)

The Court finds section 2232 unambiguously applies to all "water resources development project[s]" as defined in section 2232(a), including the Project at issue in this case.  Consequently, the "Authority" provisions and conditions in section 2232(b) apply to the Diversion Authority as it is the "non-Federal sponsor" carrying out the Project.  And the Corps has an independent mandate to monitor and audit the Diversion Authority as it carries out the Project to ensure compliance with section 2232.  *Id.* § 2232(d)(4).  Therefore, the Court will deny the Corps' Rule 12(b)(6) motion to dismiss Count I in the DNR's Complaint and part of Count IV in JPA's Complaint.[9]

## E.      The Corps' Motion to Dismiss – NEPA

The Corps also moves to dismiss JPA's NEPA claim on the grounds that JPA failed to allege facts supporting its claim that the Corps is required to file a supplemental

---

[8] The Corps cites its own unpublished Engineering Report to indicate section 2232 only "authorizes non-Federal interests to undertake construction of certain water resources development projects, with potential credit or reimbursement of the Federal share of that construction."  (Decl. of Devon Lehman McCune in Supp. of Mot. to Dismiss, Ex. 6 at 2, May 23, 2017, Docket No. 448.)

[9] The Corps also argues section 2232 does not apply because both the FEIS and the Chief's Report indicated any work completed was done under 42 U.S.C. § 1962-5b.  But the requirements of section 1962-5b are incorporated in section 2232 and, thus, Congress intended the two provisions to work in concert with each other.  *See* 33 U.S.C. § 2232(d)(1)(A)(iii) ("[T]he non-Federal interest [must] enter[] into a written agreement with the [Corps] under section 1962d-5b of title 42[.]").

environmental impact statement ("SEIS") in light of the DNR's denial of the Permit.[10] Under NEPA, the Corps is required to submit an SEIS if: (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns"; or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

The Supreme Court has held "[a]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). Such a requirement "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.*

> [T]he decision whether to prepare [an SEIS] is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or **to a significant extent not already considered**, a supplemental EIS must be prepared.

*Id.* at 374 (emphasis added) (quoting 42 U.S.C. § 4332(2)(C)).

Here, the Corps already considered the DNR's concerns about the Project and the possibility that the Permit may be denied. *See Dist. Court Order II*, 176 F. Supp. 3d at 850 ("[T]he Corps undisputedly did respond to numerous comments made by the State of

---

[10] To the extent JPA's NEPA claim can be construed as raising the same claims already dismissed with prejudice by this Court, *see Dist. Court Order II*, 176 F. Supp. 3d at 851, the Court will grant the Corps' motion to dismiss Count I in JPA's Complaint.

Minnesota."); (DNR Compl. ¶¶ 73-75 (stating that the Corps acknowledge the permit requirement in the FFREIS)). JPA provided the Court with no citations to comments that the DNR made that the Corps left unaddressed. (DNR Compl. ¶¶ 71-75 (stating the DNR informed the Corps that the Diversion Authority would need a permit).) In fact, at the hearing in this matter, JPA admitted that it relies solely on "[t]he permit denial and the response of the jurisdictions" to the Permit denial to support its NEPA claim. The Corps "**already considered**" the impact of the concerns raised by the DNR and the impact a Permit denial would have on the Project. *See Marsh*, 490 U.S. at 374 (emphasis added). Therefore, JPA fails to allege a "major federal action" necessitating an SEIS and the Court will grant the Corps' motion to dismiss JPA's NEPA claim (Count I).

### F.     The Diversion Authority's Motion to Dismiss

The Diversion Authority separately moves to dismiss Count IV in JPA's Complaint against the Diversion Authority for lack of subject matter jurisdiction. The Diversion Authority asserts that Count IV fails because neither section 2232 nor section 7002 provides a private right of action.

JPA does not contest that WRRDA-2014 does not contain an express private right of action[11] or that the APA would provide jurisdiction against the Diversion Authority.

---

[11] JPA's concession is consistent with caselaw regarding previous WRRDA statutes finding no express private right of action. *Envt'l Def. Fund v. Marsh*, 651 F.2d 983, 1003 (5th Cir. 1981) ("WRDA establishes no specific right to judicial review . . . ."); *White Oak Realty, LLC v. U.S. Army Corp of Eng'rs*, No. 13-4761, 2014 WL 4387317, at *5 (E.D. La. Sept. 4, 2014) ("Given that the WRDA does not provide a private right of action, the Court can conceive

(Footnote continued on next page.)

Thus, whether the Court should grant the Diversion Authority's motion turns on whether WRRDA-2014 contains an implied private right of action.

To analyze whether a statute contains an implied private right of action, the Court must analyze the following four factors, as described in *Cort v. Ash*:

> (1) whether the plaintiff is a member of the class of persons for whose benefit the statute was enacted; (2) whether the legislature has implicitly or explicitly manifested any intent to create or deny such a remedy; (3) whether it is consistent with the underlying purpose of the legislative scheme to imply such a remedy; and (4) whether the cause of action is traditionally a creature of state law such that inferring a cause of action based solely on federal law would be inappropriate.

*McCabe v. City of Eureka*, 664 F.2d 680, 681-82 (8th Cir. 1981) (citing *Cort v. Ash*, 422 U.S. 66, 95 (1975)). Because "[t]he language of the statute and its legislative history do not suggest that [the statute] was intended to create federal rights for the especial benefit of a class of persons," the Court finds "it is unnecessary to inquire" beyond the first two factors. *California v. Sierra Club*, 451 U.S. 287, 294 (1981).

The Court must first inquire into whether JPA is "'one of the class for whose especial benefit the statute was enacted,'—that is, [whether] the statute create[s] a federal right in favor of" JPA. *Cort*, 422 U.S. at 78 (quoting *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916)). The Supreme Court has explained that "[t]he question is not simply

---

(Footnote continued.)

of no other way that Plaintiffs could obtain the relief requested other than by filing suit under the APA."); *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 175 F. Supp. 2d 755, 762 (E.D. Pa. 2001) ("[N]either provision of the WRDA at issue in this case makes explicit provision for judicial review . . . .").

who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.'" *Sierra Club*, 451 U.S. at 294.

In *New Jersey Department of Environmental Protection & Energy v. Long Island Power Authority*, the Third Circuit held "the Coastal Zone Management Act requirement conditioning certain federal licenses and permits on [a] showing that proposed activities compl[ied] with the state's coastal management program" did not make New Jersey an especial beneficiary creating right of action against private defendants. 30 F.3d 403, 418-19, 421-22 (3d Cir. 1994). The court found that even though the statute benefited New Jersey because of "enhanced authority and healthier coastal zones," the ultimate goal of the statute was to "protect[] the nation's coastal zones." *Id.* at 422. Thus, the statute did not translate into "a right in favor" of New Jersey to enforce the federal statute against private defendants.

Here, WRRDA-2014 similarly provides that projects carried out under the statute must comply with state law and, as a result, Minnesota and local government entities benefit from "enhanced authority" and more cooperative projects. But the ultimate goal of WRRDA-2014 – as expressed by Congress – was to "provide for improvements to the rivers and harbors of the United States, to provide for the conservation and development of water and related resources, and for other purposes." WRRDA-2014, Purpose Statement. Thus, the statute itself was meant to provide improvements to the rivers and harbors of the United States – not to provide special benefits to state and local entities to enforce the federal statute against non-Federal sponsors.

The Court must next assess WRRDA-2014 to determine whether there is "any indication of legislative intent, explicit or implicit, either to create [the requested] remedy or to deny [it]." *Cort*, 422 U.S. at 78. Here, JPA relies on the history of federal statutes relating to water resource projects and the fact that Congress has carefully considered the role of state sovereignty when enacting the statutes. Thus, JPA argues Congress intended to provide local governments a right of action to ensure compliance with state regulations in order to protect state sovereignty.

But courts have held that broad federal statutes focusing on bringing states into a federal plan "do not represent an open-ended grant of enforcement authority to the states." *Long Island Power Auth.*, 30 F.3d at 423. Instead "[a] general statement of intent to enhance state authority, given effect through explicit measures in the statute itself, cannot be taken to indicate an intent also to create rights of actions that the statute fails to mention." *Id.*

For these reasons, the Court finds WRRDA-2014 does not contain a private right of action and will grant the Diversion Authority's motion to dismiss Count IV in JPA's Complaint against the Diversion Authority.

## II.     MOTIONS FOR PRELIMINARY INJUNCTIONS

### A.     Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court must consider four factors in determining whether to grant preliminary injunctive relief:     (1) the

probability that the moving party will succeed on the merits; (2) the threat of irreparable

harm to the moving party; (3) the balance of harms as between the parties; and (4) the

public interest. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776

(8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

1981)). "At base, the question is whether the balance of equities so favors the movant

that justice requires the court to intervene to preserve the status quo until the merits are

determined." *Dataphase*, 640 F.2d at 113. The party requesting injunctive relief bears

the complete burden for showing the above factors. *Watkins Inc. v. Lewis*, 346 F.3d 841,

844 (8th Cir. 2003).

## B.     Likelihood of Success

"While no single *Dataphase* factor is determinative, the likelihood of success on

the merits is predominant in the preliminary injunction analysis." *Dist. Court Order I*,

2015 2251481, at *17. The movant must show that it has a "fair chance of prevailing" on

its claims.[12] *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th

---

[12] The Diversion Authority argues the Court should apply a more stringent "likely to prevail" standard under this factor. But the Court already decided this issue. The Court held that

> [while i]t is true that this [P]roject was brought about through a robust environmental planning process that involved significant public input[,] . . . . the Eighth Circuit in *Rounds* applied the more stringent "likely to prevail" test more narrowly – not just to governmental decisions that involved public input, but to government statutes and regulations that involved debate and deliberation by an elected legislative body. *See* [*Rounds*, 530 F.3d] at 732-33 ("Only in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, must district courts make a threshold finding that a party is likely to prevail on the merits.").

(Footnote continued on next page.)

Cir. 2008) (en banc).  Likelihood of success does not, however, require the moving party

to "prove a greater than fifty per cent likelihood that [it] will prevail on the merits."

*PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting

*Dataphase*, 640 F.2d at 113).  In considering whether a movant is likely to prevail on the

merits, "a court does not decide whether the movant will ultimately win."  *Id.*  Where, as

here, a plaintiff alleges several violations of state law and seeks one type of injunctive

relief that is tied to all of the alleged statutory violations, it "need only establish a

likelihood of succeeding on the merits of any one of those claims in order to satisfy this

part of the preliminary injunction standard."  *Am. Rivers v. U.S. Army Corps of Eng'rs*,

271 F. Supp. 2d 230, 250 (D.D.C. 2003).

### 1.    Claims Against the Corps

Both the DNR and JPA argue that their claims based on WRRDA-2014 are likely

to succeed on the merits because the Corps' decision to sign the PPA prior to requiring

the Diversion Authority to obtain the Permit was "arbitrary, capricious, an abuse of

------------------------------

(Footnote continued.)

*Dist. Court Order I*, 2015 WL 2251481, at *18.  Here, even with claims challenging compliance with WRRDA-2014, the parties are not seeking to enjoin the implementation the statute or regulation; the parties simply seek to enjoin one project undertaken pursuant to statutory authorization.  *Id.* ("[E]ven if the JPA were trying to enjoin [WRRDA-2014]'s authorization of the project more broadly, that project was adopted along with other projects pursuant to the [Chief's Report].    Congress's authorization of a project pursuant to expert agency recommendation is far different than adopting a complex statute through fulsome debate that a plaintiff seeks to permanently bar from being enforced.").  Thus, the Court will apply the "fair chance of prevailing" standard.

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the Court's factual inquiry must be "searching and careful," the scope of review is quite narrow; the Court is "not empowered to substitute its [own] judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Court should simply determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Downer v. U.S. ex rel. U.S. Dep't of Agric. & Soil Conservation*, 97 F.3d 999, 1002 (8th Cir.1996) (quoting *Marsh*, 490 U.S. at 378).

### a.     Section 2232 Claim

Here, the DNR and JPA have alleged entering into the PPA was an arbitrary and capricious action or was not in accordance with the law because it was "premature" to sign the PPA prior to the Diversion Authority obtaining permits allegedly required by WRRDA-2014. (DNR Compl. ¶ 92 ("[S]igning the PPA was premature and inconsistent with the guidance from the OMB when allocating Project funding"); *id.* ¶¶ 109, 120 (explaining the action in paragraph 92 "[was] arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law"); JPA Compl. ¶ 46 ("These actions were outside the scope of the authority granted by [WRRDA-2014] and were arbitrary

and capricious").)[13]    To support this claim, the DNR and JPA rely primarily on uncontested facts.

The record reflects that the Corps and the Diversion Authority signed the PPA on July 11, 2016. (PPA at 15.) The PPA "set forth the rights and obligations of the Corps and the Diversion Authority pertaining to Project construction and operation." (DNR Compl. ¶¶ 26, 91; JPA Compl. ¶ 46.) The PPA divided construction responsibility into two categories: "Federal Work" and "Non-Federal Work" and limited the "Non-Federal Work" to construction occurring primarily on the North Dakota side of the Red River. (PPA at 2.) And the PPA opened the door for both the Corps and the Diversion Authority to begin construction of the Project. (Chief's Report at 5, 8 (indicating the Corps and the Diversion Authority must enter an agreement before construction begins).)

Before July 11, 2016, the DNR made clear to the Corps that Minnesota law required the Diversion Authority to obtain permits prior to beginning construction of the

---

[13]  The DNR and JPA also allege that it was arbitrary and capricious and not in accordance with law for the Corps and the Diversion Authority to draft and sign the PPA in an attempt to circumvent Minnesota's permitting authority. (DNR Compl. ¶ 93 (explaining the PPA divided work so that "most of the Project work to be undertaken in Minnesota" would be constructed by the Corps); *id.* ¶¶ 109, 120 (explaining the action in paragraph 93 "[was] arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law"); JPA Compl. ¶ 8 (noting the Corps will undertake "some construction" of the Project under the PPA); *id.* ¶¶ 45-46 (describing the PPA's division of labor as "arbitrary and capricious"); PPA at 2 (dividing "non-federal" and "federal" work).) After the hearing in this matter, documents were disclosed that support this contention. (O'Donovan Decl., Ex. L at 4 (indicating the Corps and the Diversion Authority drafted certain sections of the PPA to avoid "forsee[able] objections arising from Project opponents, some of which c[ould] be silenced or preempted by merely giving the [Corps] authority to use its own power").) Because the Court finds there is a likelihood of success on the merits of their claims regarding premature signing of the PPA, the Court does not address the merits of this claim. *See Am. Rivers*, 271 F. Supp. 2d at 250.

Project. (Decl. of Gerald Von Korff, Ex. 4 at 17-18, Nov. 30, 2016, Docket No. 347 (DNR June 29, 2016 ROD stating the Permit was required); *id.*, Ex. 6 at 1 (letter from DNR informing the Corps that the "state's permitting process [was] ongoing" and that the completion of the environmental review process "should not, by any means, be interpreted as a project approval or as an indication that state permits are likely to be forthcoming" because the Project "presents significant issues under Minnesota's regulatory system").) And the DNR implicitly warned the Corps that it should not sign the PPA because outstanding regulatory issues could affect construction of the project. (*Id.*, Ex. 6 at 1.) In spite of these warnings, the Corps executed the PPA.

Based upon these uncontested facts, the DNR and JPA have a fair chance of prevailing on their section 2232 claim. As set forth above, section 2232(b)(2)(a) requires that "**[b]efore**" the Diversion Authority carries out the Project, it must "obtain **any permit** or approval required in connection with the project . . . under Federal or **State** law." (Emphasis added). The statute further requires the Corps to "monitor and audit" the Project to ensure "the **construction** is carried out in compliance with the requirements" of section 2232. 33 U.S.C. § 2232(d)(4). Here, the DNR and JPA present evidence the DNR informed the Corps that regulatory issues regarding the Diversion Authority were outstanding and, in spite of this warning, the Corps signed the PPA allowing the Diversion Authority to begin construction of the Project. Under this set of facts, the DNR and JPA have shown a likelihood of success on their claim that signing the PPA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because the Corps' actions violated section 2232.

The Corps disagrees with this reasoning, presenting evidence that "[m]ost construction permits for the [P]roject . . . cannot be obtained prior to executing a PPA because near-final to final detailed designs must be completed in order to apply." (Decl. of Terryl L. Williams ("Williams Decl.") ¶ 9, May 31, 2017, Docket No. 468.) But section 2232(b)(2)(A) plainly requires that the Diversion Authority "obtain **any** permit" required by law "**[b]efore** carrying out" the Project. And section 2232(d)(4) mandates that the Corps ensure "construction is carried out in compliance with [that] requirement[]."

The Corps next argues the DNR failed to show a likelihood of success on the merits of the 2232 claim because the Diversion Authority is not required to get a permit for work the Diversion Authority does not complete. But the Eighth Circuit held that "laws governing a project that crosses the border between two states are bound to have some extraterritorial effect"; if the Diversion Authority was "permitted to begin building the diversion project in North Dakota, and could only be stopped once it reached the Minnesota border, the practical effect would be that for interstate projects, the state with more lenient laws would always control." *Appellate Court Order*, 826 F.3d at 1042 (quoting *Dist. Court Order I*, 2015 WL 2251481, at *15). Thus the Eighth Circuit affirmed the Court's earlier finding that the requirements of Minnesota law applied to the Diversion Authority, even when it only completed work outside the state, because "Minnesota has an interest in regulating the larger diversion project and its parts." *Id.*

### b. Section 7002 Claim

The DNR and JPA also argue they are likely to succeed on their section 7002 claim. Section 7002 provides:

> The following final feasibility studies for water resource development and conservation . . . are authorized to be carried out by the [Corps] substantially in accordance with the plan, and subject to the conditions, described in the respective reports designated in this section.

The report specific to the Project that is designated under section 7002 is the Chief's Report dated December 19, 2011. The Chief's Report endorsed the FFREIS where the Corps acknowledged that

> [a]s part of implementing this project, the non-federal sponsors [were] required to obtain a [DNR] protected waters permit . . . . In order to obtain the necessary permits from the state of Minnesota, the non-federal sponsors [were required to] complete the scoping and review process required by the Minnesota Environmental Policy Act. . . . The construction contractors [were] responsible for acquiring all local licenses/permits required to comply with state and municipal laws, codes and regulations.

(DNR Compl. ¶ 74; JPA Compl. ¶ 34; *accord* Notice of Submission of Exs., Ex. F.) And the Chief's Report noted in several locations that the Project would comply with "Federal and State laws and regulations." (Chief's Report at 4. 7.)

As set forth above, the record shows the DNR informed the Corps that regulatory issues regarding the Diversion Authority were outstanding and, in spite of this warning, the Corps signed the PPA allowing the Diversion Authority to begin construction of the Project. Under this set of facts, the DNR and JPA have shown "fair chance of prevailing," *Planned Parenthood*, 530 F.3d at 732, on their section 7002 claim on the ground that the Corps' decision to sign the PPA in spite of outstanding regulatory issues

was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

The Corps argues the DNR is not likely to succeed on the merits because the Chief's Report only requires compliance with "State laws and regulations" and, by only completing work in North Dakota, the Diversion Authority does not need a Minnesota permit. As stated above, the Eighth Circuit held "laws governing a project that crosses the border between two states are bound to have some extraterritorial effect;" and if the Diversion Authority was "permitted to begin building the diversion project in North Dakota, and could only be stopped once it reached the Minnesota border, the practical effect would be that for interstate projects, the state with more lenient laws would always control." *Appellate Court Order*, 826 F.3d at 1042. Applying this reasoning, the Diversion Authority cannot circumvent its obligation to obtain Minnesota permits simply by completing work in North Dakota when the parties agree the work in North Dakota will impact Minnesota and the Red River.

The Corps also argues the DNR and JPA are not likely to succeed on the merits of the section 7002 claim because the statute only requires the Corps to carry out the Project "substantially in accordance with the plan." WRRDA-2014 § 7002. But section 7002 fully states that the Project is "authorized to be carried out . . . substantially in accordance with the plan, **and subject to the conditions**, described in the respective reports." *Id.* (emphasis added). Reading the plain language of the statute, the word "and" is a coordinating conjunction that is used to "link[] independent ideas." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011). When terms are connected by a conjunctive term in a

statute, "courts normally interpret the statute as requiring satisfaction of both of the conjunctive terms." *United States v. Ganadonegro*, 854 F. Supp. 2d 1068, 1081 (D.N.M. 2012) (citing *Bruesewitz*, 562 U.S. at 236).

Here, the use of the word "and" reveals two separate requirements in section 7002: the Corps must carry out the Project (1) "substantially in accordance with the plan . . . described in the [Chief's Report]"; and (2) "subject to the conditions[] described in the [Chief's Report]." WRRDA-2014 § 7002. Reviewing the Chief's Report, the Project recommendation was "subject to the condition[]," *id.*, that non-Federal sponsors would comply "with all applicable Federal and **State laws and regulations**," (Chief's Report at 4, 7). Thus, while the Corps has some discretion regarding the specifics of the Project itself, Congress did not provide for such discretion with regard to the conditions set forth in the Chief's Report. Because compliance with state laws and regulations was plainly a condition set forth in the Chief's Report, the Corps' argument is unavailing.

For these reasons, the Court finds the DNR and JPA have shown a fair chance of prevailing on their claims against the Corps.

## 2.     Claims Against the Diversion Authority

The DNR and JPA also assert that they have shown a fair chance of prevailing on their state-law claims against the Diversion Authority. The Diversion Authority challenges the DNR's and JPA's analysis on three grounds: Dormant Commerce Clause; preemption; and the merits.

### a.     Dormant Commerce Clause

The Diversion Authority first asserts that, even if the DNR and JPA were likely to succeed on the merits, the claims against the Diversion Authority are precluded by the Dormant Commerce Clause.  The Court already decided this issue, explaining:

> Unlike a state statute that effectively reins in out-of-state energy producers, here, MEPA and MERA would regulate the [Diversion] Authority[, which] is partially led by Minnesota governmental units (the kind expressly regulated by both MEPA and MERA) engaged in a project that will take place, in part, in Minnesota.  As the Supreme Court has said, the [D]ormant Commerce Clause is about protecting interstate commerce from being unduly burdened by states, but it is not a tool to allow citizens to protect themselves from their own responsibilities.  In other words, to let [Diversion] Authority – particularly its Minnesota members – escape Minnesota environmental law via the [D]ormant Commerce Clause, would be to extend that clause's reach beyond its traditional focus on keeping one state from regulating the commerce of another.  It may be that only [Diversion] Authority's North Dakota members sign construction paperwork as to construction in North Dakota, but, as noted above, that does not change the fact that Minnesota counties and cities are still equal members in the Diversion Authority and that the [Diversion] Authority is ultimately the local sponsor in charge of and responsible for all non-federal funding and construction, including the integral work on portions like the OHB [R]ing [L]evee.

*Id.* at *13-15. The Eighth Circuit affirmed this reasoning.  *Appellate Court Order*, 826 F.3d at 1042.  The Court finds the factual distinction between the Diversion Authority constructing North Dakota portions of the Project set forth in the PPA, as opposed to the OHB Ring Levee in North Dakota, does not change the Court's previous analysis, and, again, the Court finds the application of Minnesota's regulatory requirements does not violate the Dormant Commerce Clause.

### b. Preemption

The Diversion Authority also argues the DNR and JPA are not likely to succeed on their state-law claims because state law is preempted by WRRDA-2014. The Supremacy Clause of the United States Constitution provides that the "Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under this clause, any "state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Preemption can be express or implied. "[A] court may find that Congress impliedly preempted such claims by 'conflict' if 1) compliance with both federal and state law is impossible, or 2) the claims would 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mensing v. Wyeth, Inc.*, 588 F.3d 603, 608 (8th Cir. 2009) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)), *rev'd in part on other grounds sub nom. Pliva, Inc. v. Mensing*, 564 U.S. 604 (2011). Therefore, "a conflict arises when compliance with both federal and state regulations is a physical impossibility." *Schedin v. Ortho-McNeil-Janssen Pharm., Inc.*, 776 F. Supp. 2d 907, 910 (D. Minn. 2011) (emphasis omitted) (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

The Court is not persuaded by the Diversion Authority's preemption arguments. As stated above, WRRDA-2014 requires compliance with state laws and regulations. 33 U.S.C. § 2232(b)(2)(A) (requiring the Diversion Authority to obtain relevant permits);

WRRDA-2014 § 7002 ("subject to the conditions, described in the respective reports"); Chief's Report at 7 (requiring the Diversion Authority to "[c]omply with all applicable . . . State laws and regulations"). In order to comply with state law, the Diversion Authority must obtain permits, making compliance with both state and federal law not only possible, but tantamount to complying with federal law.[14]

The Diversion Authority also argues that because the Corps already submitted a final plan that was approved by Congress, any permit that conflicts with the approval stands as an obstacle to the accomplishment of that goal. To support this argument, the Diversion Authority cites *In re Operation of Missouri River Systems Litigation*, 320 F. Supp. 2d 873, 878 (D. Minn. 2004). There, the court found that "[r]equiring the Corps to comply with North Dakota's water quality standards irrespective of the Corps' other obligations and existing river conditions circumvents the intention of Congress in its enactment of the [Flood Control Act] and the [Clean Water Act]." *Id.* The court explained that ordering the Corps to comply with North Dakota's standards would cause Corps to "violate its federal statutory obligations." *Id.* Thus, because the Corps' obligations between federal and state law conflicted, the state law was preempted. *Id.*

---

[14] The Diversion Authority also asserts that, because WRRDA-2014 adopted a detailed feasibility report, the law left no room for Minnesota to regulate the feasibility of the Project. But the FFREIS acknowledged that "[a]s part of implementing this project, the non-federal sponsors [were] required to obtain [the Permit]" and "[t]he construction contractors [were] responsible for acquiring all local licenses/permits required to comply with state and municipal laws, codes and regulations." (Notice of Submission of Exs., Ex. F at 109.) Thus, the feasibility report left room for Minnesota regulation of the Project. (*See also* Chief's Report at 4, 6-7.)

But this case is not analogous to *Missouri River Systems*. Here, the DNR and JPA do not seek to require the Corps to obtain a permit conflicting with Congress's authorization. Instead, the Diversion Authority, made up in part of Minnesota entities subject to DNR jurisdiction, seeks to avoid obtaining a Minnesota permit under the guise that the permitting requirements would conflict with the Congressional authorization. And, as repeatedly stated, WRRDA-2014 requires the Diversion Authority to comply with state laws and regulations and, therefore, there is no conflict with the authorization.

Further, the Diversion Authority's argument hinges on the notion that the parameters of the Project cannot change after Congress passed the authorization. But along with explicitly requiring compliance with state regulations, WRRDA-2014 only requires "substantial compliance" with the plan set forth in the Chief's Report. *See* WRRDA-2014 § 7002. And there is evidence in the record suggesting the plan can change after Congressional authorization. (*See, e.g.*, Williams Decl. ¶ 9.) Such evidence shows that, even after Congressional authorization, the Corps can alter the final designs for the Project.

For these reasons, the Court concludes WRRDA-2014 does not preempt Minnesota's permitting requirements.

### c. MERA – Merits

The DNR and JPA assert that they are likely to succeed on their MERA claims. MERA "permits any person to maintain a civil action for declaratory or equitable relief against another person 'for the protection of the air, water, land, or other natural

resources located within the state, whether publicly or privately owned, from pollution, impairment, or destruction.'" *White v. Minn. Dep't of Nat. Res.*, 567 N.W.2d 724, 737 (Minn. Ct. App. 1997) (quoting Minn. Stat. § 116B.03, subd. 1). "Person" is defined to include "any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality, [or] any public or private corporation . . . ." Minn. Stat. § 116B.02, subd. 2.

The DNR and JPA correctly point out there are two distinct paths to showing a MERA violation. The first requires the DNR and JPA to show "'any conduct by any person which *violates*, or is *likely to violate*,' any environmental quality standard, permit, or similar rule." *State by Schaller v. County of Blue Earth*, 563 N.W.2d 260, 264 (Minn. 1997) (quoting Minn. Stat. § 116B.02, subd. 5). The second path necessitates showing conduct "materially adversely affects or is likely to materially adversely affect the environment." *Id.* (emphasis omitted) (quoting Minn. Stat. § 116B.02, subd. 5). Both are discussed in turn.

Beginning with the first path, "MERA . . . does not define what constitutes an environmental-quality standard, limitation, or rule." *State ex rel. Afremov v. Remes*, No. A14-2037, 2015 WL 4715316, at *5 (Minn. Ct. App. Aug. 10, 2015). But the Minnesota Court of Appeals has defined the term as "a standard, limitation, or rule with a **primary purpose of protecting Minnesota's natural resources**." *Id.* at *7 (emphasis added). The Diversion Authority does not dispute that the Permit requirement has the "primary purpose of protecting Minnesota's natural resources."

The DNR and JPA assert that they have shown a fair likelihood of success on their MERA claims because the Diversion Authority violates Minn. Stat. § 103G.245 and related regulations by constructing the Project without the Permit. The DNR points out that section 103G.245, subdivision 1, requires a permit in order to "construct, reconstruct, remove, abandon, transfer ownership, or make any change in a . . . dam . . . on public waters." Further, a permit is required for "a project affecting floodwaters." *Id.*, subd. 9. Thus, because any work the Diversion Authority does with regard to construction of the Project affects both a dam on public waters and floodwaters, any work completed by the Diversion Authority without a Permit violates Minnesota law and regulations. *See also* Minn. R. 6115.0190, subp. 5 (fill of public waters); Minn. R. 6115.0200, subp. 5 (excavation of public waters); Minn. R. 6115.0300 (construction and operation of dams).

The Diversion Authority responds that the regulations the DNR and JPA rely on do not apply to the actions of the Diversion Authority because the term "public waters" does not reach outside the border of Minnesota. While the Diversion Authority is correct that the definition of "public waters" does not explicitly cover watercourses bordering the state, the term does refer to, among other things, "natural and altered watercourses with a total drainage area greater than two square miles." Minn. Stat. § 103G.005, subd. 15(9). Further, Minnesota defines "waters of the state" to include "**boundary** and inland waters." *Id.*, subd. 17 (emphasis added). Thus, the Diversion Authority's statutory argument does not support a finding that Minnesota cannot regulate projects affecting waters that border the state. Further, the Eighth Circuit held that "Minnesota has an interest in regulating the larger diversion project and its parts" – including portions of the

Project constructed in North Dakota, because of the Project's connections to and effects on Minnesota. *Appellate Court Order*, 826 F.3d at 1042.

The Diversion Authority also argues that, to the extent it is required to obtain the Permit, it is not required to do so until the Diversion Authority touches the Red River. This argument is also inconsistent with the Eighth Circuit's holding. *See id.* In addition, the Diversion Authority is acquiring Minnesota land to assist the Corps in construction of the Project on the Minnesota side of the river. (PPA at 4-5 (noting the Diversion Authority "shall acquire the real property interests" defined as "lands, easements, and rights-of-way").) Thus, as obtaining such land is necessary to accomplish the Project and these acts constitute "construct[ion], . . . transfer [of] ownership . . . , or . . . [a] change in a . . . dam . . . on public waters," the permitting requirements apply. Minn. Stat. § 103G.245, subd. 1. For these reasons, the DNR is likely succeed on its MERA claim against the Diversion Authority.

With regard to the second path to establishing a MERA claim, the Minnesota Supreme Court requires the Court to weigh five factors:

> (1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

> (2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

> (3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable (for example, by replanting trees or restocking fish);

> (4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed);

(5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action.

*Schaller*, 563 N.W.2d at 267.

The DNR and JPA rely on numerous findings the DNR made when denying the Permit to support its argument that the Diversion Authority's conduct is likely to have a materially adverse impact on Minnesota's environment. When denying the Permit, the DNR identified that the Project would reduce the stability of streams and rivers, result in the loss of fish connectivity, impact aquatic habitat, and encourage the spread of invasive species. (*See, e.g.*, DNR Permit Denial ¶ 48, at 10, 12-13.) The Diversion Authority does not directly respond to this argument by presenting competing evidence regarding the effect the Project will have on Minnesota's environment,[15] (*see* Diversion Authority's Mem. in Opp. to DNR's Mot. for Prelim. Inj. at 20 n.3, May 31, 2017, Docket No. 459),

---

[15] The Diversion Authority asks the Court not to consider this argument because the Diversion Authority was not permitted to seek expedited discovery on this issue. Specifically, the Diversion Authority asserts that the DNR and JPA cannot rely on the "materially adverse impact" claim to show a likelihood of success on the MERA claim because the DNR represented to the magistrate judge that no factual issues were presented as part of the motion for a preliminary injunction. But the record shows that, with the benefit of the DNR's and JPA's initial briefing on the motions for preliminary injunctions, the magistrate judge determined there were no grounds for expedited discovery. (Order at 2-5, May 4, 2017, Docket No. 436.) The magistrate judge made the decision knowing the DNR and JPA made arguments regarding "materially adverse impact" under MERA and, even so, used its discretion to deny the motion. (*Id.*; *see also* JPA's Mem. in Supp. of Mot. for Prelim. Inj. at 28-29, Mar. 30, 2017, Docket No. 414; DNR's Mem. in Supp. of Mot. for Prelim. Inj. at 18-20, Apr. 21, 2017, Docket 426.) Thus, the magistrate judge's decision does not impact the DNR's and JPA's claims that they are entitled to a preliminary injunction for their MERA claims on the ground of "materially adverse impact."

and, therefore, the Court finds the DNR and JPA have presented sufficient evidence to show a fair likelihood of success on the merits.

### d. Section 103G.135 – Merits

Finally, the DNR asserts that it is likely to prevail on its claim pursuant to Minn. Stat. § 103G.135. The statute provides:

> [u]pon application of the commissioner, the district court of a county where a project is entirely or partially located may by injunction enforce compliance with, or restrain the violation of, an order of the commissioner made under [chapter 103G] or chapter 103F, or restrain the violation of this chapter or chapter 103F.

The DNR contends the record shows the Diversion Authority is "undertak[ing] or procur[ing] another to undertake an alteration in the course, current, or cross section of public waters . . . after a permit to undertake the project has been denied" in violation of Minn. Stat. § 103G.141, subd. 1(3) and, therefore, the DNR is entitled to an injunction.

The Diversion Authority responds that, because there is a contested case hearing regarding the Permit denial, there is not a final order denying the Permit and an injunction could not be enforced. But the DNR correctly points out that section 103G.135 does not require a final order. It only limits injunctive relief to enforcing "**an order** of the commissioner." Minn. Stat. § 103G.135 (emphasis added). The Diversion Authority also argues this section does not apply because the Diversion Authority is only completing work in North Dakota so it is not in violation of the commissioner's order. But the Permit denial related to the "proposed Project" as a whole, not just the construction physically occurring in Minnesota. And, as discussed

above, the Diversion Authority is acquiring land in Minnesota to aid in construction of the project and Minnesota has an interest in regulating the Project.[16]

For these reasons, the Court finds the DNR and JPA have shown a fair likelihood of success on their claims against the Diversion Authority.

### C. Irreparable Harm

Next, for the Court to find that a preliminary injunction is appropriate, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). However, "the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

### 1. The DNR

The DNR asserts that it will suffer both procedural and substantive harm if the Court denies its motion for a preliminary injunction. The DNR argues that failed enforcement of the Permit denial is a cognizable procedural harm that will occur in the absence of a preliminary injunction. The DNR also asserts that it will suffer substantive

---

[16] Arguably, the DNR is entitled to an injunction on its section 103G.135 claim due to the Diversion Authority's failure to comply with the Permit denial by beginning construction on the Project. Because the Court finds an injunction is warranted under the *Dataphase* factors, it does not separately decide this issue.

harm in the form of reduced stream and river stability, loss of fish connectivity, harm to aquatic habitats, and the spread of invasive species in Minnesota that will result from the Project. (*See, e.g.*, DNR Permit Denial ¶ 48.)

The Corps argues the DNR's alleged procedural violation is insufficient because any injury to the DNR has already occurred. To support this proposition, the Corps cites *Am. Ass'n for Homecare v. Leavitt*, No. 08-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008). There, the court found an advocacy group representing healthcare businesses failed to show irreparable procedural harm when the U.S. Department of Health and Human Services initiated a program that excluded the advocacy group from a Medicare competitive bidding program. *Id.* at *1. Applying the stringent standard used in the District of Columbia, the court found the advocacy group failed to show irreparable harm. *Id.* at *4-5. The court reasoned that the advocacy group failed to show irreparable procedural harm, in part, because any procedural violation had "already occurred," as the bidding process had already resulted in the award of contracts. *Id.* at *2-3, 5.

This case is highly distinguishable from *Leavitt*. Not only does the Eighth Circuit apply a different legal standard, but the procedural violation in *Leavitt* had "already occurred" because "the government announced the winning bidders" before the advocacy group filed the complaint. *See id.* at *2. Thus, contracts were already awarded to other groups and the advocacy group's harm in not receiving a contract had already occurred and would not be remedied by a preliminary injunction. *Id.* at *5. In contrast, every day the Corps and the Diversion Authority construct the Project, there is a continuing violation of the Permit denial; the ongoing passage of time also reduces the opportunities

for the DNR to influence the final iteration of the Project. Finally, failure to comply with Minnesota law governing environmental permits "is a harm in and of itself" of a character not alleged in *Leavitt*. *See Dist. Court Order I*, 2015 WL 2251481, at *22.

The Corps also argues that the DNR failed to allege a substantive harm because nothing the Corps will do in the next nine months is irreparable. But the Court has already held that once the project begins, it creates the risk of a "steam roller" effect preventing the DNR from properly regulating the Project.[17] *Id.* at *14, 22, 24; *see also Appellate Court Order*, 826 F.3d at 1039 (holding procedural harm can be shown when it is difficult to stop "the specific iteration of the larger project once construction has begun"). And no one disputes that the Project itself – including actions taken on the North Dakota side of the river – will substantively impact Minnesota. Thus, the DNR alleged substantive harm from the Project.

The Diversion Authority also argues the DNR failed to allege substantive harm because no soil in Minnesota will be touched for at least two years. But, as discussed above, the Diversion Authority is purchasing land in Minnesota to assist in construction of the Project and any construction of a dam on the Red River will have an environmental effect on Minnesota. Thus, again, the DNR alleged substantive harm.

---

[17] The Diversion Authority argues the Court should not apply the "steam roller" doctrine because the Minnesota statutes do not require a permit before beginning construction. But Minnesota law requires that the Diversion Authority obtain a permit prior to constructing a dam in Minnesota. *See* Minn. Stat. § 103G.245, subd. 1. Thus, there is a temporal requirement for obtaining a permit.

For these reasons, the Court finds the DNR presented sufficient evidence of irreparable injury to warrant a preliminary injunction.

## 2.    JPA

JPA also asserts that it will be procedurally injured if the Corps and the Diversion Authority proceed without compliance with state law. JPA also argues it will be injured because the public process of requiring Minnesota permits will be undermined.

The Corps correctly points out that procedural harm alone, without some effect on the litigant's concrete interest, is not sufficient to show irreparable harm, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009), and that JPA must "show irreparable harm to" itself, *Appellate Court Order*, 826 F.3d at 1037. Thus, the harm Minnesota suffers because state law is undermined is not the same as the harm to JPA. But the Eighth Circuit has already affirmed that JPA has specific environmental interests that will be undermined if the Corps and the Diversion Authority construct the Project prior to compliance with Minnesota's laws and regulations. *See id.* ("JPA's specific environmental interests [are] sufficient to support a preliminary injunction. The procedural harm identified . . . was the [Diversion] Authority's continued work on 'an integral part of the diversion project prior to the completion of the MDNR's environmental review.' This construction, prior to completing the review, could be presumed to risk real environmental harm.").

Further, while JPA made somewhat vague assertions regarding the substantive harm that JPA will suffer should construction continue, as part of the motion for a

preliminary injunction JPA submitted a declaration from Marcus Larson, a resident of Bakke, North Dakota. (Decl. of Marcus Larson, Mar. 30, 2017, Docket No. 415.) In that document, Larson documents that the North Dakota communities of Hickson and Bakke currently have few flooding-related issues (*id.* ¶¶ 4; 9(a)), the new dam will create flooding-related issues (*id.* ¶¶ 6, 9(b)), the Project will create a wet pond that "will be a stagnant nuisance" (*id.* ¶ 9(b)), and the Project will "deflat[e] property values" in the community (*id.* ¶ 9(d)). Here, "the construction . . . is critically tied to that eventual harm" discussed by Larson because the specific configuration of the Project, if completed, will have a certain and significant impact on citizens in Hickson, Bakke, and elsewhere. *Dist. Court Order I*, 2015 WL 2251481, at *23. "That certain and significant impact will no doubt have immediate consequences in terms of property value, at a minimum." *Id.*

For these reasons, the Court finds JPA presented sufficient evidence of both procedural and substantive harm to show irreparable injury warranting a preliminary injunction.

### D.     Balance of the Harms

With regard to the balance of the harms, the Court acknowledges that a delay in construction will result in extending the time it takes to complete the Project. The Court further understands the risk of flood exposure faced by the Fargo-Moorhead community and that a delay may result in higher construction costs. But those harms are outweighed by the harm the DNR and JPA will suffer if the DNR's orders are not enforced and the damage Minnesota will suffer if the Project moves forward without ensuring compliance

with Minnesota law. And, at the end of the day, if construction proceeds too far, any ultimate decision of the DNR will have no meaning because the parties will no longer be able to modify the specific iteration of the Project.

### E. Public Interest

"Finally, before granting a preliminary injunction, the Court must also consider the public interest." *Dist. Court Order I*, 2015 WL 2251481, at *24. Here, the Court finds the public interest aligns with the DNR and JPA. While the Fargo-Moorhead community will certainly benefit from permanent flood protection once the Project is complete, Minnesota must have the authority to adequately protect its citizens and ensure non-Federal interests comply with state law when engaging in projects that impact Minnesota waters. Had Congress intended to circumvent Minnesota laws and regulations in order to ensure fast construction of the Project, it could have fashioned the authorization in a way that avoided Minnesota's regulatory requirements. Instead, Congress has repeatedly indicated its intent that the Project comply with Minnesota's laws and regulations and, therefore, as Congress made this express statement, the public interest weighs in favor of granting the motions for a preliminary injunction.

### F.    Conclusion

After weighing the *Dataphase* factors, the Court will grant the DNR's and JPA's motions for preliminary injunctions. At this time, the Court will enjoin all construction of the Project. If portions of the Project construction have no impact on Minnesota's waterways, the Court will consider requests to allow that construction to go forward.

Ultimately, at this stage, the Court finds the DNR and JPA are likely succeed on their claims that the Project must comply with Minnesota laws and regulations – including obtaining necessary permits – prior to construction. Construction of the Project prior to compliance with state law creates a real risk of the "steam roller" effect, making it difficult for the DNR to require modifications to mitigate damages to Minnesota. Under these circumstances, "justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

## III.    MOTION FOR SANCTIONS

JPA requests that the Court postpone decision on the motions to dismiss and motions for a preliminary injunction until the parties supplement the record and provide supplemental briefing. According to JPA, the Corps and the Diversion Authority violated Fed. R. Civ. P. 26 when they disclosed certain documents two days after the hearing on the pending motions to dismiss and motions for preliminary injunctions. (JPA's Mem. in Supp. of Mot. for Rule 37(c)(1) Sanctions and Leave to Suppl. at 11-14, Aug. 4, 2017, Docket No. 507.) JPA asserts the new documents undermine the Corps' and the Diversion Authority's arguments regarding WRRDA-2014 and NEPA. (*Id.* at 4.)

Rule 37(c)(1) provides that

> If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: . . . may impose other appropriate sanctions."

The Court "has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case."  *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008).

Here, JPA seeks sanctions in the form of postponing decision on the motions and providing an opportunity to supplement the record.  Having reviewed the documents submitted by JPA, (*see* Von Korff Decl., Exs. 1-7), even assuming the Court found the Corps and the Diversion Authority failed to comply with Rule 26, the submitted documents would not change the Court's analysis of the WRRDA-2014 or NEPA claims. The Court, therefore, finds it unnecessary to sanction the Corps or the Diversion Authority at this time by postponing decision on the pending motions.  *See Dist. Court Order III*, 2017 WL 740994, at *2 ("The Court intends to move this case along as expeditiously as possible.").  If however evidence is discovered at a later date showing discovery violations, the Court will entertain a renewed motion for sanctions.

## CONCLUSION

There is no question that communities along the Red River, particularly Fargo and Moorhead, need permanent flood protection.  Severe flooding in recent years has left little doubt that a river flowing north in a cold climate at the bottom of a large flat basin

will overflow its banks if snowmelt, rainfall, and temperature collide in a manner that causes water to pool behind ice that is blocking the water's path to the north. Proponents of the Project are well-intentioned in their push to begin construction and quite properly fear the impact of another severe flood. And opponents quite properly fear environmental degradation and significant loss of value of lands behind the proposed dam.

But in the Court's view, the law is clear: Congress has required that all necessary state and local permits be obtained prior to construction. Congress clearly has the power to exempt a project from state permitting requirements, but it has not done so. And the State of Minnesota has **not** approved permits that are absolutely necessary for a project of this magnitude along a major border waterway, a project which clearly impacts the waters and lands of both North Dakota and Minnesota. The result in this case would be the same if North Dakota was opposing a similar border project being proposed by Minnesota. The presence of the Corps and the difficult jurisdictional complexities caused by the unusual combination of federal and non-federal actors working together on the Project does not change this basic fact. The Court strongly encourages all parties to work to agree on a flood protection project that can serve the interests of both states and the affected communities. It is time for all parties to work together to find common ground.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED:**

1.  Defendant-Intervenor Fargo-Moorhead Flood Diversion Board of Authority's (the "Diversion Authority") Motion to Dismiss [Docket No. 451] is **GRANTED**. Count IV of Richland/Wilkin Joint Powers Authority's ("JPA") Fourth Amended Complaint [Docket No. 419] as applied to the Diversion Authority is **DISMISSED with prejudice**.

2.  Defendant U.S. Army Corps of Engineers' (the "Corps") Motion to Dismiss [Docket No. 445] is **GRANTED in part** and **DENIED in part** as follows:

    a.  The motion is **GRANTED** with respect to Count I in JPA's Fourth Amended Complaint [Docket No. 419]. This claim is **DISMISSED with prejudice**.

    b.  The motion is **DENIED** in all other respects.

3.  Plaintiff JPA's Motion for a Preliminary Injunction [Docket No. 412] and Plaintiff-Intervenor Minnesota Department of Natural Resources' (the "DNR's") Motion for a Preliminary Injunction [Docket No. 425] are **GRANTED**. The Clerk shall enter judgment on this motion.

    a.  The Corps and the Diversion Authority and all other individuals or entities acting in concert with the Corps and the Diversion Authority shall cease and desist all construction work on the Fargo-Moorhead Flood Risk Management Project ("Project") until further order of the Court.

b. If portions of Project construction have no impact on Minnesota's waterways, the Court will consider requests to allow certain construction to go forward.

c. In accordance with Fed. R. Civ. P. 65(c), the preliminary injunction shall become effective upon the DNR's and JPA's posting a bond with the Clerk of Court in the amount of Ten Thousand Dollars ($10,000.00) for the payment of such costs and damages as may be incurred or suffered by the Corps and the Diversion Authority in the event the Corps and the Diversion Authority are found to have been wrongfully enjoined.

4. Plaintiff JPA's Motion for Sanctions [Docket No. 505] is **DENIED**.


DATED:  September 7, 2017                  _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                              Chief Judge
                                               United States District Court